# UNITED STATES BANKRUPTCY COURT
# SOUTHERN DISTRICT OF NEW YORK

|  |  |
|---|---|
| In re: | ) Chapter 11 |
|  | ) |
| ION MEDIA NETWORKS, INC., *et al.*, | ) Case No. 09-13125 (JMP) |
|  | ) |
| Debtors. | ) Joint Administration Requested |
|  | ) |

**FINAL ORDER (I) AUTHORIZING POSTPETITION SECURED
FINANCING PURSUANT TO 11 U.S.C.§§ 105(a),
361, 362, 364(c)(1), 364(c)(2), 364(c)(3), 364(d)(1) AND 364(e),
(II) AUTHORIZING THE DEBTORS' USE OF CASH COLLATERAL
PURSUANT TO 11 U.S.C. § 363, AND (III) GRANTING
ADEQUATE PROTECTION PURSUANT TO 11 U.S.C. §§ 361, 363 AND 364**

Upon the Motion dated May 19, 2009 (as supplemented on June 25, 2009 [D.E. #100]

and June 30, 2009 [D.E. #118], the "***Motion***") of ION Media Networks, Inc. ("***ION***") and its

affiliated debtors, each as a debtor and debtor in possession (collectively, the "***Debtors***")[1] in the

---

[1] The Debtors in these chapter 11 cases are: ION Media Networks, Inc.; America 51, L.P.; ION Media Akron License, Inc.; ION Media Albany License, Inc.; ION Media Atlanta License, Inc.; ION Media Battle Creek License, Inc.; ION Media Boston License, Inc.; ION Media Brunswick License, Inc.; ION Media Buffalo License, Inc.; ION Media Charleston License, Inc.; ION Media Chicago License, Inc.; ION Media Dallas License, Inc.; ION Media Denver License, Inc.; ION Media Des Moines License, Inc.; ION Media Entertainment, Inc.; ION Media Greensboro License, Inc.; ION Media Greenville License, Inc.; ION Media Hartford License, Inc.; ION Media Hawaii License, Inc.; ION Media Hits, Inc.; ION Media Holdings, Inc.; ION Media Houston License, Inc.; ION Media Indianapolis License, Inc.; ION Media Jacksonville License, Inc.; ION Media Kansas City License, Inc.; ION Media Knoxville License, Inc.; ION Media Lexington License, Inc.; ION Media License Company, LLC; ION Media Los Angeles License, Inc.; ION Media LPTV, Inc.; ION Media Management Company.; ION Media Martinsburg License, Inc.; ION Media Memphis License, Inc.; ION Media Milwaukee License, Inc.; ION Media Minneapolis License, Inc.; ION Media New Orleans License, Inc.; ION Media of Akron, Inc.; ION Media of Albany, Inc.; ION Media of Atlanta, Inc.; ION Media of Battle Creek, Inc.; ION Media of Birmingham, Inc.; ION Media of Boston, Inc.; ION Media of Brunswick, Inc.; ION Media of Buffalo, Inc.; ION Media of Cedar Rapids, Inc.; ION Media of Charleston, Inc.; ION Media of Chicago, Inc.; ION Media of Dallas, Inc.; ION Media of Denver, Inc.; ION Media of Des Moines, Inc.; ION Media of Detroit, Inc.; ION Media of Fayetteville, Inc.; ION Media of Greensboro, Inc.; ION Media of Greenville, Inc.; ION Media of Hartford, Inc.; ION Media of Honolulu, Inc.; ION Media of Houston, Inc.; ION Media of Indianapolis, Inc.; ION Media of Jacksonville, Inc.; ION Media of Kansas City, Inc.; ION Media of Knoxville, Inc.; ION Media of Lexington, Inc.; ION Media of Los Angeles, Inc.; ION Media of Louisville, Inc.; ION Media of Martinsburg, Inc.; ION Media of Memphis, Inc.; ION Media of Miami, Inc.; ION Media of Milwaukee, Inc.; ION Media of Minneapolis, Inc.; ION Media of Nashville, Inc.; ION Media of New Orleans, Inc.; ION Media of New York, Inc.; ION Media of Norfolk, Inc.; ION Media of Oklahoma City, Inc.; ION

above-captioned cases (the "***Cases***"), pursuant to sections 105, 361, 362, 363(b), 363(c)(2), 364(c)(1), 364(c)(2), 364(c)(3), 364(d)(1), and 364(e) of the Bankruptcy Code, and Rules 2002, 4001, 6004 and 9014 of the Federal Rules of Bankruptcy Procedure (the "***Bankruptcy Rules***"), seeking, among other things:

(a)     authorization for ION, in its capacity as borrower (the "***Borrower***"), to obtain postpetition financing (the "***Financing***") and for each of the other Debtors to guarantee unconditionally (the "***Guarantors***"), on a joint and several basis, the Borrower's obligations in connection with the Financing, consisting of a superpriority priming multiple draw term loan facility in an aggregate principal amount of up to $150,000,000 in respect of new money funding (the "***DIP Loans***");

(b)     authorization for the Debtors to execute and deliver all final documentation consistent with the terms and conditions of the Financing and that certain Debtor In Possession Credit Agreement dated as of [•], 2009, among ION Media Networks, Inc., the subsidiary guarantors, the lenders party thereto (collectively, the "***DIP Lenders***"), and Wilmington Trust

---

Media of Orlando, Inc.; ION Media of Philadelphia, Inc.; ION Media of Phoenix, Inc.; ION Media of Portland, Inc.; ION Media of Providence, Inc.; ION Media of Raleigh, Inc.; ION Media of Roanoke, Inc.; ION Media of Sacramento, Inc.; ION Media of Salt Lake City, Inc.; ION Media of San Antonio, Inc.; ION Media of San Jose, Inc.; ION Media of Scranton, Inc.; ION Media of Seattle, Inc.; ION Media of Spokane, Inc.; ION Media of Syracuse, Inc.; ION Media of Tampa, Inc.; ION Media of Tulsa, Inc.; ION Media of Washington, Inc.; ION Media of Wausau, Inc.; ION Media of West Palm Beach, Inc.; ION Media Oklahoma City License, Inc.; ION Media Orlando License, Inc.; ION Media Philadelphia License, Inc.; ION Media Portland License, Inc.; ION Media Publishing, Inc.; ION Media Raleigh License, Inc.; ION Media Sacramento License, Inc.; ION Media Salt Lake City License, Inc.; ION Media San Antonio License, Inc.; ION Media San Jose License, Inc.; ION Media Scranton License, Inc.; ION Media Songs, Inc.; ION Media Spokane License, Inc.; ION Media Syracuse License, Inc.; ION Media Television, Inc.; ION Media Tulsa License, Inc.; ION Media Washington License, Inc.; ION Media Wausau License, Inc.; ION Media West Palm Beach Holdings, Inc.; ION Media West Palm Beach License, Inc.; ION Television Net, Inc.; Ocean State Television, L.L.C.; Open Mobile Ventures Corporation.  The location of the corporate headquarters for all Debtors except ION Media of New York, Inc. is: 601 Clearwater Park Road, West Palm Beach, Florida  33401-6233.  The location of the corporate headquarters for ION Media of New York, Inc. and the service address for all of the Debtors is:  1330 Avenue of the Americas, New York, New York  10019.  Information regarding the Debtors' business, their pre-arranged restructuring and the background of these chapter 11 cases can be found in the Declaration of R. Brandon Burgess, Chairman, President and Chief Executive Officer of ION Media Networks, Inc., In Support Of First Day Pleadings (the "***First Day Declaration***"), filed on May 19, 2009, the date the Debtors filed their petitions (the "***Petition Date***") under chapter 11 of title 11 of the United States Code (the "***Bankruptcy Code***").

FSB, as administrative and collateral agent (in such capacity, the "***DIP Agent***") (as amended, restated or otherwise modified from time to time in accordance with the terms thereof, the "***DIP Credit Agreement***"; together with all agreements, documents, and instruments delivered or executed in connection therewith, the "***DIP Documents***"), which DIP Credit Agreement shall be in substantially the same form attached hereto as <u>Exhibit A</u>, and to perform such other and further acts as may be required in connection with the DIP Credit Agreement or other DIP Documents;

(c)     authorization for the Debtors to use proceeds of the Financing and Cash Collateral (as defined below) to provide working capital for, and for other general corporate purposes of, the Debtors, including for payment of any adequate protection obligations as set forth herein;

(d)     the granting of adequate protection to the secured parties whose liens and security interests under the following documents are being primed by the Financing (collectively, the "***Existing Primed Secured Facilities***"):

(i)     the Term Loan Agreement dated as of December 30, 2005 (as amended, restated, supplemented or otherwise modified from time to time, the "***Prepetition Term Credit Facility***"), among ION (formerly known as Paxson Communications Corporation), the subsidiary guarantors party thereto, Wells Fargo Bank, N.A., as successor administrative agent (the "***Prepetition Agent***"), and the lenders party thereto ("***Prepetition Term Lenders***");

(ii)     the indenture dated as of December 30, 2005 (as amended, restated, supplemented or otherwise modified from time to time, the "***First Priority Indenture***") among ION (formerly known as Paxson Communications Corporation), the subsidiary guarantors party thereto, and The Bank of New York Mellon Trust Company, NA

(formerly known as the Bank of New York Trust Company, NA), as trustee (the "***First Priority Notes Trustee***"), governing the Floating Rate First Priority Senior Secured Notes due 2012 (the "***First Priority Notes***" and the holders of the First Priority Notes being the "***First Priority Noteholders***");

(iii)     the indenture dated as of December 30, 2005 (as amended, restated, supplemented or otherwise modified from time to time, the "***Second Priority Indenture***") among ION (formerly known as Paxson Communications Corporation), the subsidiary guarantors party thereto, Manufacturers and Traders Trust Company, as successor trustee to The Bank of New York Mellon Trust Company, NA, as trustee (the "***Second Priority Notes Trustee***" and, together with the First Priority Notes Trustee, the "***Indenture Trustees***"), governing the Floating Rate Second Priority Senior Secured Notes due 2013 (the "***Second Priority Notes***" and the holders of the Second Priority Notes being the "***Second Priority Noteholders***" and, together with the First Priority Noteholders, the "***Noteholders***");

