THE UNITED STATES BANKRUPTCY COURT
FOR THE SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| In re: | Chapter 11 |
| ION MEDIA NETWORKS, INC., *et al.*, | Case No. 09-13125 (JMP) |
| Debtors. | Jointly Administered |

**MEMORANDUM DECISION DENYING MOTION BY CYRUS SELECT OPPORTUNITIES MASTER FUND LTD TO RECONSIDER ORAL RULING REGARDING THE DEBTORS' MOTION FOR A FINAL ORDER APPROVING DEBTOR-IN-POSSESSION FINANCING**

KIRKLAND & ELLIS LLP
Attorneys for Debtors and Debtors in Possession
Citigroup Center
153 E. 53rd Street
New York, New York 10022-4675

   Jonathan S. Henes, Esq.
   Joshua Sussberg, Esq.

WHITE & CASE LLP
Attorneys for Cyrus Select Opportunities Master Fund Ltd.
1155 Avenue of the Americas
New York, New York 10036

   Thomas E. Lauria, Esq.
   Gerard Uzi, Esq.

LOWENSTEIN SANDLER PC
65 Livingston Avenue
Roseland, NJ 07068

   Sharon L. Levine, Esq.
   Wojciech F. Jung, Esq.

ROPES & GRAY LLP
1211 Avenue of the Americas
New York, New York 10036

       Mark I. Bane, Esq.

**JAMES M. PECK**
**UNITED STATES BANKRUPTCY JUDGE**

*Introduction*

Cyrus Select Opportunities Master Fund Ltd. ("Cyrus") has brought a Motion (the "Motion") seeking reconsideration of the Court's bench ruling delivered at the conclusion of a hearing (the "Hearing") held on July 1 approving debtor-in-possession financing proposed by a group of the Debtors' First Lien Lenders (the "DIP Financing") and overruling Cyrus's opposition to such financing. The Motion was filed on July 2, 2009, the day after the Hearing. The Official Committee of Unsecured Creditors (the "Committee") filed a joinder to the Motion on July 5, 2009.

Cyrus indicates in the Motion that, in light of the Court's oral ruling, it has reconsidered its own stated position during the Hearing and is prepared now to remove a due diligence contingency applicable to its own competing financing proposal (the "Cyrus Proposal"). Cyrus decided after the Hearing to further sweeten its bid to be chosen as the DIP lender. The Motion asserts that its diligence requirement appears to have been the main reason that the Court sided with the First Lien Lenders at the Hearing and argues for reconsideration contending that the Cyrus financing proposal includes measurably better economic terms and has become clearly superior to the DIP Financing due to the recent elimination of the diligence risk.

In approving the DIP Financing, the Court endorsed a process undertaken by the Debtors in conjunction with their counsel and financial advisors to negotiate financing on the best terms that were available under the circumstances. Evidence presented during the Hearing supports the conclusion that the Cyrus Proposal, while including a number of material terms that are economically superior to the existing DIP Financing, included certain risk factors, a major one being the risk that the financing would not close due to the diligence contingency. But this was not the only source of risk considered by the Debtors in evaluating the competing proposals or by the Court in rendering its decision.

Other factors included the risk of a priming fight with the First Lien Lenders and the impact of an intercreditor agreement between the First Lien Lenders and second lien lenders such as Cyrus purporting to restrict the ability of Cyrus to object to DIP financing offered by the First Lien Lenders. These factors, and the desire to secure financing without further delay and uncertainty, combined to support the business decision of the Debtors to seek approval of the DIP Financing.

Cyrus' election to waive the diligence contingency one day after the close of the record may well be a sincere last-ditch attempt to become a viable alternative source of financing, but this strong indication of interest by Cyrus comes too late in what has already become an unusually protracted process to secure workable financing for these Debtors. Given the other factors considered by the Debtors in selecting the DIP Financing, the fact that Cyrus could have acted earlier to eliminate the diligence requirement and the Debtors' need to move forward without delay with its plans to acquire programming content for the upcoming television season, this latest move by

Cyrus does not constitute sufficient cause for the Court to reconsider its bench ruling. Accordingly, the Motion is denied as explained in greater detail below.