(iv)     (a)     that certain ISDA Master Agreement   (the "***Goldman Master Agreement***"), dated February 22, 2006 among Goldman Sachs Capital Markets, L.P., ION and certain subsidiaries of ION, as amended and supplemented by a Schedule to the Master Agreement, dated February 22, 2006 and two Confirmations, each dated February 22, 2006, in the notional amounts of $326,250,000 and $182,250,000 and (b) that certain ISDA Master Agreement (the "***UBS Master Agreement***" and, together with the Goldman Master Agreement, the "***Master Agreements***"), dated February 22, 2006 among UBS AG, ION and certain subsidiaries of ION, as amended and supplemented by a Schedule to the Master Agreement, dated February 22, 2006 and two Confirmations, each dated February

22, 2006, in the notional amounts of $398,750,000 and $222,750,000 (such amounts owed under the Master Agreements being the "***First Priority Secured Swap Claims***" and the holders of the Prepetition Hedges being the "***Swap Claim Holders***" and, collectively, with the Prepetition Term Lenders and the Noteholders, the "***Prepetition Secured Debt Holders***"); and

(v)     that certain Pledge and Security Agreement dated December 30, 2005 (as the same may have been amended, supplemented, restated or otherwise modified on or prior to the Petition Date, the "***Prepetition Pledge and Security Agreement***") by and between ION (formerly known as Paxson Communications Corporation), each of the other grantors party to the Prepetition Pledge and Security Agreement referred to therein, The Bank of New York Mellon Trust Company, NA, as collateral agent (the "***Collateral Agent***"), the First Priority Notes Trustee, the Second Priority Notes Trustee and the Prepetition Agent.

(e)     authorization for the Debtors to use Cash Collateral in which the Prepetition Secured Debt Holders, the Prepetition Agent, the Indenture Trustees and the Collateral Agent (collectively, the "***Adequate Protection Parties***") may have an interest and the granting of adequate protection to the Adequate Protection Parties with respect to, among other things, such use of their Cash Collateral and use and diminution in the value of the Prepetition Collateral (as defined below);

(f)     the granting of valid, enforceable, non-avoidable and fully perfected first priority priming liens on and senior security interests in all of the property, assets and other interests in property and assets of the Debtors, whether such property is presently owned or after-acquired, and all other "property of the estate" (within the meaning of the Bankruptcy Code) of the

Debtors, of any kind or nature whatsoever, real or personal, tangible, intangible or mixed, now existing or hereafter acquired or created, whether existing prior to or arising after the Petition Date, excluding Avoidance Actions (as defined below) and the proceeds thereof, subject only to the Carve-Out (as defined below) on the terms and conditions set forth herein and in the DIP Documents;

(g)     the granting of superpriority administrative expense claims to the DIP Agent and the DIP Lenders pursuant to Bankruptcy Code section 364(c)(1) with respect to the DIP Obligations (as defined below) over any and all administrative expenses of any kind or nature including, without limitation, the kinds specified in or arising or ordered under sections 105(a), 326, 328, 330, 331, 503(b), 506(c), 507, 546(c), 726, 1113 and 1114, subject and subordinate only to the payment of the Carve-Out on the terms and conditions set forth herein and in the DIP Documents; and

(h)     the limitation of the Debtors' and the estates' right to surcharge against the Prepetition Collateral pursuant to Bankruptcy Code section 506(c);

Due and appropriate notice of the Motion, the relief requested therein and the Interim Hearing having been served by the Debtors on, among others, (i) the Office of the United States Trustee for the Southern District of New York (the "***United States Trustee***"), (ii) counsel to the DIP Agent and the DIP Lenders, (iii) counsel to any known secured creditor of record, (iv) the Prepetition Agent, (v) the Collateral Agent, (vi) the Indenture Trustees, (vii) the fifty (50) largest unsecured creditors of the Debtors, (viii) any party asserting liens against any of the Debtors' assets, (ix) the Internal Revenue Service, and (x) the Securities and Exchange Commission in compliance with Bankruptcy Rules 4001(b) and (c) and the Local Rules of the United States Bankruptcy Court for the Southern District of New York (the "***Local Bankruptcy Rules***").

The Interim Hearing having been held by this Court on May 21, 2009, and this Court having entered an interim order dated June 2, 2009 (the "*Interim Order*") that, among other things, (i) authorized (a) the Borrower, on an interim basis, to borrow from the DIP Lenders under the debtor-in-possession credit agreement attached as Exhibit A to the Interim Order up to an aggregate principal amount not to exceed $25 million in DIP Loans and (ii) authorized each Guarantor to guaranty the DIP Obligations (as defined below) of the Borrower; (iii) authorized the Debtors' use of Cash Collateral (as defined below), (iv) granted the adequate protection described in the Interim Order, and (v) scheduled a final hearing (the "*Final Hearing*") to consider entry of a final order (the "*Final Order*") authorizing the balance of the borrowings under the DIP Documents on a final basis, as set forth in the Motion and the DIP Documents, which Interim Order was subsequently extended through and including July 1, 2009, pursuant to the Court's bridge order dated June 23, 2009.

The Supplement to the Motion (the "*Supplement*"), together with the amended and restated DIP Credit Agreement, having been filed with this Court on June 25, 2009.

The Second Supplement to the Motion (the "*Second Supplement*" and together with the Supplement, the "*Supplements*"), together with the further amended and restated DIP Credit Agreement, having been filed with this Court on June 30, 2009.

The Declaration of Steven G. Panagos in Support of Debtors' Motion for Interim and Final Orders (I) Authorizing Postpetition Secured Financing Pursuant to 11 U.S.C. §§ 105(a), 361, 362, 364(c)(1), 364(c)(2), 364(c)(3), 364(d)(1) and 364(e), (II) Authorizing the Debtors' Use of Cash Collateral Pursuant to 11 U.S.C. § 363, (III) Granting Adequate Protection Pursuant to 11 U.S.C. §§ 361, 363 and 364 and (IV) Scheduling a Final Hearing Pursuant to Bankruptcy Rules 4001(b) and 4001(c) having been filed on May 20, 2009 [D.E. # 19].

The Supplemental Declaration of Steven G. Panagos in Support of Debtors' Motion for Interim and Final Orders (I) Authorizing Postpetition Secured Financing Pursuant to 11 U.S.C. §§ 105(a), 361, 362, 364(c)(1), 364(c)(2), 364(c)(3), 364(d)(1) and 364(e), (II) Authorizing the Debtors' Use of Cash Collateral Pursuant to 11 U.S.C. § 363, (III) Granting Adequate Protection Pursuant to 11 U.S.C. §§ 361, 363 and 364 and (IV) Scheduling a Final Hearing Pursuant to Bankruptcy Rules 4001(b) and 4001(c) having been filed on June 30, 2009 [D.E. # 119].

The Declaration of R. Brandon Burgess, Chairman, President and Chief Executive Officer of ION Media Networks, Inc., in Support of Debtors' Motion for Interim and Final Orders (I) Authorizing Postpetition Secured Financing Pursuant to 11 U.S.C. §§ 105(a), 361, 362, 364(c)(1), 364(c)(2), 364(c)(3), 364(d)(1) and 364(e), (II) Authorizing the Debtors' Use of Cash Collateral Pursuant to 11 U.S.C. § 363, (III) Granting Adequate Protection Pursuant to 11 U.S.C. §§ 361, 363 and 364 and (IV) Scheduling a Final Hearing Pursuant to Bankruptcy Rules 4001(b) and 4001(c) having been filed on June 30, 2009 [D.E. # 120].

Due and appropriate notice of the Motion, the Supplements, the final relief requested therein and the Final Hearing, as well as the Interim Order, having been served by the Debtors upon the notice parties in accordance with the terms of the Interim Order (the "***Interim Order Notice Parties***") and, with respect to the Supplements, served on counsel for the statutory committee of unsecured creditors appointed in these chapter 11 cases (the "***Creditors' Committee***") and Cyrus Select Opportunities Master Fund Ltd. ("***Cyrus***," and, together with the Interim Order Notice Parties and the Creditors' Committee, the "***Notice Parties***").

Upon the record made by the Debtors and other parties in interest at the Interim Hearing and at the Final Hearing, and the Court having considered the various objections to the Motion as supplemented by the Supplements, including the Limited Objection of Cyrus Select

8

Opportunities Master Fund Ltd. [D.E. #71] and the supplement to Cyrus' objection [D.E. #115] (together, the "**Cyrus Objection**") and the objection of the Creditors' Committee [D.E. #114], which objection was resolved on the record at the Final Hearing with such modifications reflected herein; and after due deliberation and consideration and sufficient cause appearing therefor;

IT IS FOUND, DETERMINED, ORDERED AND ADJUDGED, that:

1.     *Disposition*.  The Motion is granted on a final basis in accordance with the terms of this Final Order.  Except as may otherwise be provided herein, [JMP 07/06/09] ~~A~~any objections to the Motion or the Supplements with respect to the entry of this Final Order, including, without limitation, the Cyrus Objection, that have not been withdrawn, waived or settled, and all reservation of rights included therein, are hereby denied and overruled.

2.     *Jurisdiction*.  This Court has core jurisdiction over the Cases commenced on May 19, 2009 (the "**Petition Date**"), the Motion, and the parties and property affected hereby pursuant to 28 U.S.C. §§ 157(b) and 1334.  Venue is proper before this Court pursuant to 28 U.S.C. §§ 1408 and 1409.  The statutory predicates for the relief granted herein are Bankruptcy Code sections 105, 361, 362, 363 and 364 and Bankruptcy Rules 2002, 4001, 6004 and 9014 and the Local Bankruptcy Rules.

3.     *Notice*.  Under the circumstances, the notice given by the Debtors of the Motion, the relief requested therein, the Interim Hearing, the Interim Order and the Final Hearing constitutes due and sufficient notice thereof and complies with Bankruptcy Rules 4001(b) and (c) and the Local Bankruptcy Rules, and no further notice of the relief sought at the Final Hearing and the relief granted herein is necessary or required.