*Background*

The Debtors own the largest group of broadcast television stations in the United States. These stations are operated as a nationwide integrated programming network known as "ION Television". The network's programming lineup consists mainly of syndicated TV series, feature films and a limited amount of other entertainment and sports programming. The stations also broadcast so-called infomercials. Revenue is derived from these infomercials and from commercial advertising sales.

During the First Day hearings that took place on May 19, 2009, Debtors sought approval of a DIP Financing proposal offered by certain of its First Lien Lenders. This financing package, negotiated before the filing date, included a variety of terms and conditions that the Court thought to be undesirable, particularly those provisions that elevated the priority of $150 million in prepetition debt held by the lenders and that imposed an extremely tight timetable for developing a plan acceptable to these First Lien Lenders. Certain other holders of first lien indebtedness appeared through counsel at the initial hearing on the financing to complain that they had not been consulted regarding the financing and to indicate a willingness to consider providing financing on more favorable terms.

Following a period of active negotiations with competing groups of holders of the first lien indebtedness as detailed in the supplemental declarations of Brandon Burgess and Steven G, Panagos[1], the Debtors determined that the revised DIP Financing proposed

---

[1] Debtors filed these supplemental declarations on July 1. These declarations were offered into evidence at the Hearing held later that day and, despite cross-examination of these witnesses by counsel for Cyrus, the

4

by the First Lien Lenders represented significantly improved financing and sought approval of this new financing facility.

On June 15, 2009, Cyrus filed a limited objection to this DIP financing motion. Cyrus, a holder of second lien debt, asserted that certain special purpose subsidiaries (the "License Subsidiaries") of ION Media Networks, Inc. ("ION") have rights in broadcasting and other licensees, authorizations, waivers and permits issued by the FCC. Cyrus argued that the License Subsidiaries should remain unencumbered and should not be allowed to enter into the proposed DIP Financing, guaranty the financing or grant liens in connection with the financing because, according to Cyrus, these entities will not be benefiting from the DIP advances to the Debtors' operating companies.

On June 29, 2009, Cyrus provided ION with a commitment for DIP financing on substantially the same terms as that offered by the First Lien Lenders with a few specific changes, including: (a) the institution of a marshalling mechanism that requires the DIP financing to be paid first from the non-FCC license-holding debtor entities, (b) pro rata participation in the DIP financing for all existing first lien lenders, *provided* that $30 million is reserved for Cyrus[2]; (c) reduction of the applicable margin from L+1200 bps to L+1000 bps (and from L+1300 bps to L+1100 bps after the effectiveness of the facility extension option); and (d) a reduction in the total percentage of equity Cyrus will receive (i.e., less than 56.25% in the aggregate) if ION opts to convert the DIP to equity in connection with the effectiveness of a plan. Significantly, at the time (two days before the

---

substance of both declarations is uncontroverted. These declarations provide the factual basis for the rulings made on July 1 and for this memorandum decision.

[2] Cyrus' counsel announced during the Hearing that Cyrus would remove this required minimum participation in the facility.

5

Hearing), the Cyrus financing commitment was subject to satisfactory completion of certain diligence.

Although the Cyrus proposal included features that were more favorable from an economic point of view, ION and its advisors concluded that the DIP Financing proposed by the First Lien Lenders was the only logical source of financing. This conclusion was influenced by the fact that more than 88% of the First Lien Lenders had agreed either to support or not to object to the financing. Such consensus among the constituency of the First Lien Lenders was significant to ION's advisors because the financing was available only on a priming basis and the First Lien Lenders would not consent to be primed by any other proposed lender. This meant that the financing could be obtained with reasonable certainty and without the risks and distractions of a priming fight.

The Committee objected to various terms of the DIP Financing but ultimately withdrew its objections to the financing at the Hearing due to a number of last minute concessions made to accommodate the Committee. Thus, at the Hearing, Debtors and the Committee were aligned[3], and Cyrus was the only party that objected to the DIP Financing. Cyrus, through its counsel, argued that its alternative financing was superior, that it was improper and potentially prejudicial to the second lien lenders for the License Subsidiaries to become burdened with DIP indebtedness, that there was no real urgency to approve the financing because ION presently had sufficient liquidity to maintain its operations and could obtain certain programming (*i.e.* infomercials) at little or no out of

---

[3] The Committee has switched sides and now joins in the Motion, presumably because the Cyrus Proposal includes a higher carveout for the Committee's professionals and other more favorable provisions. For the reasons noted, the Committee's support is understandable, but not helpful. This matter has already been fully litigated, and it is too late for the Committee to throw its support to Cyrus.