4. *Debtors' Stipulations*. Subject to the rights of any other party (including the Creditors' Committee) to among other things, challenge the validity, priority, perfection and enforceability of the Existing Primed Secured Facilities (and specifically subject in all respects to paragraph 23 below), the Debtors admit, stipulate, and agree that:

(a) As of the Petition Date:

(i) The Debtors were party to or otherwise obligated under the Prepetition Term Credit Facility, without defense, counterclaim or offset of any kind, and were indebted and liable to the Prepetition Term Lenders in the aggregate principal amount of approximately $325 million in respect of loans outstanding thereunder, exclusive of accrued and unpaid interest, premium, if any, and certain fees, costs, expenses, charges and all other obligations incurred in connection therewith as provided by the Prepetition Term Credit Facility (collectively, the "***Term Loan Debt***"), which Term Loan Debt is secured by first priority liens on and security interests in substantially all of the Debtors' assets (the "***Term Loan Collateral***");

(ii) The Debtors were party to or otherwise obligated under the First Priority Indenture, without defense, counterclaim or offset of any kind, and were jointly and severally indebted and liable to the First Priority Noteholders in the aggregate principal amount of approximately $400 million in respect of the First Priority Notes, exclusive of accrued and unpaid interest, premium, if any, and certain fees, costs, expenses, charges and all other obligations incurred in connection therewith as provided in the First Priority Indenture (the "***First Priority Note Debt***"), which First Priority Note Debt is secured by first priority

liens on and security interests in substantially all of the Debtors' assets (the "***First Priority Note Collateral***");

(iii)     The Debtors were party to or otherwise obligated under the Second Priority Indenture, without defense, counterclaim or offset of any kind, and were jointly and severally indebted and liable to the Second Priority Noteholders in the aggregate principal amount of approximately $448 million in respect of the Second Priority Notes, exclusive of accrued and unpaid interest, premium (if any) and certain fees, costs, expenses, charges and all other obligations incurred in connection therewith as provided in the Second Priority Indenture (the "***Second Priority Note Debt***"), which Second Priority Note Debt is secured by second priority liens on and security interests in substantially all of the Debtors' assets (the "***Second Priority Note Collateral***"); and

(iv)     The Debtors were party to or otherwise obligated under the Master Agreements, without defense, counterclaim or offset of any kind, and were jointly and severally indebted and liable to the Swap Claim Holders in the aggregate principal amount of approximately $121 million in respect of the Prepetition Hedges, exclusive of accrued and unpaid interest and certain fees, costs, expenses, charges and all other obligations incurred in connection therewith as provided in the Master Agreements (the "***Swap Debt***" and, together with the Term Loan Debt and the First Priority Note Debt, the "***First Lien Debt***" and, together with the Second Priority Note Debt, the "***Prepetition Secured Debt***"), which Swap Debt is secured by first priority liens on and security interests in substantially all of the Debtors' assets (the "***Prepetition Hedge Collateral***" and, together with the Term

Loan Collateral, the First Priority Note Collateral and the Second Priority Note Collateral, the "***Prepetition Collateral***").

(b)     The Prepetition Secured Debt constitutes the legal, valid and binding obligations of the Debtors as set forth in the Prepetition Term Credit Facility, the First Priority Indenture, the Second Priority Indenture and the Master Agreements (collectively referred to as the "***Prepetition Loan Documents***"), enforceable in accordance with their terms (other than in respect of the stay enforcement arising from Bankruptcy Code section 362).

(c)     No portion of the Prepetition Secured Debt or any payment made to the Prepetition Agent, the Indenture Trustees, the Collateral Agent or the Prepetition Secured Debt Holders or applied to obligations owing under the Prepetition Loan Documents prior to the Petition Date is subject to avoidance, recharacterization, recovery, subordination, attack, offset, counterclaim, defense or "claim" (as such term is defined in the Bankruptcy Code) of any kind pursuant to the Bankruptcy Code or other applicable law.

(d)     Each Debtor hereby forever waives and releases any and all "claims" (as such term is defined in the Bankruptcy Code), counterclaims, causes of action, defenses or setoff rights against the Adequate Protection Parties, whether arising at law or in equity, including any recharacterization, subordination, avoidance or other claim arising under or pursuant to section 105 or chapter 5 of the Bankruptcy Code or under any other similar provisions of applicable state or federal law.

(e)     The security interests granted to the Collateral Agent on the Prepetition Collateral (collectively, the "***Prepetition Security Interests***") in connection with the

Prepetition Loan Documents and pursuant to the Prepetition Pledge and Security Agreement, including, without limitation, all security agreements, pledge agreements, mortgages, deeds of trust and other security documents executed by any of the Debtors in favor of the Collateral Agent (collectively, the "***Prepetition Collateral Documents***"), for the benefit of the Adequate Protection Parties, are (i) valid, binding, perfected and enforceable liens and security interests in the real and personal property described in the Prepetition Collateral Documents, (ii) not, pursuant to the Bankruptcy Code or other applicable law, subject to avoidance, recharacterization, recovery, subordination, attachment, offset, counterclaim, defense or "claim" (as such term is defined in the Bankruptcy Code) of any kind and (iii) subject and subordinate only to (A) the DIP Liens (as defined below), (B) the Carve-Out and (C) valid, perfected and unavoidable liens and security interests permitted under the applicable Prepetition Loan Documents, but only to the extent that such liens and security interests are permitted by the applicable Prepetition Loan Documents to be senior to or *pari passu* with the applicable Prepetition Security Interests.

(f)     The foregoing admissions, stipulations and agreements are not findings of the Court and are not binding on the Court or on any other party in interest.     [JMP 07/06/09]

5.     *Findings Regarding the Financing.*

(a)     Good cause has been shown for the entry of this Final Order.

(b)     The Debtors have an immediate need to obtain the Financing and to use the Cash Collateral to, among other things, (i) permit the orderly continuation of their businesses; (ii) maintain business relationships with vendors, suppliers, carriers, and

customers of the Debtors; (iii) make payroll; (iv) make capital expenditures; (v) make adequate protection payments and (vi) pay the costs of administration of their estates and satisfy other working capital and general corporate purposes of the Debtors. The ability of the Debtors to obtain sufficient working capital and liquidity through the use of Cash Collateral, incurrence of the new indebtedness for borrowed money and other financial accommodations is vital to the preservation and maintenance of the going concern values of the Debtors and to the Debtors' successful reorganization.

(c)     The Debtors believe the financing proposed to be provided by the DIP Lenders is the most favorable financing available, in accordance with the terms and conditions set forth in the DIP Documents and the Debtors are unable to obtain adequate unsecured credit allowable under Bankruptcy Code section 503(b)(1) as an administrative expense. The Debtors are also unable to obtain secured credit allowable under Bankruptcy Code sections 364(c)(1), 364(c)(2), and 364(c)(3) for the purposes set forth in the DIP Documents without the Debtors granting to the DIP Agent and the DIP Lenders, subject to the Carve-Out and excluding Avoidance Actions and any proceeds thereof as provided for herein, the DIP Liens and the Superpriority Claims (as defined below) under the terms and conditions set forth in this Final Order and the DIP Documents.

(d)     The terms of the Financing, the DIP Documents and the use of Cash Collateral are fair and reasonable, reflect the Debtors' exercise of prudent business judgment consistent with their fiduciary duties and constitute reasonably equivalent value and fair consideration. [JMP 07/06/09]

14

(e)     The Financing has been negotiated in good faith and at arm's length among the Debtors, the DIP Agent, and the DIP Lenders, and all of the Debtors' obligations and indebtedness arising under, in respect of, or in connection with the Financing and the DIP Documents and the rights granted in the Interim Order, including without limitation, all loans made to and guarantees issued by the Debtors pursuant to the DIP Documents and all other obligations under the DIP Documents (collectively, the "**DIP Obligations**"), shall be deemed to have been extended by the DIP Agent and the DIP Lenders and their affiliates in good faith, as that term is used in Bankruptcy Code section 364(e), and in express reliance upon the protections offered by Bankruptcy Code section 364(e), and the DIP Obligations, the DIP Liens and the Superpriority Claims shall be entitled to the full protection of Bankruptcy Code section 364(e) in the event that this Final Order or any provision hereof is vacated, reversed, or modified, on appeal or otherwise.

(f)     Absent granting the relief sought by this Final Order, the Debtors' estates will be immediately and irreparably harmed. Consummation of the Financing and authorization of the use of the Prepetition Collateral (including the Cash Collateral) in accordance with this Final Order and the DIP Documents are, therefore, in the best interests of the Debtors' estates and are consistent with the Debtors' fiduciary duties.

6.     *Authorization of the Financing and the DIP Documents.*

(a)     The Debtors were by the Interim Order and hereby are expressly authorized and empowered to execute, deliver, and, on such execution and delivery, directed to perform under the DIP Documents, including the DIP Credit Agreement (as modified) and as modified hereunder, and the DIP Documents are hereby approved and

incorporated herein by reference. The DIP Documents and this Final Order shall govern the financial and credit accommodations to be provided to the Debtors by the DIP Lenders; *provided* that in the event of any inconsistency between the DIP Credit Agreement or any other DIP Document and this Final Order, this Final Order shall control.

(b)     The Borrower was by the Interim Order and hereby is authorized to borrow money pursuant to the DIP Documents and the Guarantors are hereby authorized to guaranty such borrowing, in accordance with the terms of this Final Order and the DIP Documents, which shall be used solely for the purposes permitted under the DIP Documents, this Final Order and in accordance with the Operating Forecast and the 13-Week Projections (each, as defined in the DIP Credit Agreement), plus permitted variances as set forth in the DIP Documents, as well as to make the payment of Professional Fees (as defined below) incurred by the Debtors and the Creditors' Committee cases.