6

pocket cost, and that additional time was needed for a review of ION's business plan by Debtors' creditor constituencies.

Counsel for Cyrus cross-examined Mr. Burgess at length regarding the License Subsidiaries. Mr. Burgess testified that ION operated an integrated business and that the Debtors' broadcast operations and programming were needed to maintain the FCC licenses held by the License Subsidiaries. That testimony supports the conclusion that using the proceeds of the DIP Financing to acquire new and varied programming content not only will help the Debtors to attract advertising dollars and fulfill the objectives of the ION business plan but will, coincidentally, help the Debtors to preserve the assets of the License Subsidiaries. The License Subsidiaries will receive an indirect benefit from the improved performance of Debtors' broadcasting operations. Further, delay is detrimental to the future success of these operations, and the DIP Financing is needed immediately so that ION can acquire new programming for its fall schedule.

Cyrus, through its counsel, also questioned Mr. Panagos of Moelis & Co. regarding the negotiations that lead to the selection of the DIP Financing proposal offered by the First Lien Lenders. Mr. Panagos confirmed that the financing as it has evolved is significantly better than the financing that had been proposed as of the commencement of the bankruptcy cases and acknowledged that the Cyrus proposal was superior to the current iteration of the DIP Financing from an economic perspective. He noted that the diligence condition was a source of concern, however, given the risk that Cyrus had reserved the right to refuse to lend after examining requested materials relating to ION's financial condition and performance. Mr. Panagos also indicated that avoiding a priming

fight was an important factor in ION's decision to opt for financing from the First Lien Lenders.

Cyrus knew throughout the Hearing that the diligence condition in its competing financing proposal was a problem. In argument, counsel tried to minimize the impact and severity of the risk by suggesting that a delay of a few days to accommodate the need to review information regarding ION, particularly at the time of the July 4th Holiday, should have little impact on the Debtors' ability to acquire new programming. At no time during the Hearing did Cyrus indicate any willingness to waive the condition. And even if it had done so, it is not known whether Debtors would have decided to reconsider its business decision regarding the DIP Financing in view of potential complications relating to both a foreseeable contest over priming and the risk of ancillary litigation due to claimed breaches by Cyrus of Section 11.3 of the intercreditor agreement[4]

*Discussion*

Pursuant to Bankruptcy Rule 9023, Federal Rule 59(e) and Local Rule 9023-1, in order to be entitled to relief, a party must demonstrate "that the court overlooked controlling decisions or factual matters 'that might materially have influenced its earlier decision.'" *In re Best Payphones, Inc.*, 2007 WL 203980, *5 (Bankr. S.D.N.Y. 2007) (*quoting Anglo American Ins. Group, P.L.C. v. CalFed Inc.*, 940 F.Supp. 554, 557 (S.D.N.Y. 1996)). "Alternatively, the movant must demonstrate the need to correct a clear error or prevent manifest injustice." *Griffin Indus., Inc. v. Petrojam, Ltd.*, 72 F.

---

[4] During colloquy with counsel for Cyrus and the First Lien Lenders, the Court asked about the enforceability of the limitations imposed under the intercreditor agreement. The responses indicate that (i) Cyrus believes its competing DIP proposal is permitted under the agreement so long as it is not characterized as an objection to the DIP Financing proposed by the First Lien Lenders and (ii) the First Lien Lenders dispute the right of any second lien lender to compete for a DIP financing that is otherwise acceptable to ION. The potential for intercreditor litigation is more than merely theoretical here and may be brought in any court of competent jurisdiction, including the bankruptcy court.

Supp. 2d 365, 368 (S.D.N.Y. 1999). *See also In re Interbank Funding Corp.*, 2007 WL 2080512, *2 (Bankr. S.D.N.Y. 2007) (denying a motion for reconsideration because movant failed to "demonstrate any manifest errors or injustice, newly discovered evidence or change in controlling law"); *In re Adelphia Business Solutions, Inc.*, 2002 WL 31557665, *1 (Bankr. S.D.N.Y. 2002) (denying a motion for reargument for failure to identify factual matters or decisions that the court overlooked).