(c)     In furtherance of the foregoing and without further approval of this Court, each Debtor was by the Interim Order and hereby is authorized and directed, and the automatic stay imposed by Bankruptcy Code section 362 is hereby lifted to the extent necessary, to perform all acts and to make, execute and deliver all instruments and documents (including, without limitation, the DIP Credit Agreement, the execution or recordation of any security and pledge agreements, financing statements, and any mortgages contemplated thereby), and to pay all fees, that may be reasonably required or necessary for the Debtors' performance of their obligations under the Financing including, without limitation:

(i)      the execution, delivery and performance of the DIP Documents, including, without limitation, the DIP Credit Agreement in substantially the same form filed with the Court on or about June 30, 2009, any security and pledge agreement, and any mortgage contemplated thereby;

(ii)      the execution, delivery and performance of one or more amendments, waivers, consents or other modifications to and under the DIP Documents for, among other things, the purpose of adding additional entities as DIP Lenders and reallocating the commitments for the Financing among the DIP Lenders, in each case in such form as the Debtors, the DIP Agent and the DIP Lenders (to the extent required under the DIP Credit Agreement) may reasonably agree, it being understood that no further approval of the Court shall be required for amendments, waivers, consents or other modifications to and under the DIP Documents or the DIP Obligations that do not (A) shorten the maturity of the extensions of credit thereunder, (B) increase the commitments or the rate of interest or fees payable thereunder or (C) materially adversely affect the rights of the Adequate Protection Parties (and, in any case, a copy of each such amendment, waiver, consent or other modification referenced in this subsection (C) shall be immediately provided to the Adequate Protection Parties including, but not limited to, the Prepetition Agent, the First Priority Notes Trustee, and the Collateral Agent);

(iii)      the non-refundable payment to each of the Initial Lenders (as defined in the DIP Credit Agreement), the DIP Agent, or the DIP Lenders, as the case may be, of the fees referred to in the DIP Credit Agreement and reasonable

costs and expenses as may be due from time to time, including, without limitation, fees and expenses of counsel, information agents and other professionals retained by the DIP Agent and the DIP Lenders as provided for in the DIP Documents, which such fees and expenses shall not be subject to the approval of the Court, nor shall any recipient of any such payment be required to file with respect thereto any interim or final fee application with the Court;

(iv)    make the adequate protection payments provided for in this Final Order; and

(v)    the performance of all other acts required under or in connection with the DIP Documents.

(d)    The procedures for making allocations of the DIP Loans (the "*Procedures*"), as described in Schedule 2.01 of the DIP Credit Agreement, are hereby approved.  Allocations of the DIP Loans made by the DIP Agent in accordance with the Procedures will be final and binding.  The DIP Agent may, in connection with such allocations, conclusively rely on, and shall have no liability whatsoever in respect of, record date ownership information provided to it.  The DIP Agent and the Prepetition Agent, the Indenture Trustees or the Collateral Agent, as applicable, shall have no liability whatsoever in respect of the Procedures, including, without limitation, in respect of the representations and warranties made by, and the other information provided by, subscribers pursuant to the Procedures.  In furtherance of the foregoing and in connection with the consummation of the Financing and the related DIP Documents, the performance of such acts as set forth in the Procedures and related documentation is hereby authorized and approved.

(e)     Upon execution and delivery of the DIP Credit Agreement and the other DIP Documents, such DIP Documents shall constitute valid, binding and non-avoidable obligations of the Debtors enforceable against each Debtor party thereto in accordance with their respective terms and the terms of this Final Order for all purposes during the Cases, any subsequently converted Case of any Debtor under chapter 7 of the Bankruptcy Code or after the dismissal of any Case.  No obligation, payment or repayment thereof, or recovery on or in respect thereof, transfer or grant of security under the DIP Credit Agreement, the other DIP Documents or this Final Order shall be stayed, restrained, revocable, voidable, avoidable or recoverable under the Bankruptcy Code or under any applicable law (including without limitation, under Bankruptcy Code sections 502(d), 548 or 549 or under any applicable state Uniform Fraudulent Transfer Act, Uniform Fraudulent Conveyance Act or similar statute or common law), or subject to any defense, reduction, setoff, recoupment or counterclaim.

(f)     The Guarantors hereby are authorized and directed to jointly, severally and unconditionally guarantee in full all of the DIP Obligations of the Borrower.

7.     *Unconditional Guarantee of Subsequently Arranged or Organized Subsidiaries.* Except as otherwise agreed by the DIP Agent, the obligations of the Borrower shall further be unconditionally guaranteed by each and every subsequently acquired or organized direct or indirect subsidiary of any of the Debtors, which shall be made a Debtor and a Guarantor, and shall be deemed a Guarantor immediately upon its acquisition and/or organization.

8.     *Superpriority Claims.*  Pursuant to Bankruptcy Code section 364(c)(1), all of the DIP Obligations shall constitute allowed senior administrative expense claims against each of the Debtors (the "***Superpriority Claims***") with priority over any and all administrative expenses,

adequate protection claims, diminution claims (including all Adequate Protection Obligations (as defined below)) and all other claims against the Debtors, now existing or hereafter arising, of any kind whatsoever, including, without limitation, all administrative expenses of the kind specified in Bankruptcy Code sections 503(b) and 507(b), and over any and all administrative expenses or other claims arising under sections 105, 326, 328, 330, 331, 503(b), 506(c), 507(a), 507(b), 546, 726, 1113, or 1114 or otherwise, whether or not such expenses or claims may become secured by a judgment lien or other non-consensual lien, levy or attachment, which allowed claims shall for the purposes of Bankruptcy Code section 1129(a)(9)(A) be considered administrative expenses allowed under Bankruptcy Code section 503(b) and which shall be payable from and have recourse to all prepetition and postpetition property of the Debtors and all proceeds thereof, subject only to the payment of the Carve-Out to the extent specifically provided for herein; provided, however, that the Superpriority Claims shall not include, and thus shall expressly exclude, causes of action and any proceeds or property recovered in connection with the pursuit of claims or causes of action arising under chapter 5 of the Bankruptcy Code, if any (the "*Avoidance Actions*"), which Avoidance Actions shall be preserved and addressed in connection with a chapter 11 plan and at no time prior thereto. Except as set forth in this Final Order, no other superpriority claims shall be granted or allowed in these Cases.

9. *Carve-Out.* "*Carve-Out*" means (i) all fees required to be paid to the Clerk of the Bankruptcy Court and to the Office of the United States Trustee under section 1930(a) of title 28 of the United States Code plus interest pursuant to 31 U.S.C. § 3717 (without regard to the notice set forth in (iii) below); (ii) all reasonable fees and expenses up to $100,000 incurred by a trustee under Bankruptcy Code section 726(b) (without regard to the notice set forth in (iii) below); (iii) to the extent allowed at any time, whether by interim order, procedural order or otherwise, all

unpaid fees, disbursements, costs and expenses (collectively, the "***Professional Fees***") incurred by professionals or professional firms retained by (x) the Debtors pursuant to Bankruptcy Code section 327 and (y) the Creditors' Committee (collectively, the "***Professional Persons***") at any time before or on the first business day following delivery by the DIP Agent of a Carve-Out Trigger Notice (as defined below), whether allowed by the Bankruptcy Court prior to or after delivery of a Carve-Out Trigger Notice; and (iv) after the first business day following delivery by the DIP Agent of the Carve-Out Trigger Notice, to the extent allowed at any time, whether by interim order, procedural order or otherwise, the payment of Professional Fees of Professional Persons in an aggregate amount not to exceed $4,000,000 (the "***Post Carve-Out Trigger Notice Cap***") (plus the amounts specified in items (i) through (iv) hereof). "***Carve-Out Trigger Notice***" means written notice delivered by the DIP Agent to the Debtors and their lead counsel, the United States Trustee, and lead counsel to the Creditors' Committee (with the Debtors to promptly provide copies to the Prepetition Agent, the Indenture Trustees, the Collateral Agent and their counsel), which notice may be delivered following the occurrence of an Event of Default as defined in the DIP Credit Agreement) under the DIP Documents, stating that the Post Carve-Out Trigger Notice Cap has been invoked.

10.     As security for the DIP Obligations, effective and perfected upon the date of the Interim Order and without the necessity of the execution, recordation of filings by the Debtors of mortgages, security agreements, control agreements, pledge agreements, financing statements or other similar documents, or the possession or control by the DIP Agent or any DIP Lender of, or over, any DIP Collateral (as defined below), the following security interests and liens were by the Interim Order and hereby  are granted by the Debtors to the DIP Agent, for the benefit of the DIP Agent and the DIP Lenders (all property identified in clauses (a), (b) and (c) below being

collectively referred to as the "***DIP Collateral***"[2]), subject, only in the event of the occurrence and during the continuance of an Event of Default, to the payment of the Carve-Out (all such liens and security interests granted to the DIP Agent, for the benefit of the DIP Lenders, pursuant to the Interim Order, this Final Order and the DIP Documents, the "***DIP Liens***"):

(a) <u>First Lien on Cash Balances and Unencumbered Property.</u>  Pursuant to Bankruptcy Code 364(c)(2), a valid, binding, continuing, enforceable, fully-perfected first priority senior security interest in and lien upon all prepetition and postpetition property of the Debtors, whether existing on the Petition Date or thereafter acquired, that, on or as of the Petition Date is not subject to valid, perfected and non-avoidable liens (collectively, "***Unencumbered Property***"), including without limitation, any such unencumbered cash of the Debtors (whether maintained with the DIP Agent or otherwise) and any investment of such cash, inventory, accounts receivable, other rights to payment whether arising before or after the Petition Date, contracts, properties, plants, equipment, general intangibles, documents, instruments, interests in leaseholds, real properties, patents, copyrights, trademarks, trade names, other intellectual property, equity interests, and the proceeds of all the foregoing.  For purposes of clarity, Unencumbered Property shall not include any proceeds or property recovered in connection with the pursuit of the Avoidance Actions.