As Chief Judge Bernstein noted, "[t]he rule permitting reargument must be narrowly construed to avoid repetitive arguments on issues that the court has already fully considered. Further, the parties cannot advance new facts or arguments, and may not submit affidavits or new material." *In re Stylesite Marketing, Inc.*, 2001 WL 13212, *1 (Bankr. S.D.N.Y. 2001). "This rule is calculated to 'insure the finality of decisions and to prevent the practice of a losing party examining a decision and then plugging the gaps of a lost motion with additional matters.'" *In re Jamesway Corp.*, 203 B.R. 543, 546 (Bankr. S.D.N.Y. 1996) (*quoting Carolco Pictures, Inc. v. Sirota*, 700 F.Supp. 169, 170 (S.D.N.Y. 1988)).

Cyrus has failed to show cause to reconsider the bench ruling of July 1 that approved Debtors' amended DIP Financing from the First Lien Lenders[5]. Cyrus has not demonstrated any errors or injustice, nor has Cyrus demonstrated any newly discovered evidence. Newly discovered evidence pursuant to Rule 59 is "evidence which was in existence at the time of trial of which the moving party was excusably ignorant." *In re Crozier Bros., Inc.*, 60 B.R. 683, 688 (Bankr. S.D.N.Y. 1986). Although all parties, including the Debtors and the Committee, are naturally motivated to obtain financing on the best possible terms, a business decision to obtain credit from a particular lender is

---

[5] A form of Order approving the DIP Financing was entered on July 6, 2009. (ECF doc. #142).

almost never based purely on economic terms. Relevant features of the financing must be evaluated, including non-economic elements such as the timing and certainty of closing, the impact on creditor constituencies and the likelihood of a successful reorganization. This is particularly true in a bankruptcy setting where cooperation and establishing alliances with creditor groups can be a vital part of building support for a restructuring that ultimately may lead to a confirmable reorganization plan. That which helps to foster consensus may be preferable to a notionally better transaction that carries the risk of promoting unwanted conflict.

The Motion rather simplistically assumes that waiving of the diligence condition should constitute sufficient cause to reopen the issues that were resolved last week at the Hearing. The mistaken assumption is that the Court's ruling was predicated exclusively on the existence of Cyrus's diligence condition. That was certainly one of the reasons for the decision, but it was not the only one. The ruling relied on the facts as they existed at the time, including the judgment of the Debtors and their advisors regarding the benefits of a financing provided by a significant percentage of the class of First Lien Lenders. The Cyrus offer was not competitive during the Hearing because of the lack of an enforceable financing commitment and the ability of Cyrus to walk from the transaction in its sole discretion after conducting its diligence. The fact that Cyrus has changed its mind does not necessarily change the outcome of the Debtors' deliberative process.

If the Debtors wish to reconsider their business decision because Cyrus is so eager to lend that it has decided to drop demands for diligence, that is a matter appropriately left to the discretion of the Debtors' management and advisory team. The Committee has a statutory right to be consulted, but the decision rests with the debtor-in-possession.

Reconsideration may be possible here, but only if ION requests it. The Motion does not allege that the Court made any mistakes as to the law or the facts or failed to understand the evidence presented. Instead, it seeks a second bite at the financing apple on account of Cyrus's own decision to make its competitive offer more attractive *after* the Hearing.

The DIP Financing is the product of a long process of arms length negotiation, and it is time for that process to end. The Court's ruling at the Hearing was based on the facts as they existed on July 1. The changed circumstances presented in the Motion eliminate one financing contingency but do not amount to cause to reconsider the ruling. That ruling will not be disturbed unless the Debtors choose to substitute the Cyrus financing (or another alternative deemed to be superior) for the one that has already been approved by the Court. The Motion is denied.

SO ORDERED.

Dated: New York, New York     /s/ James M. Peck_____
       July 6, 2009                HONORABLE JAMES M. PECK
                                       UNITED STATES BANKRUPTCY JUDGE