(b) <u>Liens Priming Prepetition Secured Parties' Liens.</u>  Pursuant to Bankruptcy Code section 364(d)(1), a valid, binding, continuing, enforceable, fully-perfected first priority senior priming security interest in and lien upon all prepetition and postpetition property of the Debtors (including, without limitation, Cash Collateral, inventory,

---

[2] Notwithstanding anything to the contrary in this Final Order or the DIP Documents, DIP Collateral and the DIP Liens shall not include, and thus shall expressly exclude, the Avoidance Actions.

accounts receivable, other rights to payment whether arising before or after the Petition Date, contracts, properties, plants, equipment, general intangibles, documents, instruments, interests in leaseholds, real properties, patents, copyrights, trademarks, trade names, other intellectual property, equity interests, and the proceeds of all the foregoing), whether now existing or hereafter acquired, that is subject to any existing lien presently securing the Prepetition Secured Debt. Such security interests and liens shall be senior in all respects to the interests in such property of the Adequate Protection Parties arising from current and future liens of the Adequate Protection Parties (including, without limitation, adequate protection liens granted hereunder), but shall be junior to any (i) valid, perfected, enforceable and unavoidable security interests and liens of other parties, if any, on such property existing immediately prior to the Petition Date, or (ii) valid, perfected and unavoidable interests in such property arising out of statutory liens existing immediately prior to the Petition Date that become perfected subsequent to the Petition Date as permitted by Bankruptcy Code section 546(b).

(c)     Liens Junior to Certain Other Liens. Pursuant to Bankruptcy Code section 364(c)(3), a valid, binding, continuing, enforceable, fully-perfected security interest in and lien upon all prepetition and postpetition property of the Debtors (other than the property described in clauses (a) or (b) of this paragraph 10, as to which the liens and security interests in favor of the DIP Agent will be as described in such clauses), whether now existing or hereafter acquired, that is subject to (i) valid, perfected, enforceable and unavoidable liens in existence immediately prior to the Petition Date or (ii) valid, perfected and unavoidable interests in such property arising out of statutory liens existing immediately prior to the Petition Date that become perfected subsequent to the Petition

Date as permitted by Bankruptcy Code section 546(b), which security interests and liens in favor of the DIP Agent are junior to such valid, perfected and unavoidable liens.

(d) <u>Liens Senior to Certain Other Liens.</u> The DIP Liens and the Adequate Protection Liens (as defined below) shall not be subject or subordinate to (i) any lien or security interest that is avoided and preserved for the benefit of the Debtors and their estates under Bankruptcy Code section 551; (ii) any liens arising after the Petition Date (other than as set forth in paragraph 10(c) above) including, without limitation, any liens or security interests granted in favor of any federal, state, municipal or other governmental unit, commission, board or court for any liability of the Debtors; or (iii) any intercompany or affiliate liens of the Debtors.

11. *Protection of DIP Lenders' Rights.*

(a) All DIP Collateral shall be free and clear of all liens, claims and encumbrances, except for those liens, claims and encumbrances expressly permitted under the DIP Documents or this Final Order.

(b) Until all DIP Obligations (including any non-contingent claim for indemnification by the DIP Agent or the DIP Lenders) shall have been indefeasibly paid in full in cash or otherwise satisfied in full as set forth in paragraph 25 (other than contingent indemnity obligations as to which no claim has been asserted when all other amounts have been paid) and the commitments under the DIP Documents have terminated, the Adequate Protection Parties shall (i) take no action to foreclose upon or recover in connection with the liens granted thereto pursuant to the Prepetition Loan Documents, the Interim Order or this Final Order, or otherwise exercise remedies against any DIP Collateral, except to the extent authorized by an order of this Court, (ii) be

deemed to have consented to any release of DIP Collateral authorized under the DIP Documents and (iii) not file any further financing statements, trademark filings, copyright filings, mortgages, notices of lien or similar instruments, or otherwise take any action to perfect their security interests in the DIP Collateral unless, solely as to this clause (iii), the DIP Lenders file financing statements or other documents to perfect the liens granted pursuant to the Interim Order or this Final Order, or as may be required by applicable state law to continue the perfection of valid and unavoidable liens or security interests in effect as of the Petition Date.

(c)     The automatic stay provisions of Bankruptcy Code section 362 are vacated and modified to the extent necessary to permit the DIP Agent and the DIP Lenders to exercise (i) immediately upon the occurrence of an Event of Default (subject to applicable grace periods) or the Maturity Date (as defined in the DIP Credit Agreement), all rights and remedies under the DIP Documents other than those rights and remedies against the DIP Collateral as provided in clause (ii) below and (ii) upon the occurrence and during the continuance of an Event of Default (subject to any applicable grace periods) and the giving of five (5) business days' prior written notice to the Debtors (with the Debtors to promptly provide a copy to counsel to any Committee, the United States Trustee, First Priority Notes Trustee, the Prepetition Agent and the Collateral Agent and each of their counsel) to the extent provided for in any DIP Document, all rights and remedies against the DIP Collateral provided for in any DIP Document (including without limitation, to the extent applicable, the right to set off against any accounts maintained by the Debtors with the DIP Agent or any DIP Lender or any affiliate thereof) and provided that, upon the receipt of any such notice, the Borrower may only make

disbursements in the ordinary course of business and with respect to the Carve-Out, but may not disburse any other amounts. In any hearing regarding any exercise of rights or remedies, the only issue that may be raised by any party in opposition thereto shall be whether, in fact, an Event of Default has occurred and is continuing, and the Debtors and the Adequate Protection Parties hereby each waive their right to seek relief, including, without limitation, under Bankruptcy Code section 105, to the extent such relief would in any way impair or restrict the rights and remedies of the DIP Agent or the DIP Lenders set forth in this Final Order or the DIP Documents. In no event shall the DIP Agent, the DIP Lenders, or the Adequate Protection Parties be subject to the equitable doctrine of "marshaling" or any similar doctrine with respect to the DIP Collateral. The delay or failure to exercise rights and remedies under the DIP Documents or this Final Order by the DIP Agent or any DIP Lenders shall not constitute a waiver of the DIP Agent's or such DIP Lender's rights hereunder, thereunder or otherwise, unless any such waiver is pursuant to a written instrument executed in accordance with the terms of the applicable DIP Documents.

12. *Limitation on Charging Expenses Against Collateral*. Except to the extent of the Carve-Out, no costs or expenses of administration of the Cases or any future proceeding that may result therefrom, including liquidation in bankruptcy or other proceedings under the Bankruptcy Code, shall be charged against or recovered from the DIP Collateral, the Prepetition Collateral or the Cash Collateral pursuant to Bankruptcy Code section 506(c) or any similar principle of law without the prior written consent of the DIP Agent, the Prepetition Agent, the Indenture Trustees, or the Collateral Agent, as the case may be, and no such consent shall be implied from any other

action, inaction, or acquiescence by the DIP Agent, the DIP Lenders, the Prepetition Agent, the Indenture Trustees or the Prepetition Secured Debt Holders.

13.     In light of their agreement to subordinate their liens and superpriority claims to the Carve-Out, the DIP Lenders and the Adequate Protection Parties shall be entitled to all benefits of Bankruptcy Code section 552(b) and the "equities of the case" exception under Bankruptcy Code section 552(b) shall not apply to such parties with respect to the proceeds, products, offspring, or profits of any of their collateral; provided, however, that nothing in this paragraph 13 shall prejudice the right of any party in interest to challenge the right of the DIP Lenders to assert a claim under the authority of Bankruptcy Code section 552(b) in any proceeds of any FCC license owned by any affiliate of the Debtors. [JMP 07/06/09]

14.     *Cash Collateral.*  Pursuant to Bankruptcy Code section 552, any proceeds of the Prepetition Collateral are cash collateral of the applicable Adequate Protection Parties within the meaning of Bankruptcy Code section 363(a).  All cash proceeds of the Prepetition Collateral and all other cash collateral (as defined in the Bankruptcy Code) of the Adequate Protection Parties is referred to herein as "***Cash Collateral***."[3]

15.     *Use of Cash Collateral.*  The Debtors are hereby authorized to use all Cash Collateral of the Adequate Protection Parties but solely in accordance with the Operating Forecast and the 13-Week Projections (plus permitted variances as set forth in the DIP Documents), including, but not limited to, payment of Professional Fees and to make adequate protection payments to the Adequate Protection Parties, and the Adequate Protection Parties are directed promptly to turn over to the Debtors all Cash Collateral received or held by them; provided that the Adequate Protection Parties are granted adequate protection as hereinafter set

---

[3] For purposes of clarity, Cash Collateral shall not include, and thus shall expressly exclude, the Avoidance Actions and any proceeds thereof.

forth and, except on the terms and conditions of this Final Order, the Debtors shall be enjoined and prohibited from at any time using the Cash Collateral. The Debtors' right to use Cash Collateral, and the Adequate Protection Parties' consent to the use of Cash Collateral, shall terminate automatically on the Maturity Date, provided that the Debtors shall continue to have the right to use Cash Collateral (and the Adequate Protection Parties' consent to such continued use of Cash Collateral), and the Debtors are hereby directed to use Cash Collateral, to pay and satisfy the payments contemplated by the Carve-Out until repayment of the DIP Obligations, with any such payment to be subject to such further and other orders of the Court regarding the compensation of professionals.

16.     *Adequate Protection.* The Adequate Protection Parties are entitled, pursuant to Bankruptcy Code sections 361, 363(e) and 364(d)(1), to adequate protection of their interests in their respective Prepetition Collateral, including the Cash Collateral, subject to any rights of the Creditors' Committee or any other party in interest to assert a Lender Claim pursuant to paragraph 23 hereof, for and equal in amount to the aggregate diminution in the value (each such diminution, a "***Diminution in Value***") of the Adequate Protection Parties' security interests in the Prepetition Collateral during the Cases (which Diminution in Value shall be calculated in accordance with Bankruptcy Code section 506(a)) as a result of, among other things, the Debtors' sale, lease or use of Cash Collateral and any other of the Prepetition Collateral, the priming of the Adequate Protection Parties' security interests and liens in the Prepetition Collateral by the DIP Agent and the DIP Lenders pursuant to the DIP Documents and this Final Order, and the imposition of the automatic stay pursuant to Bankruptcy Code section 362 or otherwise; provided, however, that no Adequate Protection Party shall be entitled to adequate protection with respect to any Diminution in Value of such Adequate Protection Party's interest in the Prepetition Collateral resulting from

any successful Avoidance Action or other Lender Claim against, or Avoidance Action proceeds recovered from, such Adequate Protection Party. As adequate protection, the Adequate Protection Parties are hereby granted the following (collectively, the "***Adequate Protection Obligations***") [4]:

(a)     Adequate Protection Liens. As security for and solely to the extent of any Diminution in Value of the Prepetition Security Interests, the Collateral Agent (for itself and for the respective benefit of the applicable Adequate Protection Parties) are by the Interim Order and hereby is granted, effective and perfected upon the date of the Interim Order and without the necessity of the execution by the Debtors of mortgages, security agreements, pledge agreements, financing statements or other agreements, a replacement security interest in and lien upon all the DIP Collateral (together, the "***Adequate Protection Liens***"), subject and subordinate only to (i) the Carve-Out and (ii) the DIP Liens and any liens on the DIP Collateral that are senior to, or *pari passu* with, the DIP Liens, which Adequate Protection Liens shall rank in the same relative priority and right as do the respective security interests and liens of the respective Existing Primed Secured Facilities as of the Petition Date. Notwithstanding the foregoing, the Adequate Protection Liens granted in respect of the Second Priority Note Debt shall at all times be junior to the Prepetition Liens in respect of the First Lien Debt.

(b)     Section 507(b) Claims. To the extent of any Diminution in Value of the Prepetition Security Interests, the Adequate Protection Parties were by the Interim Order and hereby are granted, subject to the payment of the Carve-Out, allowed superpriority administrative expense claims (the "***Adequate Protection Parties' Superpriority***

---

[4] For avoidance of doubt, and notwithstanding anything to the contrary in this Final Order or the DIP Documents, Adequate Protection Obligations (including Adequate Protection Liens, Adequate Protection Parties' Superprioity Claims) shall not include, and thus shall expressly exclude, the Avoidance Actions and the proceeds thereof.

***Claims***") as provided for in Bankruptcy Code section 507(b), immediately junior to the claims under Bankruptcy Code section 364(c)(1) held by the DIP Agent and the DIP Lenders, which Adequate Protection Parties' Superpriority Claims shall rank in the same relative priority and right as do the respective claims of the Prepetition Secured Parties as of the Petition Date, <u>provided</u> that the Adequate Protection Parties shall not receive or retain any payments, property or other amounts in respect of the Adequate Protection Parties' Superpriority Claims under Bankruptcy Code section 507(b) granted hereunder or under the Existing Primed Secured Facilities unless and until the obligations under the DIP Obligations have indefeasibly been paid in cash in full or as otherwise agreed by the DIP Lenders as provided for in the DIP Documents; and, <u>provided</u>, <u>further</u>, that the Second Priority Noteholders shall not be entitled to receive any amounts in respect of the foregoing until the claims of the holders of First Lien Debt have been indefeasibly paid in full in cash.

(c)       <u>Fees and Expenses</u>.    The Prepetition Agent, the First Priority Notes Trustee, and the Collateral Agent shall receive (for the benefit of the Prepetition Term Lenders and the First Priority Noteholders) from the Debtors current cash payments of all reasonable and documented fees and expenses payable to the Prepetition Agent, the First Priority Notes Trustee and the Collateral Agent under the Prepetition Term Credit Facility, First Priority Notes Indenture and the Pledge and Security Agreement, respectively, including reasonable and documented professional fees and expenses incurred for the benefit of the Prepetition Term Lenders during the Prepetition Agent transition period, promptly upon delivery of invoices    herefore (subject in all respects to applicable privilege or work product doctrines) to the Debtors, the DIP Agent and the

Creditors' Committee and without the necessity of filing motions or fee applications, including such amounts arising before and after the Petition Date; provided that, with respect to fees and expenses of professionals retained by the Prepetition Agent, the First Priority Notes Trustee and the Collateral Agent, such reimbursement shall be limited to (i) Troutman Sanders LLP, as counsel for the First Priority Trustee and the Collateral Agent and (ii) Loeb & Loeb, LLP and Schulte Roth & Zabel LLP, as counsel for the Prepetition Agent, and shall not include the fees and expenses of any financial or other consultants or advisors. All amounts paid as Adequate Protection are deemed permitted uses and expenditures for purposes of the Financing and are permitted uses of Cash Collateral.

(d) <u>Financial Reporting</u>. The Debtors shall provide the Prepetition Agent, the Indenture Trustees and the Creditors' Committee with financial and other reporting substantially in compliance with, and substantially upon the time frames set forth in, the Existing Primed Secured Facilities and any reporting described herein and in the DIP Documents.

(e) <u>Additional Guarantors</u>. To the extent any entity becomes a guarantor of the DIP Obligations, and each and every subsequently acquired or organized direct or indirect subsidiary of any of the Debtors, which shall be made a Debtor and a Guarantor, shall be deemed a guarantor under the Existing Primed Secured Facilities immediately upon becoming a Guarantor of the DIP Obligations.

17. *Additional Liens*. All intercompany/affiliate liens of the Debtors, if any (other than any liens securing the DIP Obligations), will be contractually subordinated to the DIP Obligations and to the Adequate Protection Obligations on terms satisfactory to the DIP Agent,

the Required Lenders, the Prepetition Agent, the First Priority Notes Trustee and the Collateral Agent..

18.     *Finding of Adequate Protection.*   Under the circumstances and given that the above-described adequate protection is consistent with the Bankruptcy Code, including section 506(b) thereof, the Court finds that the adequate protection provided herein is reasonable and sufficient to protect the interests of the Adequate Protection Parties.

19.     *Reservation of Rights of Adequate Protection Parties.*   Upon a material change in circumstances, any Adequate Protection Party may request further or different adequate protection, and the Debtors or any other party may contest any such request; <u>provided</u> that any such further or different adequate protection shall at all times be subordinate and junior to the claims and liens of the DIP Agent and the DIP Lenders granted under the Interim Order, this Final Order or the DIP Documents.  Except as expressly provided herein, nothing contained in this Final Order (including, without limitation, the authorization of the use of any Cash Collateral) shall impair or modify any rights, claims or defenses available in law or equity to any Adequate Protection Party, the DIP Agent or any DIP Lender.

20.     *Perfection of the DIP Liens and Adequate Protection Liens.*

(a)     Subject to the provisions of paragraph 11(b) above, the Debtors, the DIP Agent, the DIP Lenders and the Adequate Protection Parties are hereby authorized, but not required, to file or record financing statements, trademark filings, copyright filings, mortgages, notices of lien or similar instruments in any jurisdiction, or take possession of or control over, or take any other action in order to validate and perfect the liens and security interests granted to them hereunder.  Whether or not the DIP Agent and/or the Collateral Agent shall, in their sole discretion, choose to file such financing statements,

trademark filings, copyright filings, mortgages, notices of lien or similar instruments, or take possession of or control over, or otherwise confirm perfection of the liens and security interests granted to them hereunder, such liens and security interests shall be deemed valid, perfected, allowed, enforceable, non-avoidable and not subject to challenge or dispute or subordination, at the time and on the date of entry of the Interim Order. Upon the request of the DIP Agent and/or the Collateral Agent, without any further consent of any party, each Debtor is authorized to take, execute, deliver and file such instruments (in each case without representation or warranty of any kind) to enable the DIP Agent and/or the Collateral Agent to further validate, perfect, preserve and enforce the DIP Liens and the Adequate Protection Liens. Except where expressly agreed in writing to the contrary between the Debtors and the applicable parties, the Debtors shall execute and deliver to the DIP Agent, the Prepetition Agent, the Indenture Trustees and the Collateral Agent all such agreements, financing statements, instruments and other documents as the DIP Agent, the Prepetition Agent, the Indenture Trustees and/or the Collateral Agent may reasonably request to more fully evidence, confirm, validate, perfect, preserve and enforce the DIP Liens and the Adequate Protection Liens. All such documents will be deemed to have been recorded and filed as of the Petition Date.

(b)     A certified copy of this Final Order may, in the discretion of the DIP Agent or the Collateral Agent, as the case may be, be filed with or recorded in filing or recording offices in addition to or in lieu of such financing statements, mortgages, notices of lien or similar instruments, and all filing offices are hereby authorized to accept such certified copy of this Final Order for filing and recording.

(c)  ~~Any provision of any lease or other license, contract or other agreement~~ ~~that requires (i) the consent or approval of one or more landlords or other parties or (ii)~~ ~~the payment of any fees or obligations to any governmental entity, in order for any~~ ~~Debtor to pledge, grant, sell, assign or otherwise transfer any such leasehold interests, or~~ ~~the proceeds thereof, or other postpetition collateral related thereto, is hereby deemed to~~ ~~be inconsistent with the applicable provisions of the Bankruptcy Code.  Any such~~ ~~provision shall have no force and effect with respect to the transactions granting~~ ~~postpetition liens, in any leasehold interest or the proceeds of any assignment and/or sale~~ ~~thereof by any Debtor, in favor of the DIP Lenders in accordance with the terms of the~~ ~~DIP Documents or this Final Order or in favor of the Adequate Protection Parties in~~ ~~accordance with the terms of the Prepetition Loan Documents, the Prepetition Collateral~~ ~~Documents or this Final Order.~~  [JMP 07/06/09]

21.     *Preservation of Rights Granted Under the Order.*

(a)     Other than the Carve-Out, no claim or lien having a priority superior to or *pari passu* with those granted by the Interim Order or this Final Order to the DIP Agent, the DIP Lenders or the Adequate Protection Parties shall be granted or allowed while any portion of the Financing (or any refinancing thereof) or the commitments thereunder or the DIP Obligations or the Adequate Protection Obligations remain outstanding, and the DIP Liens and the Adequate Protection Liens shall not be (i) subject or junior to any lien or security interest that is avoided and preserved for the benefit of the Debtors' estates under Bankruptcy Code section 551 or (ii) subordinated to or made *pari passu* with any other lien or security interest, whether under Bankruptcy Code section 364(d) or otherwise.

(b)     Subject to paragraph 23 with respect to the Prepetition Secured Debt and the Prepetition Security Interests (but in no event with respect to the DIP Obligations), except as set forth in the DIP Credit Agreement and as more fully described in paragraph 25 below, unless all DIP Obligations shall have indefeasibly been paid in cash in full or satisfied in a manner otherwise agreed to by the Required Lenders (as defined in the DIP Credit Agreement) and the Adequate Protection Obligations shall have been indefeasibly paid in cash in full, the Debtors shall not seek, and it shall constitute an Event of Default and terminate the right of the Debtors to use Cash Collateral if any of the Debtors seek, or if there is entered, (i) any modification or extension of this Final Order without the prior written consent of the DIP Agent and the Required Lenders (or, to the extent the DIP Obligations shall have been indefeasibly paid in cash in full or satisfied in a manner otherwise agreed to by the Required Lenders, the Prepetition Agent, the Indenture

Trustees and the Collateral Agent, as applicable), and no such consent shall be implied by any other action, inaction or acquiescence, (ii) to the extent the modification or extension materially adversely affects the rights of the Adequate Protection Parties, any modification or extension without the prior consent of the Prepetition Agent, the First Priority Notes Trustee and the Collateral Agent, as applicable, and no such consent shall be implied by any other action, inaction or acquiescence or (iii) an order converting or dismissing any of the Cases.

(c)     If an order dismissing any of the Cases under Bankruptcy Code section 1112 or otherwise is at any time entered, such order shall provide (in accordance with Bankruptcy Code sections 105 and 349) that (i) the superpriority claims, priming liens, security interests, Adequate Protection Liens and replacement security interests granted to the DIP Agent and the DIP Lenders and, as applicable, the Adequate Protection Parties pursuant to the Interim Order or this Final Order shall continue in full force and effect and shall maintain their priorities as provided in this Final Order until all DIP Obligations and Adequate Protection Obligations shall have been indefeasibly paid in cash in full (or, with respect to the DIP Obligations, otherwise satisfied in a manner agreed to by the Required Lenders) and that such superpriority claims, priming liens, Adequate Protection Liens and replacement security interests, shall, notwithstanding such dismissal, remain binding on all parties in interest and (ii) this Court shall retain jurisdiction, notwithstanding such dismissal, for the purposes of enforcing the claims, liens and security interests referred to in (i) above.

(d)     If any or all of the provisions of this Final Order are hereafter reversed, modified, vacated or stayed, such reversal, stay, modification or vacation shall not affect

(i) the validity, priority or enforceability of any DIP Obligations or Adequate Protection Obligations incurred prior to the actual receipt of written notice by the DIP Agent, the Prepetition Agent, the Indenture Trustees or the Collateral Agent, as applicable, on the effective date of such reversal, stay, modification or vacation or (ii) the validity or enforceability of any lien or priority authorized or created hereby or pursuant to the DIP Credit Agreement with respect to any DIP Obligations or Adequate Protection Obligations. Notwithstanding any such reversal, stay, modification or vacation, any use of Cash Collateral, or DIP Obligations or Adequate Protection Obligations incurred by the Debtors to the DIP Agent, the DIP Lenders or the Adequate Protection Parties prior to the actual receipt of written notice by the DIP Agent, the Prepetition Agent, the Indenture Trustees or the Collateral Agent, as applicable, of the effective date of such reversal, stay, modification or vacation shall be governed in all respects by the original provisions of this Final Order, and the DIP Agent, the DIP Lenders and the Adequate Protection Parties shall be entitled to all the rights, remedies, privileges and benefits granted in Bankruptcy Code section 364(e), this Final Order and pursuant to the DIP Documents, with respect to all uses of Cash Collateral, DIP Obligations and Adequate Protection Obligations.

(e)     Except as expressly provided in this Final Order or in the DIP Documents, the DIP Liens, the Superpriority Claims, the Adequate Protection Obligations, all other rights and remedies of the DIP Agent, the DIP Lenders and the Adequate Protection Parties granted by the provisions of this Final Order and the DIP Documents shall survive, and shall not be modified, impaired or discharged by (i) the entry of an order converting any of the Cases to a case under chapter 7, dismissing any of the Cases, terminating the joint administration of these Cases or by any other act or omission or (ii)

the entry of an order confirming a plan of reorganization in any of the Cases and, pursuant to Bankruptcy Code section 1141(d)(4), the Debtors have waived any discharge as to any remaining DIP Obligations. The terms and provisions of this Final Order and the DIP Documents shall continue in these Cases, in any successor cases if these Cases cease to be jointly administered, or in any superseding chapter 7 cases under the Bankruptcy Code, the DIP Obligations, the DIP Liens, the Superpriority Claims and the Adequate Protection Obligations and all other rights and remedies of the DIP Agent, the DIP Lenders, or the Adequate Protection Parties granted by the provisions of this Final Order and the DIP Documents shall continue in full force and effect until the DIP Obligations and the Adequate Protection Obligations are indefeasibly paid in cash in full (or, with respect to the DIP Obligations, otherwise satisfied as described more fully in paragraph 25 below).

22. *Limitation on Use of Financing Proceeds and Collateral.* Notwithstanding anything herein or in any other order by this Court to the contrary, no borrowings, Cash Collateral, Prepetition Collateral, DIP Collateral, Adequate Protection Liens, portion of the proceeds of the Financing or part of the Carve-Out may be used for any of the following (each, a "***Lender Claim***") without the prior written consent of each affected party: (a) to object, contest or raise any defense to the validity, perfection, priority, extent or enforceability of any amount due under any DIP Document, Prepetition Loan Document or Prepetition Collateral Document, or the liens or claims granted under the Interim Order or this Final Order, any DIP Document, any Prepetition Loan Document or Prepetition Collateral Document, (b) to assert any claim or cause of action against the DIP Agent, any DIP Lender, the Prepetition Agent, the Indenture Trustees, the Collateral Agent or any Prepetition Secured Lender or their respective agents, affiliates,

representatives, attorneys or advisors, (c) except to contest the occurrence or continuation of an Event of Default as set forth in paragraph 11(c)(ii), to prevent, hinder or otherwise delay the DIP Agent's, the Prepetition Agent's, an Indenture Trustee's or Collateral Agent's assertions, enforcement or realization on the Cash Collateral or the DIP Collateral in accordance with the DIP Documents, the Prepetition Loan Documents, the Prepetition Collateral Documents, the Interim Order or this Final Order, (d) to assert or prosecute any action for preferences, fraudulent conveyances, other avoidance power claims or any other claims, counterclaims or causes of action, objections, contests or defenses against the Prepetition Agent, the Indenture Trustees, the Collateral Agent or any Prepetition Secured Lender or their respective affiliates, representatives, attorneys or advisors in connection with matters related to the Prepetition Loan Documents, the Prepetition Collateral Documents, the Prepetition Secured Debt, the Prepetition Security Interests, or the Prepetition Collateral or (e) to seek to modify any of the rights granted to the DIP Agent, the DIP Lenders, or the Adequate Protection Parties hereunder or under the DIP Documents, the Prepetition Loan Documents or the Prepetition Collateral Documents, provided that advisors to the Creditors' Committee may investigate the Prepetition Security Interests and, subject to any applicable law with respect to standing, commence any related proceedings as a representative of the Debtors' estates at an expense not to exceed $150,000.

23.        *Effect of Stipulations on Third Parties.*

(a)        Each stipulation, admission and agreement contained in this Final Order, including, without limitation, in paragraph 4 of this Final Order, shall be binding upon the Debtors and any successor thereto (including without limitation any chapter 7 or chapter 11 trustee appointed or elected for any of the Debtors) in all circumstances and for all purposes, and the Debtors are deemed to have irrevocably waived and relinquished all

Lender Claims as of the date of the entry of the Interim Order.  Each stipulation and admission contained in this Final Order, including without limitation, in paragraph 4 of this Final Order, shall be binding upon all other parties in interest, including, without limitation, the Creditors' Committee, under all circumstances and for all purposes, except that with respect to the stipulations, admissions and agreements with respect to the Prepetition Loan Documents, the Prepetition Secured Debt and the Prepetition Security Interests in this Final Order, including, without limitation, in paragraph 4 to the extent that (i) the Creditors' Committee or another party in interest has, subject to the limitations contained herein, including, among other things, in paragraph 22, timely and properly filed an adversary proceeding or contested matter asserting a Lender Claim with respect to any of the stipulations or admissions set forth in paragraph 4 by no later than September 21, 2009 (the "***Challenge Period***"); <u>provided</u>, <u>however</u>, that the Challenge Period may be extended (a) as has been agreed to, in writing, by the Prepetition Agent, applicable Indenture Trustee or the Collateral Agent in their sole discretion or (b) by an order of the Court, for cause shown, after notice and a hearing and (ii) there is a final order in favor of the plaintiff sustaining such Lender Claim.

(b)      The success of any particular Lender Claim shall not alter the binding effect on each party in interest of any stipulation or admission not subject to such Lender Claim.  Except to the extent (but only to the extent) a timely and properly filed adversary proceeding or contested matter asserting a Lender Claim, as provided in clause (a) above, is successful, (i) the Prepetition Secured Debt shall constitute allowed claims, not subject to avoidance, recharacterization, recovery, subordination, attack, offset, counterclaims, defenses or "claims" (as such term is defined in the Bankruptcy Code) of any kind

40

pursuant to the Bankruptcy Code or other applicable law, for all purposes in the Cases and any subsequent chapter 7 cases, (ii) the Prepetition Security Interests shall be deemed to have been, as of the Petition Date, legal, valid, binding perfected and enforceable liens and security interests not subject to avoidance, recharacterization, recovery, subordination, attack, offset, counterclaims, defenses or "claims" (as such term is defined in the Bankruptcy Code) of any kind, and (iii) the Prepetition Secured Debt and the Prepetition Security Interests shall not be subject to any other or further challenge by any party in interest seeking to exercise the rights of the Debtors' estates, including, without limitation, any successor thereto (including, without limitation, any chapter 7 or chapter 11 trustee appointed or elected for any of the Debtors).

(c)     Nothing in this Final Order vests or confers on any person (as defined in the Bankruptcy Code), including the Creditors' Committee and any other Committee, standing or authority to pursue any cause of action belonging to the Debtors or their estates, including, without limitation, Lender Claims with respect to the Prepetition Loan Documents or the Prepetition Secured Debt.

24.     *Priorities Among Adequate Protection Parties.*  Notwithstanding anything to the contrary herein or in any other order of this Court, in determining the relative priorities and rights of the Adequate Protection Parties (including, without limitation, the relative priorities and rights of the Adequate Protection Parties with respect to the adequate protection granted hereunder), such relative priorities and rights shall continue to be governed by the Prepetition Loan Documents and the Prepetition Collateral Documents, and the adequate protection rights granted hereunder to each Adequate Protection Party shall have the same relative seniority and priority vis-à-vis the adequate protection rights granted to each other Adequate Protection Party as the

prepetition claims of such Adequate Protection Party have relative to the prepetition claims of such other Adequate Protection Party (taking into consideration whether such claims are secured and the entity against which such claims are held or not held); provided, however, that the Second Priority Noteholders shall not be entitled to receive any amounts in respect of the foregoing until the claims of the holders of First Lien Debt and the Adequate Protection Obligations have been indefeasibly paid in full in cash.

25.     *Treatment of DIP Claims.*[5]  Except as otherwise set forth herein and as more fully set forth in Schedule 2.05 to the DIP Credit Agreement, unless, at the Borrower's option, the Borrower repays in cash on the Approved Plan Consummation Date the outstanding principal amount of all (but not less than all) New Money Loans, on such Approved Plan Consummation Date, the sum of (i) the outstanding principal amount of all (but not less than all) New Money Loans and (ii) the aggregate unused amount of the New Money Commitments, in each case as of the Approved Plan Consummation Date, will be converted to 62.50% (or such lesser proportional percentage to reflect any prepayment of the New Money Loans pursuant to Sections 2.04(a) or (b) of the DIP Credit Agreement) (the "***Conversion Equity***") of the new common stock of the reorganized Borrower (the "***New Common Stock***")[6] issued under the Approved Plan on a fully diluted basis after giving effect to all New Common Stock issued on the Approved Plan Consummation Date (such conversion, the "***Conversion***"); *provided, however,* that if the final $50 million of unused New Money Commitments is not funded or contributed within one (1) year after the consummation of a plan of reorganization, then the Conversion Equity issued shall be

---

[5]     All terms used but not otherwise defined in this paragraph 25 shall have the meanings set forth in the DIP Credit Agreement.

    [6]  To the extent that any Lender cannot certify that its direct and indirect ownership of the New Common Stock will be less than 25% foreign owned for FCC purposes, such Lender shall receive nominally priced warrants to purchase New Common Stock in lieu of New Common Stock.

reduced, *pro rata,* such that the Conversion Equity shall equal 62.5% of the New Common Stock on a fully diluted basis as set forth above, multiplied by a fraction, the numerator of which is the sum of the principal amount of New Money Loans advanced plus equity contributions actually made as of such date, and the denominator of which is $150,000,000, which shall be effected pursuant to documentation reasonably acceptable to the Required Initial Lenders; *provided, further,* that upon such conversion, customary minority shareholder rights and registration rights shall be provided for, which shall, in each case, be reasonably acceptable to the Required Initial Lenders; *provided, further,* that (A) prior to such conversion, with respect to any New Money Loans, each Lender shall, at its option, either (i) sell such New Money Loan to a Lender, or (ii) agree to effectuate the conversion of such New Money Loan into equity, (B) prior to such conversion, with respect to any unused New Money Commitments that are to be converted, on or after the Transfer of Control (as defined below), if the Board of Directors of the reorganized Borrower should determine in its reasonable discretion that such contribution is necessary, each Lender shall, at its option, either (i) fund its ratable portion of such unused New Money Commitments, (ii) execute a commitment to provide an equity contribution equal to its ratable portion of such unused New Money Commitment, which will be required to be funded by the Lenders on the earlier of (x) the date the Board of Directors of the reorganized Borrower determines in its reasonable discretion that such funding is necessary and (y) 1 year after the Transfer of Control, or (iii) sell any such unused New Money Commitments to a Lender that will effectuate either (i) or (ii) above, and (C) in connection with such conversion, at the option of the Initial Lenders, the Initial Lenders shall provide to the Borrower an exit credit facility in an aggregate principal amount of $10.0 million, which credit facility shall have the following terms: (x) interest rate and other economic terms shall be the same as in the Facility, provided that the

Borrower shall not be required to pay an origination, commitment, extension, exit or other comparable or substitute fee, or any prepayment premium, penalty or fee and (y) non-economic terms shall be substantially similar to the terms of the Facility, provided that the bankruptcy concepts shall be generally removed.  For purposes hereof, "*Transfer of Control*" means the FCC approval of transfer of control to the holders of New Common Stock.  For the avoidance of doubt, none of the Agents shall be responsible for making any of the calculations set forth above or for the consummation of the Conversion.  In the event that a chapter 11 plan is proposed in the Cases that provides for the DIP Lenders to receive treatment other than payment in full in cash on account of the DIP Obligations, the DIP Lenders will be impaired and entitled to vote to accept or reject such plan.

26.     *Order Governs.*    In the event of any inconsistency between the provisions of this Final Order and the DIP Documents, the provisions of this Final Order shall govern.

27.     *Binding Effect; Successors and Assigns.* The DIP Documents and the provisions of this Final Order, including all findings herein, shall be binding upon all parties in interest in these Cases, including without limitation, the DIP Agent, the DIP Lenders, the Adequate Protection Parties, any Committee appointed in these Cases, and the Debtors and their respective successors and assigns (including any chapter 7 or chapter 11 trustee hereinafter appointed or elected for the estate of any of the Debtors, an examiner appointed pursuant to Bankruptcy Code section 1104, or any other fiduciary appointed as a legal representative of any of the Debtors or with respect to the property of the estate of any of the Debtors) and shall inure to the benefit of the DIP Agent, the DIP Lenders, and the Adequate Protection Parties, provided, however, that except to the extent expressly set forth in this Final Order, the Adequate Protection Parties shall have no obligation to permit the use of Cash Collateral or to extend any financing to any chapter 7 trustee

or similar responsible person appointed for the estates of the Debtors. In determining to make the DIP Loans (whether under the DIP Credit Agreement, a promissory note or otherwise), to permit the use of Cash Collateral or in exercising any rights or remedies as and when permitted pursuant to this Final Order or the DIP Documents, the DIP Agent, the DIP Lenders and the Adequate Protection Parties shall not (i) be deemed to be in control of the operations of the Debtors or (ii) owe any fiduciary duty to the Debtors, their respective creditors, shareholders or estates.

28.     *No Impact on Certain Contracts or Transactions.*   No rights of any entity in connection with a contract or transaction of the kind listed in Bankruptcy Code sections 555, 556, 559, 560 or 561, whatever they might or might not be, are affected by the provisions of this Final Order.

29.     *Effectiveness.*   This Final Order shall constitute findings of fact and conclusions of law and shall take effect and be fully enforceable *nunc pro tunc* to the Petition Date immediately upon entry hereof. Notwithstanding Bankruptcy Rules 4001(a)(3), 6004(h), 6006(d), 7062 or 9024 or any other Bankruptcy Rule, or Rule 62(a) of the Federal Rules of Civil Procedure, this Final Order shall be immediately effective and enforceable upon its entry and there shall be no stay of execution or effectiveness of this Final Order.

30.     *Reimbursement of Fees and Expenses of the Minority First Lien Holder Group.* Notwithstanding anything herein, the ad hoc group of holders of First Lien Debt (the "***Minority First Lien Holder Group***"), who, as of July 1, 2009, holds approximately $114 million, or approximately 13.4%, of First Lien Debt,[7] shall be paid in full for all reasonable and documented out-of-pocket fees and expenses (including, without limitation, fees and expenses incurred in connection with objecting to the proposed postpetition debtor-in-possession financing, preparing

---

[7]     On July 1, 2009, the Minority First Lien Holder Group filed an amended 2019 Statement with the Court, verifying that this group holds approximately $114 million, or 13.4%, of the First Lien Debt.

and negotiating commitment letters and the proposed backstop letter), including the fees and expenses of Ropes & Gray LLP, as well as $250,000 in fees to Chilmark Partners and $60,000 in fees to Media Services Group, and their respective out-of-pocket expenses, incurred up to and including the date of entry of this Final Order, promptly upon delivery of invoices therefor (subject in all respects to applicable privilege or work product doctrines) to the Debtors, the DIP Agent, the Creditors' Committee and attorneys for the Ad Hoc First Lien Lender Group[8] without the necessity of filing motions or fee applications, with such fees and expenses being an administrative expense claim under Bankruptcy Code section 503; provided, however, that the Minority First Lien Holder Group shall also be paid in full for those reasonable fees and expenses incurred by Ropes & Gray LLP after entry of this Final Order in connection with, and limited to, developing the subscription procedures for the Financing, up to $10,000 in the aggregate for such out-of-pocket fees and expenses incurred after entry of this Final Order, without the necessity of filing motions or fee applications, with such fees and expenses being an administrative expense claim under Bankruptcy Code section 503.

31.     *Disclosure Date*.  The "***Disclosure Date***" under the respective confidentiality agreements signed by the members of the Minority First Lien Holder Group will be accelerated to a date that is as soon as practicable, but in any event not less than fifteen (15) days prior to any subscription deadline or record date under the DIP Credit Agreement.

---

[8]     The Ad Hoc First Lien Lender Group filed a 2019 Statement on May 21, 2009, verifying that this group holds over $437 million, or over 60%, of First Lien Debt.

32.    *Headings*.  Section headings used herein are for convenience only and are not to affect the construction or to be taken into consideration in interpreting this Final Order.

Dated: July 6, 2009
       New York, New York

_____*s/ James M. Peck*_____
UNITED STATES BANKRUPTCY JUDGE