**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| In re: | Chapter 11 |
| ION MEDIA NETWORKS, INC., *et al.*, | Case No. 09-13125 (JMP) |
| Debtors. | Jointly Administered |

## DEBTORS' FIRST MODIFIED JOINT PLAN OF REORGANIZATION
## PURSUANT TO CHAPTER 11 OF THE BANKRUPTCY CODE

James H.M. Sprayregen
Jonathan S. Henes
Joshua A. Sussberg
KIRKLAND & ELLIS LLP
601 Lexington Avenue
New York, New York  10022-4611
Telephone:          (212) 446-4800
Facsimile:          (212) 446-4900

Attorneys for the Debtors and Debtors in Possession

**TABLE OF CONTENTS**

**ARTICLE I. DEFINED TERMS, RULES OF INTERPRETATION, COMPUTATION OF TIME, AND GOVERNING LAW**..................................................................................................1
    A.    Defined Terms...................................................................................................1
    B.    Rules of Interpretation...................................................................................14
    C.    Computation of Time......................................................................................14
    D.    Governing Law................................................................................................14
    E.    Reference to Monetary Figures......................................................................15
    F.    Reference to the Debtors or the Reorganized Debtors...................................15

**ARTICLE II. ADMINISTRATIVE CLAIMS AND PRIORITY TAX CLAIMS**..................15
    A.    Administrative Claims.....................................................................................15
    B.    Priority Tax Claims.........................................................................................16
    C.    Other Priority Claims......................................................................................17
    D.    Intercompany Claims......................................................................................17
    E.    Statutory Fees.................................................................................................17

**ARTICLE III. CLASSIFICATION AND TREATMENT OF CLAIMS AND INTERESTS**............17
    A.    Classification of Claims and Interests............................................................17
    B.    Summary of Classification.............................................................................17
    C.    Treatment of Claims and Interests.................................................................18

**ARTICLE IV. ACCEPTANCE REQUIREMENTS**....................................................................22
    A.    Acceptance or Rejection of the Plan..............................................................22
    B.    Confirmation Pursuant to Sections 1129(a)(10) and 1129(b) of the Bankruptcy Code..........22

**ARTICLE V. MEANS FOR IMPLEMENTATION OF THE PLAN**.........................................22
    A.    Conversion of the DIP Facility Into the Conversion Equity.........................22
    B.    Exit Facility/Incurrence of New Indebtedness...............................................22
    C.    Sources of Consideration for Plan Distributions...........................................23
    D.    FCC Licenses.................................................................................................23
    E.    Issuance of Plan Securities............................................................................24
    F.    Listing of Plan Securities and Transfer Restrictions.....................................24
    G.    Cancellation of Securities and Agreements...................................................24
    H.    Section 1145 Exemption................................................................................25
    I.    Corporate Existence.......................................................................................25
    J.    New Certificate of Incorporation and New By-Laws.....................................26
    K.    Reorganized ION Board of Directors.............................................................26
    L.    Reorganized Debtor Subsidiaries Board of Directors....................................26
    M.    Officers of Reorganized Debtors...................................................................26
    N.    Employee Benefits.........................................................................................26
    O.    Equity Incentive Program...............................................................................27
    P.    Vesting of Assets in the Reorganized Debtors...............................................27
    Q.    Restructuring Transactions.............................................................................27
    R.    Corporate Action............................................................................................27
    S.    Effectuating Documents; Further Transactions.............................................28
    T.    Exemption from Certain Taxes and Fees.......................................................28
    U.    D&O Liability Insurance Policies...................................................................28
    V.    Preservation of Rights of Action....................................................................29
    W.    FCC Trust.......................................................................................................29

**ARTICLE VI. TREATMENT OF EXECUTORY CONTRACTS AND UNEXPIRED LEASES**.....31
    A.    Assumption and Rejection of Executory Contracts and Unexpired Leases...........31
    B.    Payments Related to Assumption of Executory Contracts and Unexpired Leases..........31

| | | |
|---|---|---|
| C. | Preexisting Obligations to the Debtors Under Executory Contracts and Unexpired Leases | 31 |
| D. | Contracts and Leases Entered Into After the Petition Date | 32 |
| E. | Rejection of Indemnification Provisions | 32 |
| F. | Modifications, Amendments, Supplements, Restatements, or Other Agreements | 32 |
| G. | Reservation of Rights | 32 |
| H. | Nonoccurrence of Effective Date | 32 |
| I. | Rejection Claims Bar Date | 32 |

**ARTICLE VII. PROVISIONS GOVERNING DISTRIBUTIONS** ........................................33

| | | |
|---|---|---|
| A. | Record Date for Distributions | 33 |
| B. | Timing and Calculation of Amounts to Be Distributed | 33 |
| C. | Disbursing Agent | 33 |
| D. | Rights and Powers of Disbursing Agent | 33 |
| E. | Distributions on Account of Claims Allowed After the Effective Date | 34 |
| F. | Delivery of Distributions and Undeliverable or Unclaimed Distributions | 34 |
| G. | Withholding and Reporting Requirements | 35 |
| H. | Setoffs | 35 |
| I. | Claims Paid or Payable by Third Parties | 35 |

**ARTICLE VIII. PROCEDURES FOR RESOLVING CONTINGENT, UNLIQUIDATED AND DISPUTED CLAIMS** ........................................36

| | | |
|---|---|---|
| A. | Prosecution of Objections to Claims | 36 |
| B. | Allowance of Claims and Interests | 36 |
| C. | No Distributions Pending Allowance | 36 |
| D. | Distributions After Allowance | 36 |
| E. | Estimation of Claims | 37 |
| F. | Expungement or Adjustment to Claims Without Objection | 37 |
| G. | Deadline to File Objections to Claims | 37 |

**ARTICLE IX. SETTLEMENT, RELEASE, INJUNCTION AND RELATED PROVISIONS** ........37

| | | |
|---|---|---|
| A. | Compromise and Settlement of Claims, Interests, and Controversies | 37 |
| B. | Releases by the Debtors | 37 |
| C. | Releases by Holders of Claims and Interests | 38 |
| D. | Exculpation | 39 |
| E. | Discharge of Claims and Termination of Interests | 39 |
| F. | Injunction | 39 |
| G. | Term of Injunctions or Stays | 40 |
| H. | Protection Against Discriminatory Treatment | 40 |
| I. | Setoff and Recoupment | 41 |
| J. | Release of Liens | 41 |
| K. | Releases of Governmental Claims | 41 |

**ARTICLE X. CONDITIONS PRECEDENT TO CONFIRMATION OF THE PLAN AND THE EFFECTIVE DATE** ........................................41

| | | |
|---|---|---|
| A. | Conditions Precedent to Confirmation | 41 |
| B. | Conditions Precedent to the Effective Date | 42 |
| C. | Waiver of Conditions | 42 |
| D. | Effective Date | 42 |
| E. | Effect of Failure of Conditions | 42 |

**ARTICLE XI. MODIFICATION, REVOCATION OR WITHDRAWAL OF THE PLAN** ..............43

| | | |
|---|---|---|
| A. | Modification and Amendments | 43 |
| B. | Effect of Confirmation on Modifications | 43 |
| C. | Revocation or Withdrawal of the Plan | 43 |

**ARTICLE XII. RETENTION OF JURISDICTION** ............................................................... 43

**ARTICLE XIII. MISCELLANEOUS PROVISIONS** ............................................................. 45
    A.    **Immediate Binding Effect** ...................................................................... 45
    B.    **Additional Documents** ........................................................................... 46
    C.    **Dissolution of Committee** ...................................................................... 46
    D.    **Payment of Fees and Expenses of Initial Consenting First Lien Lenders, the Prepetition Agents and the Indenture Trustees.** .............. 46
    E.    **Reservation of Rights** ............................................................................ 46
    F.    **Successors and Assigns** .......................................................................... 47
    G.    **Service of Documents** ............................................................................ 47
    H.    **Entire Agreement** .................................................................................. 47
    I.    **Severability of Plan Provisions** ............................................................ 47
    J.    **Exhibits** ................................................................................................. 48
    K.    **Votes Solicited in Good Faith** ............................................................... 48
    L.    **Closing of Chapter 11 Cases** ................................................................ 48
    M.    **Conflicts** ................................................................................................ 48
    N.    **Filing of Additional Documents** ........................................................... 48

K&E 14662808.

# INTRODUCTION

ION Media Networks, Inc. and its Debtor Subsidiaries in the above-captioned Chapter 11 Cases respectfully propose the following joint plan of reorganization under chapter 11 of the Bankruptcy Code. Capitalized terms used in the Plan and not otherwise defined herein shall have the meanings ascribed to such terms in Article I.A hereof.

# ARTICLE I.

## DEFINED TERMS, RULES OF INTERPRETATION,

## COMPUTATION OF TIME, AND GOVERNING LAW

A.      *Defined Terms*

Unless the context otherwise requires, the following terms shall have the following meanings when used in capitalized form herein:

1.      "*11% Series A Notes Indenture*" means the Indenture, dated as of August 3, 2007 with respect to the 11% Series A Mandatorily Convertible Senior Subordinated Notes due 2013, between ION, as borrower, and U.S. Bank National Association (as successor to The Bank of New York Trust Company, N.A.), as trustee (as amended, restated, supplemented or otherwise modified from time to time).

2.      "*11% Series B Notes Indenture*" means the Indenture, dated as of May 4, 2007 with respect to the 11% Series B Mandatorily Convertible Senior Subordinated Notes due 2013, between ION, as borrower, and U.S. Bank National Association (as successor to The Bank of New York Trust Company, N.A.), as trustee (as amended, restated, supplemented or otherwise modified from time to time).

3.      "*Accrued Professional Compensation*" means, at any given moment, all accrued, contingent and/or unpaid fees and expenses (including, without limitation, success fees) for legal, financial advisory, accounting and other services and reimbursement of expenses that are awardable and allowable under sections 328, 330(a) or 331 of the Bankruptcy Code or otherwise rendered allowable before the Effective Date by any retained Professional in the Chapter 11 Cases, or that are awardable and allowable under section 503 of the Bankruptcy Code, that the Bankruptcy Court has not denied by a Final Order, all to the extent that any such fees and expenses have not been previously paid (regardless of whether a fee application has been Filed for any such amount). To the extent that the Bankruptcy Court or any higher court denies or reduces by a Final Order any amount of a professional's fees or expenses, then those reduced or denied amounts shall no longer constitute Accrued Professional Compensation.

4.      "*Additional Consenting First Lien Lender*" means any Holder of a First Lien Debt Claim, other than an Initial Consenting First Lien Lender, who becomes a DIP Lender.

5.      "*Administrative Claim*" means a Claim for costs and expenses of administration pursuant to sections 503(b), 507(a)(2), 507(b), or 1114(e)(2) of the Bankruptcy Code, including: (a) the actual and necessary costs and expenses incurred after the Petition Date and through the Effective Date of preserving the Estates and operating the businesses of the Debtors; (b) compensation for legal, financial advisory, accounting, and other services and reimbursement of expenses Allowed pursuant to sections 328, 330(a), or 331 of the Bankruptcy Code or otherwise for the period commencing on the Petition Date; (c) all fees and charges assessed against the Estates pursuant to chapter 123 of the Judicial Code; and (d) all requests for compensation or expense reimbursement for making a substantial contribution in the Chapter 11 Cases pursuant to sections 503(b)(3), (4), and (5) of the Bankruptcy Code.

6.      "*Affiliate*" has the meaning set forth in section 101(2) of the Bankruptcy Code and the DIP Credit Agreement.

7.      "*Allowed*" means with respect to Claims: (a) any Claim proof of which is timely Filed by the applicable Claims Bar Date (or for which Claim under the Plan, the Bankruptcy Code, or Final Order of the Bankruptcy Court a Proof of Claim is or shall not be required to be Filed); (b) any Claim that is listed in the Schedules as not contingent, not unliquidated, and not disputed, and for which no Proof of Claim has been timely Filed; or (c) any Claim Allowed pursuant to the Plan; *provided, however,* that with respect to any Claim described in clauses (a) and (b) above, such Claim shall be considered Allowed only if and to the extent that with respect to any Claim no objection to the allowance thereof has been interposed within the applicable period of time fixed by the Plan, the Bankruptcy Code, the Bankruptcy Rules, or the Bankruptcy Court, or such an objection is so interposed and the Claim shall have been Allowed for voting purposes only by a Final Order.  Except for any Claim that is expressly Allowed herein, any Claim that has been or is hereafter listed in the Schedules as contingent, unliquidated or disputed, and for which no Proof of Claim has been Filed, is not considered Allowed and shall be subject to expungement after an appropriate objection.

8.      "*Avenue Capital*" means Avenue International Master, L.P., Avenue Investments, L.P., Avenue Special Situations Fund V, L.P., Avenue Special Situations Fund IV, L.P., and Avenue-CDP Global Opportunities Fund, L.P. and each of the foregoing entities' Affiliates.

9.      "*Avoidance Actions*" means any and all claims and causes of action which any of the Debtors, the debtors in possession, the Estates, or other appropriate party in interest has asserted or may assert under sections 502, 510, 542, 544, 545, or 547 through 553 of the Bankruptcy Code or under similar or related state or federal statutes and common law, including fraudulent transfer laws.  All Avoidance Actions shall be released pursuant to the Plan, unless otherwise listed in the retained Causes of Action filed as part of the Plan Supplement, which shall be subject to the consent of the Requisite Initial Lenders and the Committee, which consent shall not be unreasonably withheld.

10.     "*Balloting Agent*" means Financial Balloting Group LLC, located at 757 Third Avenue, 3rd Floor, New York, NY 10017, (646) 282-1800.

11.     "*Ballots*" means the ballots accompanying the Disclosure Statement upon which certain Holders of Impaired Claims entitled to vote shall, among other things, indicate their acceptance or rejection of the Plan in accordance with the Plan and the procedures governing the solicitation process, and which must be actually received by the Balloting Agent on or before the Voting Deadline.

12.     "*Bankruptcy Code*" means title 11 of the United States Code, 11 U.S.C. §§ 101–1532.

13.     "*Bankruptcy Court*" means the United States Bankruptcy Court for the Southern District of New York having jurisdiction over the Chapter 11 Cases, and, to the extent of the withdrawal of any reference under 28 U.S.C. § 157 and/or the order of the United States District Court for the Southern District of New York, the United States District Court for the Southern District of New York.

14.     "*Bankruptcy Rules*" means the Federal Rules of Bankruptcy Procedure, as applicable to the Chapter 11 Cases, promulgated under section 2075 of the Judicial Code and the general, local, and chambers rules of the Bankruptcy Court.

15.     "*Black Diamond*" means BDCM Opportunity Fund II, L.P., Black Diamond International Funding, Ltd., Black Diamond CLO 2005-1 Ltd., Black Diamond CLO 2005-2 Ltd., BDC Finance L.L.C. and Black Diamond CLO 2006-1 (Cayman) Ltd. and each of the foregoing entities' Affiliates.

16.     "*Business Day*" means any day, other than a Saturday, Sunday, or "legal holiday" (as defined in Bankruptcy Rule 9006(a)).

17.     "*Cash*" means the legal tender of the United States of America or the equivalent thereof.

18.     "*Causes of Action*" means any action, claim, cause of action, controversy, demand, right, action, Lien, indemnity, guaranty, suit, obligation, liability, damage, judgment, account, defense, offset, power, privilege,

license, and franchise of any kind or character whatsoever, known, unknown, contingent or non-contingent, matured or unmatured, suspected or unsuspected, liquidated or unliquidated, disputed or undisputed, secured or unsecured, assertable directly or derivatively, whether arising before, on, or after the Petition Date, in contract or in tort, in law or in equity, or pursuant to any other theory of law. Cause of Action also includes: (a) any right of setoff, counterclaim, or recoupment and any claim on contracts or for breaches of duties imposed by law or in equity; (b) the right to object to Claims or Interests; (c) any claim pursuant to sections 362 or chapter 5 of the Bankruptcy Code; (d) any claim or defense including fraud, mistake, duress, and usury, and any other defenses set forth in section 558 of the Bankruptcy Code; (e) any state law fraudulent transfer claim; and (f) any claim listed in the Plan Supplement; *provided, however,* that notwithstanding anything herein, the Causes of Action shall not include Avoidance Actions unless otherwise listed as retained Causes of Action filed as part of the Plan Supplement.

19. "*Certificate*" means any instrument evidencing a Claim or an Interest.

20. "*Chapter 11 Cases*" means (a) when used with reference to a particular Debtor, the chapter 11 case pending for that Debtor under chapter 11 of the Bankruptcy Code in the Bankruptcy Court and (b) when used with reference to all Debtors, the procedurally consolidated chapter 11 cases pending for the Debtors in the Bankruptcy Court under Case No. 09-13125 (JPM).

21. "*Citadel Directors*" means John C. Baylis, Rod Chay, Todd Gjervold and Joe Russell, each of whom formerly served on ION's Board of Directors before the Petition Date.

22. "*Claim*" means any claim against a Debtor as defined in section 101(5) of the Bankruptcy Code.

23. "*Claims Bar Date*" means the dates to be established by the Bankruptcy Court by which Proofs of Claim must be Filed.

24. "*Claims Objection Bar Date*" means, for each Claim, the later of (a) 180 days after the Effective Date and (b) such other period of limitation as may be specifically fixed by an order of the Bankruptcy Court for Filing such Claims.

25. "*Claims Register*" means the official register of Claims maintained by the Notice and Claims Agent.

26. "*Class*" means a category of Holders of Claims or Interests as set forth in Article III hereof pursuant to section 1122(a) of the Bankruptcy Code.

27. "*Committee*" means the official committee of unsecured creditors of the Debtors appointed by the U.S. Trustee in the Chapter 11 Cases on June 22, 2009, pursuant to section 1102 of the Bankruptcy Code, the members of which may be reconstituted from time to time.

28. "*Communications Act*" means Chapter 5 of Title 47 of the United States Code, 47 U.S.C. § 151 et seq., as amended.

29. "*Confirmation*" means the entry of the Confirmation Order on the docket of the Chapter 11 Cases, subject to all conditions specified in Article X.A hereof having been: (a) satisfied; or (b) waived pursuant to Article X.C hereof.

30. "*Confirmation Date*" means the date upon which the Bankruptcy Court enters the Confirmation Order on the docket of the Chapter 11 Cases, within the meaning of Bankruptcy Rules 5003 and 9021.

31. "*Confirmation Hearing*" means the hearing held by the Bankruptcy Court on Confirmation of the Plan pursuant to section 1129 of the Bankruptcy Code, as such hearing may be continued from time to time.

32. "*Confirmation Order*" means the order of the Bankruptcy Court confirming the Plan pursuant to section 1129 of the Bankruptcy Code.

K&E 14662808.

33.        *"Consenting First Lien Lenders"* means the Initial Consenting First Lien Lenders and the Additional Consenting First Lien Lenders.

34.        *"Consummation"* means the occurrence of the Effective Date.

35.        *"Conversion Equity"* means 62.5% of the New Common Stock (or beneficial interests in the FCC Trust, if applicable) on a fully diluted basis after giving effect to all (i) New Common Stock (or beneficial interests in the FCC Trust, if applicable) and (ii) New Common Stock issuable upon exercise of the Special Warrants, in each case issued on the Effective Date.

36.        *"Corporate Governance Documents"* means the (i) New Certificates of Incorporation, (ii) New By-Laws, (iii) New Shareholders Agreement, (iv) Registration Rights Agreement, (v) Warrants; (vi) Special Warrants; and (vii) FCC Trust Agreement; each of which shall be filed with the Bankruptcy Court by the Corporate Governance Documents Deadline.

37.        *"Corporate Governance Documents Deadline"* means no later than two (2) days before the Voting Deadline, unless the Corporate Governance Documents Deadline is extended by each of the Initial Consenting First Lien Lenders or prior thereto brought before the Bankruptcy Court to determine the reasonableness thereof.

38.        *"Cure Claim"* means a Claim based upon a monetary default, if any, by any Debtor on an Executory Contract or Unexpired Lease at the time such contract or lease is assumed by the Debtors pursuant to sections 365 or 1123 of the Bankruptcy Code.

39.        *"D&O Liability Insurance Policies"* means all insurance policies for directors', managers', and officers' liability maintained by the Debtors as of the Petition Date.

40.        *"Debtor"* means ION or any Debtor Subsidiary, each in its respective individual capacity as a debtor and debtor in possession in the Chapter 11 Cases.

41.        *"Debtor Subsidiary"* means any of: America 51, L.P.; ION Media Akron License, Inc.; ION Media Albany License, Inc.; ION Media Atlanta License, Inc.; ION Media Battle Creek License, Inc.; ION Media Boston License, Inc.; ION Media Brunswick License, Inc.; ION Media Buffalo License, Inc.; ION Media Charleston License, Inc.; ION Media Chicago License, Inc.; ION Media Dallas License, Inc.; ION Media Denver License, Inc.; ION Media Des Moines License, Inc.; ION Media Entertainment, Inc.; ION Media Greensboro License, Inc.; ION Media Greenville License, Inc.; ION Media Hartford License, Inc.; ION Media Hawaii License, Inc.; ION Media Hits, Inc.; ION Media Holdings, Inc.; ION Media Houston License, Inc.; ION Media Indianapolis License, Inc.; ION Media Jacksonville License, Inc.; ION Media Kansas City License, Inc.; ION Media Knoxville License, Inc.; ION Media Lexington License, Inc.; ION Media License Company, LLC; ION Media Los Angeles License, Inc.; ION Media LPTV, Inc.; ION Media Management Company.; ION Media Martinsburg License, Inc.; ION Media Memphis License, Inc.; ION Media Milwaukee License, Inc.; ION Media Minneapolis License, Inc.; ION Media New Orleans License, Inc.; ION Media of Akron, Inc.; ION Media of Albany, Inc.; ION Media of Atlanta, Inc.; ION Media of Battle Creek, Inc.; ION Media of Birmingham, Inc.; ION Media of Boston, Inc.; ION Media of Brunswick, Inc.; ION Media of Buffalo, Inc.; ION Media of Cedar Rapids, Inc.; ION Media of Charleston, Inc.; ION Media of Chicago, Inc.; ION Media of Dallas, Inc.; ION Media of Denver, Inc.; ION Media of Des Moines, Inc.; ION Media of Detroit, Inc.; ION Media of Fayetteville, Inc.; ION Media of Greensboro, Inc.; ION Media of Greenville, Inc.; ION Media of Hartford, Inc.; ION Media of Honolulu, Inc.; ION Media of Houston, Inc.; ION Media of Indianapolis, Inc.; ION Media of Jacksonville, Inc.; ION Media of Kansas City, Inc.; ION Media of Knoxville, Inc.; ION Media of Lexington, Inc.; ION Media of Los Angeles, Inc.; ION Media of Louisville, Inc.; ION Media of Martinsburg, Inc.; ION Media of Memphis, Inc.; ION Media of Miami, Inc.; ION Media of Milwaukee, Inc.; ION Media of Minneapolis, Inc.; ION Media of Nashville, Inc.; ION Media of New Orleans, Inc.; ION Media of New York, Inc.; ION Media of Norfolk, Inc.; ION Media of Oklahoma City, Inc.; ION Media of Orlando, Inc.; ION Media of Philadelphia, Inc.; ION Media of Phoenix, Inc.; ION Media of Portland, Inc.; ION Media of Providence, Inc.; ION Media of Raleigh, Inc.; ION Media of Roanoke, Inc.; ION Media of Sacramento, Inc.; ION Media of Salt Lake City, Inc.; ION Media of San Antonio, Inc.; ION Media of San Jose, Inc.; ION Media of Scranton, Inc.; ION Media of Seattle, Inc.; ION Media of Spokane, Inc.; ION Media of Syracuse, Inc.; ION Media of Tampa, Inc.; ION Media of Tulsa, Inc.; ION Media of Washington, Inc.; ION Media of Wausau, Inc.; ION Media of West Palm

4

Beach, Inc.; ION Media Oklahoma City License, Inc.; ION Media Orlando License, Inc.; ION Media Philadelphia License, Inc.; ION Media Portland License, Inc.; ION Media Publishing, Inc.; ION Media Raleigh License, Inc.; ION Media Sacramento License, Inc.; ION Media Salt Lake City License, Inc.; ION Media San Antonio License, Inc.; ION Media San Jose License, Inc.; ION Media Scranton License, Inc.; ION Media Songs, Inc.; ION Media Spokane License, Inc.; ION Media Syracuse License, Inc.; ION Media Television, Inc.; ION Media Tulsa License, Inc.; ION Media Washington License, Inc.; ION Media Wausau License, Inc.; ION Media West Palm Beach Holdings, Inc.; ION Media West Palm Beach License, Inc.; ION Television Net, Inc.; Ocean State Television, L.L.C.; and Open Mobile Ventures Corporation.

42.     "*Debtor Subsidiaries*" means each Debtor Subsidiary, collectively.

43.     "*DIP Agent*" means Wilmington Trust FSB, in its capacity as administrative and collateral agent under the DIP Facility, together with its successors and assigns in such capacity.

44.     "*DIP Commitment*" means the superpriority priming multiple draw term loan facility in an aggregate principal amount of up to $150 million in respect of New Money Loans under the DIP Credit Agreement.

45.     "*DIP Credit Agreement*" means that certain Amended and Restated Debtor In Possession Credit Agreement, dated as of July 6, 2009 (as amended, restated, supplemented or otherwise modified from time to time), among ION, as borrower, each of the Debtor Subsidiaries, as subsidiary guarantors, the lenders party thereto and the DIP Agent.

46.     "*DIP Facility*" means that certain debtor in possession credit facility entered into pursuant to the DIP Credit Agreement.

47.     "*DIP Facility Claims*" means any Claim derived from or based upon the DIP Credit Agreement and the other "Loan Documents," as defined therein.

48.     "*DIP Lenders*" means the banks, financial institutions, and other lender parties to the DIP Credit Agreement from time to time, each in their capacity as such, including the Initial Consenting First Lien Lenders and the Additional Consenting First Lien Lenders that participate pursuant to the terms of the DIP Credit Agreement and those certain New Money Commitment syndication procedures dated July 14, 2009.

49.     "*DIP Order*" means the Final Order (i) Authorizing Postpetition Secured Financing Pursuant to 11 U.S.C. §§ 105(a), 361, 362, 364(c)(1), 364(c)(2), 364(c)(3), 364(d)(1) and 364(e), (ii) Authorizing the Debtors' Use of Cash Collateral Pursuant to 11 U.S.C. § 363 and (iii) Granting Adequate Protection Pursuant to 11 U.S.C. §§ 361, 363 and 364 [Docket No. 142].

50.     "*Disbursing Agent*" means the Reorganized Debtors, the Prepetition Agents or the Entity or Entities chosen by the Reorganized Debtors to make or facilitate distributions pursuant to the Plan.

51.     "*Disclosure Statement*" means the *Disclosure Statement for the Debtors' Joint plan of reorganization Pursuant to Chapter 11 of the Bankruptcy Code*, dated August 19, 2009, as amended, supplemented, or modified from time to time, including all exhibits and schedules thereto and references therein that relate to the Plan, that is prepared and distributed in accordance with the Bankruptcy Code, the Bankruptcy Rules, and any other applicable law.

52.     "*Disputed*" means, with respect to any Claim or Interest, any Claim or Interest that is not yet Allowed.

53.     "*Distribution Date*" means the date that is as soon as practicable after the Effective Date, but no later than 10 days after the Effective Date.

54.     "*Distribution Record Date*" means the date that the Confirmation Order is entered by the Bankruptcy Court.

55.     "*Effective Date*" means the later to occur of: (i) the date on which the Confirmation Order becomes a Final Order and (ii) three (3) Business Days after the date that FCC Approval is obtained; *provided, however,* in each case, the conditions specified in Article X.B. have been satisfied or waived.

56.     "*Entity*" means an entity as defined in section 101(15) of the Bankruptcy Code.

57.     "*Equity Incentive Program*" means that certain post-Effective Date Equity Incentive Program providing for a certain percentage of New Common Stock, not to exceed 10% of the issued and outstanding New Common Stock and New Common Stock issuable upon exercise of the Special Warrants, in each instance on the Effective Date, to be reserved for issuance as options, equity or equity-based grants in connection with the Reorganized Debtors' management equity incentive program and/or director equity incentive program, the terms of which shall be determined by the Requisite Initial Lenders with the Initial Consenting First Lien Lenders working in good faith to set forth the terms of the Equity Incentive Program in the Plan Supplement; but in no event shall the terms of the Equity Incentive Program be determined by the Requisite Initial Lenders and subsequently implemented by the FCC Trustees or the New Board (as applicable) no later than 60 days after the Confirmation Order becomes a Final Order; *provided, however,* that the grant of any awards issued pursuant to the Equity Incentive Program shall not vest until the Transfer of Control occurs.

58.     "*Equity Interest*" means any share of common stock, preferred stock or other instrument evidencing an ownership interest in any of the Debtors, whether or not transferable, and any option, warrant or right, contractual or otherwise, to acquire any such interest in a Debtor that existed immediately before the Effective Date, including any Claim subject to subordination pursuant to section 510(b) of the Bankruptcy Code arising therefrom; *provided, however,* that Equity Interest does not include any Intercompany Interest.

59.     "*Estate*" means, as to each Debtor, the estate created for the Debtor in its Chapter 11 Case pursuant to section 541 of the Bankruptcy Code.

60.     "*Exculpated Claim*" means any claim related to any act or omission in connection with, relating to, or arising out of the Debtors' in or out of court restructuring efforts, the Debtors' Chapter 11 Cases, formulation, preparation, dissemination, negotiation or filing of the Disclosure Statement or the Plan or any contract, instrument, release or other agreement or document created or entered into in connection with the Disclosure Statement or the Plan, the filing of the Chapter 11 Cases, the pursuit of Confirmation, the pursuit of Consummation, the administration and implementation of the Plan, including the issuance of Plan Securities, or the distribution of property under the Plan or any other agreement; *provided, however,* that Exculpated Claims shall not include any act or omission that is determined in a Final Order to have constituted gross negligence or willful misconduct.  For the avoidance of doubt, no Claim, obligation or liability expressly set forth in, arising under, or preserved by the Plan or the Plan Supplement constitutes an Exculpated Claim.

61.     "*Exculpated Party*" means each of:  (a) the Debtors, the Reorganized Debtors and their Affiliates, (b) the DIP Agent and the DIP Lenders; (c) the Creditors' Committee and the members thereof, in their capacity as such; (d) the Consenting First Lien Lenders, in their capacity as such; (e) the Prepetition Agents; (f) the Indenture Trustees; (g) the FCC Trustees, in their capacity as such; (h) Avenue Capital, Black Diamond and Trilogy; and (i) with respect to each of the foregoing Entities in clauses (a) through (h), such Entities' subsidiaries, affiliates, managed accounts or funds, officers, FCC Trustees, directors, principals, employees, agents, financial advisors, attorneys, accountants, investment bankers, consultants, representatives, management companies, fund advisors and other Professionals; *provided, however,* that with respect to officers and directors of the Debtors, only the current directors and officers of the Debtors, any additional officers and directors as of the Effective Date and the Citadel Directors shall be deemed "Exculpated Parties."

62.     "*Exculpation*" means the exculpation provision set forth in Article IX.D. hereof.

63.     "*Executory Contract*" means a contract to which one or more of the Debtors is a party that is subject to assumption or rejection under section 365 of the Bankruptcy Code.

64.     "*Exit Facility*" means the exit facility entered into pursuant to the Exit Facility Agreement.

K&E 14662808.

65.     "*Exit Facility Agent*" means the administrative agent to be appointed under the Exit Facility Agreement, which administrative agent may be changed or substituted without further order of the Court.

66.     "*Exit Facility Agreement*" means that agreement to be executed by Reorganized ION on or before the Effective Date, including any agreements, amendments, supplements or documents related thereto, which provides for an exit credit facility in an aggregate principal amount of $10 million, to be provided by one or more Initial Consenting First Lien Lenders at their option, the substantially final form of which shall be Filed as part of the Plan Supplement and acceptable to the Requisite Initial Lenders.

67.     "*Exit Facility Documents*" means, collectively, all related agreements, documents or instruments to be executed or delivered in connection with the Exit Facility and the Exit Facility Agreement.

68.     "*FCC*" means the Federal Communications Commission and any successor governmental agency performing functions similar to those performed by the Federal Communications Commission on the Effective Date.

69.     "*FCC Applications*" means the requisite FCC applications to be filed in connection with this restructuring.

70.     "*FCC Approval*" means an action by the FCC (including any action duly taken by the FCC's staff pursuant to delegated authority) granting its consent to either the (1) Transfer of Control or (2) transfer of the New Common Stock to the FCC Trust pending FCC approval of the Transfer of Control, whichever comes first.

71.     "*FCC Licenses*" means broadcasting and other licenses, authorizations, waivers and permits which are issued from time to time by the FCC.

72.     "*FCC Trust*" means the trust or other entity acceptable to the FCC that may be created on or before the Effective Date into which the New Common Stock will be issued if the FCC Trust is utilized as described herein.

73.     "*FCC Trust Agreement*" means the liquidating trust agreement to be Filed as part of the Plan Supplement, which will, among other things: (a) establish and govern the FCC Trust and (b) set forth the respective powers, duties and responsibilities of the FCC Trustees and which shall be reasonably acceptable to each of the Initial Consenting First Lien Lenders.

74.     "*FCC Trustees*" means those Persons serving as the existing board of directors of ION plus three additional independent Persons who shall be appointed by the Debtors, with the consent of each of the Consenting First Lien Lenders, and identified in the Plan Supplement and retained as of the Effective Date. The FCC Trustees shall be the fiduciaries responsible for implementing the applicable provisions of the Plan relating to the FCC Trust in accordance with the FCC Trust Agreement. If the New Common Stock is transferred to the FCC Trust, the boards of directors of Reorganized ION and the Reorganized Debtor Subsidiaries during the period that the New Common Stock is held by the FCC Trust shall consist of the same individuals as the FCC Trustees.

75.     "*Fee Claim*" means a Claim for Accrued Professional Compensation.

76.     "*File*," "*Filed*," or "*Filing*" means file, filed, or filing with the Bankruptcy Court or its authorized designee in the Chapter 11 Cases.

77.     "*Final Order*" means, as applicable, an order or judgment of the Bankruptcy Court or other court of competent jurisdiction with respect to the relevant subject matter, which has not been reversed, stayed, modified, or amended, and as to which the time to appeal or seek certiorari has expired and no appeal or petition for certiorari has been timely taken, or as to which any appeal that has been taken or any petition for certiorari that has been or may be Filed has been resolved by the highest court to which the order or judgment was appealed or from which certiorari was sought or the new trial, reargument or rehearing shall have been denied, resulted in no modification of such order or has otherwise been dismissed with prejudice.

7

78.     "*First Lien Debt Claims*" means, collectively, the Prepetition Credit Facility Claims, the First Priority Secured Swap Claims, the First Priority Notes Claims and the First Lien Subsidiary Guarantee Claims.

79.     "*First Lien Debt*" means, collectively, the Prepetition Credit Facility, the Prepetition Hedges and the First Priority Notes.

80.     "*First Lien Debt Deficiency Claim*" means the portion, if any, of the First Lien Debt Claims that exceeds the value of any and all Liens securing such indebtedness, including any Lien on collateral.

81.     "*First Priority Indenture*" means the Indenture, dated as of December 30, 2005, by and among ION, as borrower, the subsidiary guarantors party thereto and the First Priority Notes Trustee, as amended, providing for the issuance by ION of the First Priority Notes.

82.     "*First Priority Notes*" means $400 million aggregate principal amount of ION's Floating Rate First Priority Senior Secured Notes due 2012, issued under the First Priority Indenture.

83.     "*First Priority Notes Claims*" means any Claim derived from or based upon the First Priority Indenture; *provided* that First Priority Notes Claims shall not include Section 510(b) Claims.

84.     "*First Priority Notes Trustee*" means The Bank of New York Trust Company, NA, in its capacity as trustee under the First Priority Indenture, together with its successors and assigns in such capacity.

85.     "*First Priority Secured Swap Claims*" means any Claim derived from or based upon the Prepetition Hedges; *provided* that First Priority Secured Swap Claims shall not include Section 510(b) Claims.

86.     "*First Lien Subsidiary Guarantee Claims*" means all Subsidiary Guarantee Claims held by the holders of First Lien Debt Claims.

87.     "*General Unsecured Claims*" means any: (a) Senior Subordinated Notes Claim; and (b) unsecured Claim against any of the Debtors that is not an Administrative Claim, a Priority Tax Claim, an Other Priority Claim, a First Lien Debt Deficiency Claim, a Section 510(b) Claim, a Fee Claim or an Intercompany Claim.

88.     "*Global Settlement*" means the settlement by and among the Debtors, the Committee and the Initial Consenting First Lien Lenders, the terms of which are outlined in the Disclosure Statement and will be presented to the Court for approval.

89.     "*Governmental Unit*" means a governmental unit as defined in section 101(27) of the Bankruptcy Code.

90.     "*Holder*" means any Person or Entity holding a Claim or an Interest.

91.     "*Impaired*" means any Claim or Interest in an Impaired Class.

92.     "*Impaired Class*" means an impaired Class within the meaning of section 1124 of the Bankruptcy Code.

93.     "*Indemnification Provision*" means each of the indemnification provisions currently in place whether in the bylaws, certificates of incorporation or other formation documents in the case of a limited liability company, board resolutions or employment contracts for the current and former directors, officers, members (including *ex officio* members), employees, attorneys, other professionals and agents of the Debtors and such current and former directors, officers and members' respective Affiliates.

94.     "*Indemnified Parties*" means, collectively, the Debtors and each of their respective current and former officers, directors, managers and employees, each in their respective capacities as such.

K&E 14662808.

95.    "*Indenture Trustees*" means, collectively, the First Priority Notes Trustee, the Second Priority Notes Trustee and the Senior Subordinated Notes Trustee.

96.    "*Initial Consenting First Lien Lenders*" means (i) Avenue Capital, (ii) Black Diamond and (iii) Trilogy.

97.    "*Intercompany Claim*" means any Claim held by a Debtor against another Debtor.

98.    "*Intercompany Interest*" means an Equity Interest in a Debtor held by another Debtor.

99.    "*Intercreditor Agreement*" means Annex 1 to the Prepetition Security Agreement, entitled "The Collateral Agent and Secured Party Acknowledgments."

100.    "*Interests*" means, collectively, Equity Interests and Intercompany Interests.

101.    "*Interim Compensation Order*" means the *Order Granting Debtors' Motion to Establish Procedures for Interim Compensation and Reimbursement of Expenses for Professionals* [Docket No. 102].

102.    "*ION*" means ION Media Networks, Inc., a Delaware corporation.

103.    "*ION Equity Interests*" means the Equity Interests in ION and the Debtor Subsidiaries, excluding Intercompany Interests held by ION or the Debtor Subsidiaries.

104.    "*Judicial Code*" means title 28 of the United States Code, 28 U.S.C. §§ 1–4001.

105.    "*Lien*" means a lien as defined in section 101(37) of the Bankruptcy Code.

106.    "*Long Form Application*" means the application filed with the FCC seeking approval for the Transfer of Control.

107.    "*Local Bankruptcy Rules*" means the Local Bankruptcy Rules for the Southern District of New York.

108.    "*New Board*" means the initial board of directors of Reorganized ION following Transfer of Control.

109.    "*New By-Laws*" means the form of the by-laws of each of the Reorganized Debtors, which form will be included in the Plan Supplement and reasonably acceptable to each of the Initial Consenting First Lien Lenders.

110.    "*New Certificate of Incorporation*" means the form of the certificates of incorporation of each of the Reorganized Debtors, which form will be included in the Plan Supplement and reasonably acceptable to each of the Initial Consenting First Lien Lenders.

111.    "*New Common Stock*" means the new common stock, par value $.001 per share, of Reorganized ION issued on the Effective Date.

112.    "*New Employment Agreements*" mean the employment agreement between Reorganized ION and R. Brandon Burgess, in his capacity as President, Chairman and Chief Executive Officer (the "CEO"), and any other employment agreements between Reorganized ION and any other member of the Debtors' current management, which shall be negotiated by the CEO and the Initial Consenting First Lien Lenders, the form of all such agreements (including the new agreement with the CEO) to be included in the Plan Supplement and acceptable to the Requisite Initial Lenders.

K&E 14662808.

113.     "*New Money Commitment*" means, with respect to each DIP Lender, the commitment, if any, of such DIP Lender to make a New Money Loan under the DIP Credit Agreement.  The aggregate amount of the New Money Commitment is $150 million.

114.     "*New Money Loans*" means the loans made pursuant to Section 2.01(a) of the DIP Credit Agreement.

115.     "*New Shareholders Agreement*" means that certain agreement to be executed on or before the Effective Date providing for, among other things, the rights and obligations of the Holders of the New Common Stock, the form of which will be Filed pursuant to the Plan Supplement and reasonably acceptable to each of the Initial Consenting First Lien Lenders.

116.     "*Notice and Claims Agent*" means Kurtzman Carson Consultants LLC, located at 2335 Alaska Avenue, El Segundo, California 90245, (866) 967-0678, retained as the Debtors' notice, claims and solicitation agent.

*117.*     "*Ordinary Course Professional Order*" means the *Order Authorizing the Debtors' Retention and Compensation of Certain Professionals Utilized in the Ordinary Course of Business* [Docket No. 107].

118.     "*Other Priority Claim*" means any Claim accorded priority in right of payment under section 507(a) of the Bankruptcy Code, other than:  (a) an Administrative Claim; or (b) a Priority Tax Claim.

119.     "*Other Secured Claim*" means any Secured Claim that is not: (a) a DIP Facility Claim; (b) a First Lien Debt Claim; or (c) a Second Priority Notes Claim.

120.     "*Ownership Certification*" means a written certification in form and substance satisfactory to Reorganized ION to the effect that a Person is a U.S. Person and that the direct and indirect voting and economic interests of such Person are held by Persons at least 75% of whom are U.S. Persons for purposes of Section 310(b)(iv) of the Communications Act as interpreted and applied by the FCC.

121.     "*Person*" means a "person" as defined in section 101(41) of the Bankruptcy Code.

122.     "*Petition Date*" means May 19, 2009.

123.     "*Plan*" means this *Debtors' First Modified Joint Plan of Reorganization Pursuant to Chapter 11 of the Bankruptcy Code*, as amended, supplemented, or modified from time to time, including the Plan Supplement, which is incorporated herein by reference.

124.     "*Plan Securities*" means, collectively, the New Common Stock, the Special Warrants, the Warrants and, if applicable, the beneficial interests in the FCC Trust and the shares of New Common Stock to be issued to the holders of such beneficial interests after FCC approval of the Transfer of Control.

125.     "*Plan Supplement*" means the compilation of documents and forms of documents, schedules, and exhibits to the Plan to be Filed by the Debtors no later than ten (10) days before the Confirmation Hearing or such later date as may be approved by the Bankruptcy Court on notice to parties in interest, as it may thereafter be altered, amended, modified, or supplemented from time to time in accordance with the terms hereof and in accordance with the Bankruptcy Code and the Bankruptcy Rules, and additional documents Filed with the Bankruptcy Court before the Effective Date as amendments to the Plan Supplement, comprising, without limitation, the following:  (a) to the extent known, the identity of the members of the New Board and the nature and amount of compensation for any member of the New Board who is an "insider" under section 101(31) of the Bankruptcy Code; (b) a list of Executory Contracts and Unexpired Leases to be assumed; (c) a list of retained Causes of Action, which shall be subject to the consent of the Requisite Initial Lenders, which consent shall not be unreasonably withheld; (d) the form of the Exit Facility Agreement; (e) the New Employment Agreements; and (f) the Corporate Governance Documents; *provided, however,* that the Corporate Governance Documents shall be filed with the Bankruptcy Court by the Corporate Governance Documents Deadline.

K&E 14662808.

126. "*Prepetition Administrative Agent*" means Wells Fargo Bank, N.A., in its capacity as administrative agent under the Prepetition Credit Facility, together with its successors and assigns in such capacity.

127. "*Prepetition Agent*" means the Prepetition Administrative Agent, the Prepetition Collateral Agent and the First Priority Notes Trustee.

128. "*Prepetition Collateral*" means the "Collateral" as such term is defined in the Prepetition Security Agreement.

129. "*Prepetition Collateral Agent*" means The Bank of New York Trust Company, NA, in its capacity as collateral agent under the Prepetition Credit Facility, together with its successors and assigns in such capacity.

130. "*Prepetition Credit Facility*" means the Term Loan Agreement, dated as of December 30, 2005 (as amended, restated, supplemented or otherwise modified from time to time), among ION (formerly known as Paxson Communications Corporation), as borrower, the subsidiary guarantors party thereto, the lenders party thereto and the Prepetition Administrative Agent.

131. "*Prepetition Credit Facility Claims*" means any Claim derived from or based upon the Prepetition Credit Facility; *provided* that Prepetition Credit Facility Claims shall not include Section 510(b) Claims.

132. "*Prepetition Hedges*" means (a) that certain ISDA Master Agreement, dated February 22, 2006 among Goldman Sachs Capital Markets, L.P., ION, as borrower, and the subsidiary guarantors party thereto, as amended and supplemented by a Schedule to the Master Agreement, dated February 22, 2006 and two Confirmations, each dated February 22, 2006, in the notional amounts of $326,250,000 and $182,250,000 and (b) that certain ISDA Master Agreement, dated February 22, 2006 among UBS AG, ION, as borrower, and the subsidiary guarantors party thereto, as amended and supplemented by a Schedule to the Master Agreement, dated February 22, 2006 and two Confirmations, each dated February 22, 2006, in the notional amounts of $398,750,000 and $222,750,000.

133. "*Prepetition Security Agreement*" means the "Security Agreement" as such term is defined in the Prepetition Credit Facility.

134. "*Priority Tax Claim*" means any Claim of a Governmental Unit of the kind specified in section 507(a)(8) of the Bankruptcy Code.

135. "*Priority Tax Claims Bar Date*" means the first Business Day that is 180 days after the Confirmation Date.

136. "*Pro Rata*" means the proportion that an Allowed Claim in a particular Class bears to the aggregate amount of Allowed Claims in that Class, or the proportion that Allowed Claims in a particular Class bear to the aggregate amount of Allowed Claims in a particular Class and other Classes entitled to share in the same recovery as such Allowed Claim under the Plan.

137. "*Professional*" means an Entity: (a) retained pursuant to a Final Order in accordance with sections 327, 363, or 1103 of the Bankruptcy Code and to be compensated for services rendered before or on the Confirmation Date, pursuant to sections 327, 328, 329, 330, 363, and 331 of the Bankruptcy Code; or (b) awarded compensation and reimbursement by the Bankruptcy Court pursuant to section 503(b)(4) of the Bankruptcy Code.

138. "*Proof of Claim*" means a proof of Claim Filed against any of the Debtors in the Chapter 11 Cases.

139. "*Registration Rights Agreement*" means the form of registration rights agreement providing for registration rights of the New Common Stock reasonably acceptable to each of the Initial Consenting First Lien Lenders, which form will be included in the Plan Supplement.

140.     "*Rejection Claim*" means a Claim arising from the rejection of an Executory Contract or Unexpired Lease.

141.     "*Rejection Claims Bar Date*" means the first Business Day that is 30 days after the earlier of: (x) the date of entry of an order of the Bankruptcy Court approving the rejection of the relevant Executory Contract or Unexpired Lease; and (y) the Effective Date.

142.     "*Releasing Parties*" means all Entities who have held, hold, or may hold Claims or Interests that have been released pursuant to Article X.B or Article IX.C, discharged pursuant to Article IX.E or are subject to exculpation pursuant to Article X.D.

143.     "*Released Party*" means each of: (a) the DIP Agent and the DIP Lenders; (b) the Creditors' Committee and the members thereof in their capacity as such; (c) the Consenting First Lien Lenders, in their capacity as such; (d) the Prepetition Agents; (e) the Indenture Trustees; (f) the FCC Trustees, in their capacity as such; (g) Avenue Capital, Black Diamond and Trilogy; (h) with respect to each of the foregoing Entities in clauses (a) through (g), such Entities' subsidiaries, affiliates, managed accounts or funds, officers, directors, principals, employees, agents, financial advisors, attorneys, accountants, investment bankers, consultants, representatives, and other Professionals; and (h) in each case in their capacity as such and only if serving in such capacity, the Debtors' and the Reorganized Debtors' officers, directors, principals, employees, agents, financial advisors, attorneys, accountants, investment bankers, consultants, representatives, management companies, fund advisors and other Professionals; *provided, however,* that with respect to officers and directors of the Debtors, only the current directors and officers of the Debtors, any additional officers and directors serving as of the Effective Date and the Citadel Directors shall be deemed "Released Parties."

144.     "*Reorganized Debtors*" means the Debtors, in each case, or any successor thereto, by merger, consolidation or otherwise, on or after the Effective Date.

145.     "*Reorganized ION*" means ION Media Networks, Inc. as reorganized under and pursuant to the Plan, or any successor thereto, by merger, consolidation, transfer of substantially all assets or otherwise, on and after the Effective Date.

146.     "*Requisite Initial Lenders*" means [three out of four of the Initial Consenting First Lien Lenders].

147.     "*Schedules*" means, collectively, the schedules of assets and liabilities, schedules of Executory Contracts and Unexpired Leases, and statements of financial affairs Filed by the Debtors pursuant to section 521 of the Bankruptcy Code and in substantial accordance with the Official Bankruptcy Forms, as the same may have been amended, modified, or supplemented from time to time.

148.     "*Second Lien Warrants*" means those warrants, which shall be provided to the Holders of Second Priority Note Claims pursuant to the terms set forth in Article III.C.4 below and the terms of the Global Settlement, that are issued by Reorganized ION on or as soon as reasonably practicable after the Effective Date to the Holders of Second Priority Notes Claims in full and final satisfaction of all Second Priority Notes Claims to purchase 5% of the New Common Stock with a strike price equivalent to a $800 million total equity value for Reorganized ION, which will expire on the seven (7) year anniversary of the Effective Date and will not be exercisable before FCC approval of the Transfer of Control, the substantially final form of which shall be reasonably acceptable to the Debtors and to at least two of the three Initial Consenting First Lien Lenders.

149.     "*Second Priority Indenture*" means the Indenture, dated as of the December 30, 2005, by and among ION, as borrower, the subsidiary guarantors party thereto and the Second Priority Notes Trustee, as amended, providing for the issuance by ION of the Second Priority Notes.

150.     "*Second Priority Notes*" means $448.075 million aggregate principal amount of ION's Floating Rate Second Priority Senior Secured Notes due 2013 issued under the Second Priority Notes Indenture.

K&E 14662808.

151.     *"Second Priority Notes Claims"* means any Claim other than Second Priority Notes Guaranty Claims derived from or based upon the Second Priority Indenture; *provided* that Second Priority Notes Claims shall not include Section 510(b) Claims.

152.     *"Second Priority Notes Guaranty Claims"* means all Subsidiary Guaranty Claims held by the holders of the Second Priority Notes.

153.     *"Second Priority Notes Trustee"* means Manufacturers and Traders Trust Company (as successor to The Bank of New York Trust Company, NA), in its capacity as trustee under the Second Priority Indenture, together with its successors and assigns in such capacity.

154.     *"Section 510(b) Claims"* means any Claim that is subordinated or subject to subordination under section 510(b) of the Bankruptcy Code, including Claims arising from the recission of a purchase or sale of a security of the Debtors for damages arising from such purchase or sale, or for reimbursement or contribution allowed under section 502 of the Bankruptcy Code on account of such a Claim.

155.     *"Secured"* means when referring to a Claim: (a) secured by a Lien on property in which the Estate has an interest, which Lien is valid, perfected, and enforceable pursuant to applicable law or by reason of a Bankruptcy Court order, or that is subject to setoff pursuant to section 553 of the Bankruptcy Code, to the extent of the value of the creditor's interest in the Estate's interest in such property or to the extent of the amount subject to setoff, as applicable, as determined pursuant to section 506(a) of the Bankruptcy Code; or (b) otherwise Allowed pursuant to the Plan as a Secured Claim.

156.     *"Secured Claim"* means a Claim that is Secured.

157.     *"Securities Act"* means the Securities Act of 1933, 15 U.S.C. §§ 77a–77aa, as amended.

158.     *"Securities Exchange Act"* means the Securities Exchange Act of 1934, 15 U.S.C. §§ 78a–78nn, as amended.

159.     *"Senior Subordinated Notes"* means: (a) the 11% Series A Mandatorily Convertible Senior Subordinated Notes issued pursuant to the 11% Series A Notes Indenture; and (b) the 11% Series B Mandatorily Convertible Senior Subordinated Notes issued pursuant to the 11% Series B Notes Indenture.

160.     *"Senior Subordinated Notes Claims"* means any Claim derived from or based upon the Senior Subordinated Notes.

161.     *"Senior Subordinated Notes Indentures"* means: (a) the 11% Series A Notes Indenture; and (b) the 11% Series B Notes Indenture.

162.     *"Senior Subordinated Notes Trustee"* means U.S. Bank, in its capacity as trustee under each of the Senior Subordinates Notes Indentures, together with its successors and assigns in such capacity.

163.     *"Special Warrant"* means a 30 year warrant issued by Reorganized ION, with a nominal exercise price, to purchase New Common Stock, the terms of which will provide that it will not be exercisable (i) before FCC approval of the Transfer of Control and (ii) by any Person unless such Person delivers an Ownership Certification to Reorganized ION and such exercise otherwise complies with applicable law, the substantially final form of which shall be Filed with the Court by the Corporate Governance Documents Deadline and shall be reasonably acceptable to each of the Initial Consenting First Lien Lenders.

164.     *"Subsidiary Guarantee Claims"* means the First Lien Subsidiary Guarantee Claims and the Second Lien Subsidiary Guarantee Claims.

165.     *"Subsidiary Guarantors"* means the Debtor Subsidiaries of ION that guaranteed the First Lien Debt and Second Priority Notes.

K&E 14662808.

166. "*Transfer of Control*" means the transfer of control of ION to the Initial Consenting First Lien Lenders or an entity formed by the Initial Consenting First Lien Lenders.

167. "*Trilogy*" means Trilogy Portfolio Company LLC, Mariner LDC and each of the foregoing entities' Affiliates.

168. "*Unexpired Lease*" means a lease to which one or more of the Debtors is a party that is subject to assumption or rejection under section 365 of the Bankruptcy Code.

169. "*Unimpaired*" means, with respect to a Class of Claims or Interests, a Claim or an Interest that is unimpaired within the meaning of section 1124 of the Bankruptcy Code.

170. "*Unsecured Debt Warrants*" means those warrants provided to the Holders of General Unsecured Claims pursuant to the terms set forth in Article III.C.5 below and the Global Settlement, to be issued by Reorganized ION on or as soon as reasonably practicable after the Effective Date to the Holders of General Unsecured Claims to purchase 5% of the New Common Stock with a strike price equivalent to a $1.1 billion total equity value of Reorganized ION, which will expire on the seven (7) year anniversary of the Effective Date and will not be exercisable before FCC approval of the Transfer of Control, the substantially final form of which shall be reasonably acceptable to the Debtors and to at least two of the three Initial Consenting First Lien Lenders.

171. "*U.S. Persons*" means United States citizens and entities organized under the laws of the United States or any state or political subdivision or territory thereof, as applied and interrupted by the FCC.

172. "*U.S. Trustee*" means the United States Trustee for the Southern District of New York.

173. "*Voting Deadline*" means 5:00 p.m. (prevailing Eastern Time) on [•], 2009.

174. "*Warrants*" means, collectively, the Second Lien Warrants and the Unsecured Debt Warrants.

B.     *Rules of Interpretation*

For purposes herein: (a) in the appropriate context, each term, whether stated in the singular or the plural, shall include both the singular and the plural, and pronouns stated in the masculine, feminine, or neuter gender shall include the masculine, feminine, and the neuter gender; (b) any reference herein to a contract, lease, instrument, release, indenture, or other agreement or document being in a particular form or on particular terms and conditions means that the referenced document shall be substantially in that form or substantially on those terms and conditions; (c) any reference herein to an existing document or exhibit having been Filed or to be Filed shall mean that document or exhibit, as it may thereafter be amended, modified, or supplemented; (d) unless otherwise specified, all references herein to "Articles" are references to Articles hereof or hereto; (e) unless otherwise stated, the words "herein," "hereof," and ''herein'' refer to the Plan in its entirety rather than to a particular portion of the Plan; (f) captions and headings to Articles are inserted for convenience of reference only and are not intended to be a part of or to affect the interpretation hereof; (g) the rules of construction set forth in section 102 of the Bankruptcy Code shall apply; and (h) any term used in capitalized form herein that is not otherwise defined but that is used in the Bankruptcy Code or the Bankruptcy Rules shall have the meaning assigned to that term in the Bankruptcy Code or the Bankruptcy Rules, as the case may be.

C.     *Computation of Time*

The provisions of Bankruptcy Rule 9006(a) shall apply in computing any period of time prescribed or allowed herein.

D.     *Governing Law*

Unless a rule of law or procedure is supplied by federal law (including the Bankruptcy Code and Bankruptcy Rules) or unless otherwise specifically stated, the laws of the State of New York, without giving effect

K&E 14662808.

to the principles of conflict of laws, shall govern the rights, obligations, construction, and implementation of the Plan, any agreements, documents, instruments, or contracts executed or entered into in connection with the Plan (except as otherwise set forth in those agreements, in which case the governing law of such agreement shall control); *provided, however,* that corporate governance matters relating to the Debtors or the Reorganized Debtors, as applicable, not incorporated in New York shall be governed by the laws of the state of incorporation of the applicable Debtor or Reorganized Debtor, as applicable.

E.      *Reference to Monetary Figures*

All references in the Plan to monetary figures shall refer to currency of the United States of America, unless otherwise expressly provided.

F.      *Reference to the Debtors or the Reorganized Debtors*

Except as otherwise specifically provided in the Plan to the contrary, references in the Plan to the Debtors or to the Reorganized Debtors shall mean the Debtors and the Reorganized Debtors, as applicable, to the extent the context requires.

# ARTICLE II.

## ADMINISTRATIVE CLAIMS AND PRIORITY TAX CLAIMS

In accordance with section 1123(a)(1) of the Bankruptcy Code, Administrative Claims, Priority Tax Claims, Other Priority Claims and Intercompany Claims have not been classified and, thus, are excluded from the Classes of Claims and Interests set forth in Article III.

A.      *Administrative Claims*

1.      General Administrative Claims

Except with respect to Administrative Claims that are Fee Claims and except to the extent that a Holder of an Allowed Administrative Claim and the applicable Debtors agree to less favorable treatment to such Holder, each Holder of an Allowed Administrative Claim shall be paid in full in Cash on the later of: (i) on or as soon as reasonably practicable after the Effective Date, (ii) on or as soon as reasonably practicable after the date such Administrative Claim is Allowed, and (iii) the date such Allowed Administrative Claim becomes due and payable, or as soon thereafter as is practicable; *provided, however,* that Allowed Administrative Claims that arise in the ordinary course of the Debtors' business shall be paid in full in the ordinary course of business in accordance with the terms and subject to the conditions of any agreements governing, instruments evidencing, or other documents relating to, such transactions. Notwithstanding the foregoing, no request for payment of an Administrative Claim need be Filed with respect to an Administrative Claim previously Allowed by Final Order, including, without limitation, all Claims by the Prepetition Agents pursuant to the DIP Order and all Claims Allowed under this Plan.

2.      Professional Compensation

(a)     Fee Claims

Professionals or other Entities asserting a Fee Claim for services rendered before the Confirmation Date must File and serve on the Debtors and such other Entities who are designated by the Bankruptcy Rules, the Confirmation Order, the Interim Compensation Order or other order of the Bankruptcy Court an application for final allowance of such Fee Claim no later than 45 days after the Effective Date; *provided* that the Reorganized Debtors may pay retained Professionals or other Entities in the ordinary course of business after the Confirmation Date; and *provided, further* that any professional who may receive compensation or reimbursement of expenses pursuant to the Ordinary Course Professionals Order may continue to receive such compensation or reimbursement of expenses for services rendered before the Confirmation Date, without further Bankruptcy Court order, pursuant to the Ordinary Course Professional Order. Objections to any Fee Claim must be Filed and served on the Reorganized Debtors and

K&E 14662808.

the requesting party no later than 75 days after the Effective Date. To the extent necessary, the Plan and the Confirmation Order shall amend and supersede any previously entered order regarding the payment of Fee Claims.

           (b)        Post-Confirmation Date Fees and Expenses

Except as otherwise specifically provided in the Plan, from and after the Confirmation Date, the Reorganized Debtors shall, in the ordinary course of business and without any further notice to or action, order, or approval of the Bankruptcy Court, pay in Cash the reasonable legal, professional, or other fees and expenses related to implementation and Consummation of the Plan incurred by the Reorganized Debtors and Committee Professionals. Upon the Confirmation Date, any requirement that Professionals comply with sections 327 through 331 and 1103 of the Bankruptcy Code in seeking retention or compensation for services rendered after such date shall terminate, and the Reorganized Debtors may employ and pay any Professional for services rendered or expenses incurred after the Confirmation Date in the ordinary course of business without any further notice to any party or action, order, or approval of the Bankruptcy Court; *provided, however,* that counsel to the Initial Consenting First Lien Lenders shall receive notice before any payments being made to Professionals for services rendered or expenses incurred after the Confirmation Date until the Effective Date.

        3.        Administrative Claim Bar Date

Except as otherwise provided in this Article II.A, requests for payment of Administrative Claims must be filed and served on the Reorganized Debtors pursuant to the procedures specified in the Confirmation Order and the notice of entry of the Confirmation Order no later than 60 days after the Effective Date. Holders of Administrative Claims that are required to, but do not, file and serve a request for payment of such Administrative Claims by such date shall be forever barred, estopped and enjoined from asserting such Administrative Claims against the Debtors or their property and such Administrative Claims shall be deemed discharged as of the Effective Date. Objections to such requests, if any, must be filed and served on the Reorganized Debtors and the requesting party no later than 90 days after the Effective Date.

B.      *Priority Tax Claims*

        1.        Priority Tax Claims

Each Holder of an Allowed Priority Tax Claim due and payable on or before the Effective Date shall receive, on the Distribution Date, at the option of the Debtors, one of the following treatments: (1) Cash in an amount equal to such Allowed Priority Tax Claim; (2) Cash in an aggregate amount of such Allowed Priority Tax Claim payable in installment payments over a period of time not to exceed five years after the Petition Date, pursuant to section 1129(a)(9)(C) of the Bankruptcy Code; or (3) such other treatment as may be agreed upon by such Holder and the Debtors or otherwise determined upon an order of the Bankruptcy Court.

        2.        Priority Tax Claims Bar Date

Notwithstanding anything herein to the contrary, any Creditor holding (1) a Priority Tax Claim or (2) a Claim that would otherwise be a Priority Tax Claim but for the fact that such Claim arose before the applicable statutory period set forth by section 507(a)(8) of the Bankruptcy Code must File a Proof of Claim on account of such Claim, and such Proof of Claim must be Filed with the Bankruptcy Court on or before the Priority Tax Claims Bar Date. All (1) Priority Tax Claims or (2) Claims that would otherwise be Priority Tax Claims but for the fact that such Claims arose before the applicable statutory period set forth by section 507(a)(8) of the Bankruptcy Code for which a Proof of Claim is not timely Filed will be forever barred from assertion against the Debtors or the Reorganized Debtors, their Estates, and their property unless otherwise ordered by the Bankruptcy Court or as otherwise provided herein. All such Priority Tax Claims or Claims that would otherwise be Priority Tax Claims but for the fact that such Claims arose before the applicable statutory period set forth by section 507(a)(8) of the Bankruptcy Code shall, as of the Effective Date, be subject to the discharge and permanent injunction set forth in Article IX.E and Article IX.F hereof.

*C.      Other Priority Claims*

Each Holder of an Allowed Other Priority Claim due and payable on or before the Effective Date shall receive, on the Distribution Date, at the option of the Debtors, one of the following treatments: (1) Cash in an amount equal to the amount of such Allowed Other Priority Claim; (2) Cash in an aggregate amount of such Allowed Other Priority Claim payable in installment payments over a period of time not to exceed five years after the Petition Date, pursuant to section 1129(a)(9)(C) of the Bankruptcy Code; or (3) such other treatment as may be agreed upon by such Holder and the Debtors or otherwise determined upon an order of the Bankruptcy Court.

*D.      Intercompany Claims*

On the Effective Date, or as soon thereafter as is practicable, all Intercompany Claims will be adjusted, continued, or discharged to the extent determined appropriate by the Debtors, with the consent of the Requisite Initial Lenders.

*E.      Statutory Fees*

On the Distribution Date, Reorganized ION shall pay, in full in Cash, any fees due and owing to the U.S. Trustee at the time of Confirmation.  On and after the Confirmation Date, Reorganized ION shall pay the applicable U.S. Trustee fees until the entry of a final decree in each Debtor's Chapter 11 Case or until such Chapter 11 Case is converted or dismissed.

# ARTICLE III.

# CLASSIFICATION AND TREATMENT OF CLAIMS AND INTERESTS

*A.      Classification of Claims and Interests*

Pursuant to section 1122 of the Bankruptcy Code, set forth below is a designation of Classes of Claims against and Interests in each of the Debtors.  A Claim or Interest is placed in a particular Class for the purposes of voting on the Plan and receiving distributions pursuant to the Plan only to the extent that such Claim or Interest has not been paid, released, withdrawn or otherwise settled before the Effective Date.

*B.      Summary of Classification*

This Plan constitutes a separate chapter 11 plan of reorganization for each Debtor and, accordingly, the classifications set forth in Classes 1 to 8 shall be deemed to apply to ION and each of the Debtor Subsidiaries.  Class 9 consists of ION Equity Interests.  A summary of the classification and treatment of Claims and Interests for each of the 117 Debtors is attached hereto as **Exhibit A**.  Open Mobile Ventures Corporation did not issue or guarantee the First Lien Debt, the First Priority Notes, the Second Priority Notes or the Senior Subordinated Notes; therefore Open Mobile Ventures Corporation does not have a Class 3, 4 or 6.

The following chart represents the general classification of Claims and Interests against the Debtors pursuant to the Plan:

| Class | Claim | Status | Voting Rights |
|---|---|---|---|
| 1 | Other Secured Claims | Unimpaired | Deemed to Accept |
| 2 | DIP Facility Claims | Impaired | Entitled to Vote |
| 3 | First Lien Debt Claims | Impaired | Entitled to Vote |
| 4 | Second Priority Notes Claims | Impaired | Entitled to Vote |
| 5 | General Unsecured Claims | Impaired | Entitled to Vote |
| 6 | Second Lien Notes Guaranty Claims | Impaired | Deemed to Reject |
| 7 | Intercompany Interests | Unimpaired | Deemed to Accept |
| 8 | Section 510(b) Claims | Impaired | Deemed to Reject |

K&E 14662808.

| Class | Claim | Status | Voting Rights |
|-------|-------|--------|---------------|
| 9 | ION Equity Interests | Impaired | Deemed to Reject |

C.      *Treatment of Claims and Interests*

To the extent a Class contains Allowed Claims or Allowed Interests with respect to a particular Debtor, the treatment provided to each Class for distribution purposes is specified below:

1.   <u>Class 1 - Other Secured Claims</u>

(a)      *Classification*:  Class 1 consists of all Other Secured Claims.

(b)      *Treatment*:  On or as soon as practicable after the Effective Date, Holders of Allowed Claims in Class 1 for each of the Debtors, in full and final satisfaction of their Claims secured by valid Liens on the Debtors' property, shall receive one of the following treatments at the option of the applicable Debtor:

(i)      payment of the Allowed Class 1 Claim in full in Cash on the later of the Distribution Date or as soon as practicable after a particular Claim becomes Allowed;

(ii)     such other treatment as may be agreed to by the applicable Debtor and the Holder; or

(iii)    the Holder shall retain its Lien on such property and be reinstated pursuant to section 1129 of the Bankruptcy Code.

(c)      *Voting*:  Class 1 is Unimpaired, and Holders of Class 1 Claims are conclusively presumed to have accepted the Plan pursuant to section 1126(f) of the Bankruptcy Code.  Therefore, Holders of Class 1 Other Secured Claims are not entitled to vote to accept or reject the Plan.

2.   <u>Class 2 - DIP Facility Claims</u>

(a)      *Classification*:  Class 2 consists of all DIP Facility Claims.

(b)      Allowance: The DIP Facility Claims shall be Allowed and deemed to be Allowed Claims in the amount of $150 million (including the undrawn $50 million contemplated under the DIP Facility, which amount shall be drawn within one year of Consummation) plus interest and fees due and owing under the DIP Credit Agreement.

(c)      *Treatment*:  Subject to the terms of the DIP Credit Agreement, and notwithstanding Schedule 2.05 thereto, Holders of DIP Facility Claims will receive on or as soon as practicable after the Effective Date (subject to the following proviso), in full and final satisfaction of the DIP Facility Claims, their Pro Rata share of the Conversion Equity, subject to dilution on account of the Equity Incentive Program and the Warrants; *provided*, *that*, to the extent that any Holder of DIP Facility Claims does not deliver an Ownership Certification to the Debtors and otherwise comply with the Communications Act and FCC implementing rules, on, or within 10 days of, the Effective Date, such Holder shall receive Special Warrants to purchase an equivalent number of shares of New Common Stock; and *provided*, *further*, *that* if the Effective Date occurs upon an FCC Approval pursuant to clause (2) of such definition of FCC Approval, such Holders shall receive their Pro Rata share of 62.5% of the beneficial interests of the FCC Trust in lieu of any New Common Stock they would have otherwise been entitled to receive pursuant

18

to this provision (subject to receipt of Special Warrants as to any Holder to the extent such Holder does not timely deliver an Ownership Certification and otherwise comply with the Communications Act and FCC implementing rules both (i) in connection with the distribution of beneficial interests in the FCC Trust and (ii) upon distribution of the New Common Stock out of the FCC Trust to holders of beneficial interests).

    (d)    *Voting*:  Class 2 is Impaired.  Therefore, Holders of Class 2 DIP Facility Claims are entitled to vote to accept or reject the Plan.

3.    <u>Class 3 - First Lien Debt Claims</u>

    (a)    *Classification*:  Class 3 consists of all First Lien Debt Claims.

    (b)    *Allowance*:  The First Lien Debt Claims shall be Allowed and deemed to be Allowed Claims in the following amounts for the following First Lien Debt Claims: (i) Prepetition Credit Facility Claims: $329.9 million, plus interest and fees due and owing under the Prepetition Credit Facility; (ii) the First Priority Secured Swap Claims: $122.0 million, plus interest and fees due and owing under the Prepetition Hedges; and (iii) the First Priority Notes Claims $405.0 million, plus interest and fees due and owing under the First Priority Indenture.

    (c)    *Treatment*:  Holders of First Lien Debt Claims will receive, on or as soon as practicable after the Effective Date (subject to the following proviso), in full and final satisfaction of their First Lien Debt Claims, their Pro Rata share of 37.5% of the New Common Stock to be issued on the Effective Date, subject to dilution on account of the Equity Incentive Program and the Warrants; *provided, that,* to the extent that any Holder of First Lien Debt Claims does not timely deliver an Ownership Certification to the Debtors and otherwise comply with the Communications Act and FCC implementing rules on, or within 10 days of, the Effective Date, such Holder shall receive Special Warrants to purchase an equivalent number of shares of New Common Stock; and *provided, further,* that if the Effective Date occurs upon an FCC Approval pursuant to clause (2) of the definition of FCC Approval, such Holders shall receive their Pro Rata share of 37.5% of the beneficial interests of the FCC Trust in lieu of any New Common Stock they would have otherwise been entitled to receive pursuant to this provision (subject to receipt of Special Warrants as to any Holder to the extent such Holder does not timely deliver an Ownership Certification and otherwise comply with the Communications Act and FCC implementing rules both (i) in connection with the distribution of beneficial interests in the FCC Trust and (ii) upon distribution of the New Common Stock out of the FCC Trust to holders of beneficial interests).

    (d)    *Voting*:  Class 3 is Impaired.  Therefore, Holders of Class 3 First Lien Debt Claims are entitled to vote to accept or reject the Plan.  Any Holder of First Lien Debt Claims that does not vote to reject the Plan on account of its First Lien Debt Claims shall be deemed to have consented to the treatment provided to Holders of Class 4 and Class 5 Claims hereunder; *provided, further*, that if Class 3 accepts the Plan, then all of the Holders of the First Lien Debt Claims shall be deemed to have consented to the treatment provided to the Holders of Class 4 and Class 5 claims hereunder.

4.    <u>Class 4 - Second Priority Notes Claims</u>

    (a)    *Classification*:  Class 4 consists of all Second Priority Notes Claims.

    (b)    *Allowance*:  The Second Priority Notes Claims shall be Allowed and deemed to be Allowed Claims in the amount of $448.075 million, plus interest and fees due and owing under the Second Priority Indenture.

(c)     *Treatment*:  Holders of Second Priority Notes Claims will receive, on or as soon as practicable after the Effective Date, in full and final satisfaction of the Second Priority Notes Claims, their (i) Pro Rata share of the Second Lien Warrants and (ii) a Pro Rata share of a $5 million aggregate cash distribution to be shared with the Holders of General Unsecured Claims.  In addition, the terms of the Second Lien Warrants will include a three year call option beginning upon Consummation (the "*Liquidity Call Option*") which will entitle  each Holder of Second Lien Warrants to purchase its Pro Rata share of 5% of the fully diluted common equity of Reorganized ION (subject to customary weighted average anti-dilution adjustment  but excluding such dilution protection for the issuance of the Unsecured Debt Warrants) upon and in connection with a merger, sale of substantially all of the assets or economic change of control of Reorganized ION (collectively, a "*Liquidity Event*") if the valuation of Reorganized ION implied by the purchase price paid in the Liquidity Event on an equity value basis (the "*Liquidity Event Equity Valuation*") is less than $800 million.  The Liquidity Call Option price ("*Call Option Price*") for each share of common equity will be equal to 95% of the per share Liquidity Event Equity Valuation; *provided that* the difference between the aggregate Call Option Price for shares of common equity of Reorganized ION and the aggregate Liquidity Event Equity Valuation of the shares of common equity of Reorganized ION subject to the Liquidity Call Option (the "*Spread*") shall not exceed the Black Scholes value of the Second Lien Warrants and the aggregate Call Option Price for shares of common equity of Reorganized ION shall be increased to the extent which the Spread exceeds the Black Scholes value of the Second Lien Warrants; *provided, further* that if the Liquidity Event occurs within three years of Consummation but before Transfer of Control has been approved by the FCC, then in lieu of any equity in Reorganized ION, each Holder of Second Lien Warrants shall be entitled to exercise a right (the "Cashout Right") to  receive its Pro Rata share of Cash in an amount equal to the Spread, which amount shall in no event exceed the Black Scholes value of the Second Lien Warrants. Upon any exercise of the Liquidity Call Option, the applicable Second Lien Warrants shall be extinguished.

(d)     *Voting*:  Class 4 is Impaired.  Therefore, Holders of Class 4 Second Priority Notes Claims are entitled to vote to accept or reject the Plan.

5.     Class 5 - General Unsecured Claims

(a)     *Classification*:  Class 5 consists of all General Unsecured Claims (including Holders of Senior Subordinated Notes Claims).

(b)     *Treatment*:  Holders of Allowed General Unsecured Claims will receive, on or as soon as practicable after the Effective Date, in full and final satisfaction of the General Unsecured Claims, their (i) Pro Rata share of the Unsecured Debt Warrants and (ii) a Pro Rata share of a $5 million aggregate cash distribution to be shared, with the Holders of Second Priority Notes Claims; *provided, however*, that any such distributions shall be subject to the Senior Subordinated Notes Indentures, including, without limitation, Article 12.  In addition, the terms of the Unsecured Debt Warrants will include a three year Liquidity Call Option beginning upon Consummation which will entitle  each Holder of Unsecured Debt Warrants to purchase its Pro Rata share of 5% of the fully diluted common equity of Reorganized ION (subject to customary weighted average anti-dilution adjustment but excluding such dilution protection for the issuance of the Second Lien Warrants) upon and in connection with a Liquidity Event if the Liquidity Event Equity Valuation is less than $1.1 billion.  The Call Option Price for each share of common equity will be equal to 95% of the per share Liquidity Event Equity Valuation; *provided that* the Spread shall not exceed the Black Scholes value of the Unsecured Debt Warrants and the aggregate Call Option Price for shares of common equity of Reorganized ION shall be increased to the extent which the Spread exceeds the Black Scholes value of the Second Lien Warrants; *provided, further* that if the Liquidity Event occurs within three years of

K&E 14662808.

Consummation but before Transfer of Control has been approved by the FCC, then in lieu of any equity in Reorganized ION, each Holder of Unsecured Debt Warrants shall be entitled to exercise a Cashout Right to receive its Pro Rata share of Cash in an amount equal to the Spread, which amount shall in no event exceed the Black Scholes value of the Unsecured Debt Warrants. Upon any exercise of the Liquidity Call Option, the applicable Unsecured Debt Warrants shall be extinguished.

(c)     *Voting*.  Class 5 is Impaired.  Therefore, Holders of Class 5 General Unsecured Claims are entitled to vote to accept or reject the Plan.

6.   Class 6 - Second Priority Notes Guaranty Claims

(a)     *Classification:*  Class 6 consists of all Second Priority Notes Guaranty Claims.

(b)     *Treatment:*  Holders of Second Priority Notes Guaranty Claims will not receive any distribution on account of such Claims, and Second Priority Notes Guaranty Claims shall be discharged, cancelled, released and extinguished as of the Effective Date.

(c)     *Voting:*  Class 6 is Impaired, and Holders of Class 6 Second Priority Notes Guaranty Claims are not entitled to receive or retain any property under the Plan on account of Class 6 Second Priority Notes Guaranty Claims.  Therefore, Holders of Class 6 Second Priority Notes Guaranty Claims are deemed not to have accepted the Plan pursuant to section 1126(g) of the Bankruptcy Code, and Holders of Class 6 Second Priority Notes Guaranty Claims are not entitled to vote to accept or reject the Plan.

7.   Class 7 - Intercompany Interests

(a)     *Classification:*  Class 7 consists of all Intercompany Interests.

(b)     *Treatment:*  Intercompany Interests shall be retained and the legal, equitable and contractual rights to which Holders of such Allowed Intercompany Interests are entitled shall remain unaltered.

(c)     *Voting:*  Class 7 is Unimpaired, and Holders of Class 7 Intercompany Interests are conclusively presumed to have accepted the Plan pursuant to section 1126(f) of the Bankruptcy Code.  Therefore, Holders of Class 7 Intercompany Interests are not entitled to vote to accept or reject the Plan.

8.   Class 8 - Section 510(b) Claims

(a)     *Classification*:  Class 8 consists of all Section 510(b) Claims.

(b)     *Treatment*:  Holders of Section 510(b) Claims will not receive any distribution on account of such Claims, and Section 510(b) Claims shall be discharged, cancelled, released and extinguished as of the Effective Date.

(c)     *Voting*:  Class 8 is Impaired, and Holders of Class 8 Section 510(b) Claims are not entitled to receive or retain any property under the Plan on account of Class 8 Section 510(b) Claims.  Therefore, Holders of Class 7 Section 510(b) Claims are deemed not to have accepted the Plan pursuant to section 1126(g) of the Bankruptcy Code, and Holders of Class 8 Section 510(b) Claims are not entitled to vote to accept or reject the Plan.

9.   Class 9 – ION Equity Interests

(a)     *Classification*:  Class 9 consists of all ION Equity Interests.

(b)     *Treatment*:  Holders of ION Equity Interests will not receive any distribution on account of such Claims, and all ION Equity Interests shall be discharged, cancelled, released, and extinguished as of the Effective Date.

(c)     *Voting*:  Class 9 is Impaired, and Holders of Class 9 ION Equity Interests are not entitled to receive or retain any property under the Plan on account of Class 9 ION Equity Interests.  Therefore, Holders of Class 9 ION Equity Interests are deemed not to have accepted the Plan pursuant to section 1126(g) of the Bankruptcy Code, and Holders of Class 9 ION Equity Interests are not entitled to vote to accept or reject the Plan.

## ARTICLE IV. ACCEPTANCE REQUIREMENTS

Pursuant to section 1126(c) of the Bankruptcy Code and except as otherwise provided in section 1126(e) of the Bankruptcy Code, an impaired class of claims has accepted the applicable Plan if the Holders of at least two-thirds in dollar amount and more than one-half in number of Allowed Claims in such Class actually voting have voted to accept the applicable Plan.

A.      *Acceptance or Rejection of the Plan*

1.      Voting Class

Classes  2, 3, 4 and 5 for each of the Debtors (other than Open Mobile Ventures Corporation, which does not have a Class 3, 4 or 6) are Impaired under the Plan and are entitled to vote to accept or reject the Plan.

2.      Presumed Acceptance of the Plan

Classes 1 and 6 for each of the Debtors are Unimpaired under the Plan and are, therefore, conclusively presumed to have accepted the Plan pursuant to section 1126(f) of the Bankruptcy Code.

3.      Deemed Rejection of the Plan

Classes 6 (other than Open Mobile Ventures Corporation, which does not have a Class 6) and 7 for each of the Debtors and Class 8 (only with respect to ION) are Impaired and shall receive no distribution under the Plan and are, therefore, deemed to have rejected the Plan pursuant to section 1126(g) of the Bankruptcy Code.

B.      *Confirmation Pursuant to Sections 1129(a)(10) and 1129(b) of the Bankruptcy Code*

Section 1129(a)(10) of the Bankruptcy Code shall be satisfied for purposes of Confirmation by acceptance of the Plan by an Impaired Class of Claims.  The Debtors shall seek Confirmation of the Plan pursuant to section 1129(b) of the Bankruptcy Code with respect to any rejecting Class of Claims or Interests.  The Debtors reserve the right to modify the Plan in accordance with Article XI hereof to the extent, if any, that Confirmation pursuant to section 1129(b) of the Bankruptcy Code requires modification.

## ARTICLE V.

## MEANS FOR IMPLEMENTATION OF THE PLAN

A.      *Conversion of the DIP Facility Into the Conversion Equity*

On the Effective Date, Reorganized ION will convert the DIP Facility into the Conversion Equity.

B.      *Exit Facility/Incurrence of New Indebtedness*

On the Effective Date, the Reorganized Debtors are authorized to execute and deliver those documents necessary or appropriate to obtain the Exit Facility, the terms, conditions and covenants of which shall be acceptable

K&E 14662808.

to the Requisite Initial Lenders, without further notice to or order of the Bankruptcy Court, act or action under applicable law, regulation, order, or rule or vote, consent, authorization, or approval of any person.

C.      *Sources of Consideration for Plan Distributions*

All consideration necessary for the Reorganized Debtors to make payments or distributions pursuant hereto shall be obtained from the New Money Commitment, the Exit Facility (to the extent extended) or other Cash from the Debtors, including Cash from business operations.  Further, the Debtors and the Reorganized Debtors will be entitled to transfer funds between and among themselves as they determine to be necessary or appropriate to enable the Reorganized Debtors to satisfy their obligations under the Plan.  Except as set forth herein, any changes in intercompany account balances resulting from such transfers will be accounted for and settled in accordance with the Debtors' historical intercompany account settlement practices and will not violate the terms of the Plan.

D.      *FCC Licenses*

The FCC Applications shall be filed with the FCC as promptly as possible, but in no event later than ten (10) Business Days after filing the Plan.  The Debtors shall use their best efforts to cooperate in diligently pursuing and in taking all steps necessary to obtain the grant of the requisite FCC Applications and shall provide such additional documents or information requested or needed by the FCC in connection with its review of such applications.

In the event that the Long Form Application is denied or dismissed by the FCC or the Initial Consenting First Lien Lenders reasonably determine, based upon comments received from the FCC and consultation with the Debtors or the Reorganized Debtors, as applicable, that the Long Form Application will not be granted by the FCC, then the FCC Trustees, Reorganized ION and each of the Initial Consenting First Lien Lenders (in their capacity as holders of First Lien Debt or DIP Facility Claims, as applicable) shall negotiate in good faith for a period of up to 60 days from the date of such denial or dismissal by the FCC of the Long Form Application or from the Initial Consenting First Lien Lenders' determination that the Long Form Approval will not be granted by the FCC to make any changes or modifications that are necessary (to the extent permitted by applicable law) to obtain FCC approval (and make the requisite filings with the FCC to obtain approval to implement such changes to the extent required by the Communications Act); *provided*, *however*, that such modifications shall, to the extent practicable or except as otherwise set forth herein, with respect to the sale or issuance of Special Warrants set forth below, maintain the respective rights of each of the Initial Consenting First Lien Lenders (in their capacity as Holders of First Lien Debt or DIP Facility Claims, as applicable).  In the event that (i) the FCC does not approve such FCC filings, or approves such FCC filings with conditions that have, or would reasonably be expected to have, a material adverse effect on any of the Initial Consenting First Lien Lenders (in their capacity as Holders of First Lien Debt or DIP Facility Claims, as applicable); or (ii) in the event ION or Reorganized ION, as applicable, and the Initial Consenting First Lien Lenders (in their capacity as Holders of First Lien Debt or DIP Facility Claims, as applicable) are unable to reach an agreement as to how to obtain FCC approval for the Transfer of Control then, in each case (i) – (ii), to the extent the failure to obtain FCC approval of the Long Form Application relates to one or more of the Initial Consenting First Lien Lenders (A) not being qualified to hold, directly or indirectly, New Common Stock under the Communications Act and the FCC implementing rules, (B) not meeting all applicable requirements  of the Communications Act and the FCC implementing rules, including, without limitation, the FCC's media ownership rules or (C) failing to deliver an Ownership Certification or any other information required to be filed or necessary or appropriate to obtain grant of the Long Form Application, after each of the non-qualified Initial Consenting First Lien Lenders has been given an opportunity to remedy the issue and the parties have cooperated and negotiated in good faith consistent with the immediately preceding sentence with respect to remedying such qualification or other applicable issue, the applicable non-qualifying Initial Consenting First Lien Lender(s) (in their capacity as holders of First Lien Debt or DIP Facility Claims, as applicable) shall, at such affected Initial Consenting First Lien Lender's option (i) sell, assign or transfer their rights and obligations provided to them pursuant to the Plan to a Person who meets the qualifications and other requirements described in clauses (A) through (C) above; *provided, further, however,* that such Initial Consenting First Lien Lenders shall first be required to offer to sell, assign or transfer such rights and obligations to the other Initial Consenting First Lien Lenders, if any, who meet such qualifications and requirements or (ii) receive Special Warrants in lieu of any Plan Securities such Initial Consenting First Lien Lenders would have otherwise received hereunder.

E.      *Issuance of Plan Securities*

The issuance of the Plan Securities, including the shares of the New Common Stock, Special Warrants, options, or other equity awards reserved for the Equity Incentive Program, Warrants, beneficial interests in the FCC Trust and shares of New Common Stock to be distributed to the holders of such beneficial interests upon receipt of FCC Approval as contemplated by the Plan, by Reorganized ION is authorized without the need for any further corporate action or without any further action by a Holder of Claims or Interests. On the Effective Date, or as soon as reasonably practicable thereafter, the New Common Stock and the Special Warrants shall be issued to (a) Holders of DIP Facility Claims and (b) Holders of First Lien Debt Claims in accordance with the Plan (including, to the extent applicable, the issuance of beneficial interests in the FCC Trust to such holders and the distribution of New Common Stock to the holders of such beneficial interests upon receipt of FCC approval of the Long Form Applications). On the Effective Date, or as soon as reasonably practicable thereafter, Second Lien Warrants shall be issued to Holders of Second Priority Note Claims and Unsecured Debt Warrants shall be issued to Holders of General Unsecured Claims. The amount of New Common Stock, if any, to be issued pursuant to the Equity Incentive Program, and the terms thereof shall be determined by the Requisite Initial Lenders with the Initial Consenting First Lien Lenders working in good faith to set forth the terms of the Equity Incentive Program in the Plan Supplement; but in no event shall the terms of the Equity Incentive Program be determined by the Requisite Initial Lenders and subsequently implemented by the FCC Trustees or the New Board (as applicable) later than 60 days after the Confirmation Order becomes a Final Order; *provided*, *however*, that the grant of such awards issued pursuant to the Equity Incentive Program shall not vest until the Transfer of Control occurs. Holders of Special Warrants and Warrants will have the right to receive New Common Stock in accordance with the terms of the relevant agreements governing the Special Warrants and the Warrants and the exercise of the Special Warrants and the Warrants.

All of the Plan Securities and beneficial interests in the FCC Trust issued pursuant to the Plan shall be duly authorized, validly issued and fully paid and non-assessable. Each distribution and issuance referred to in Article VII hereof shall be governed by the terms and conditions set forth herein applicable to such distribution or issuance and by the terms and conditions of the instruments evidencing or relating to such distribution or issuance, which terms and conditions shall bind each Entity receiving such distribution or issuance.

F.      *Listing of Plan Securities and Transfer Restrictions*

Other than as provided in the Registration Rights Agreement, the Reorganized Debtors shall not be obligated to list the Plan Securities on a national securities exchange. The Plan Securities may be subject to certain transfer and other restrictions pursuant to, among other things, the New Shareholders Agreement, the terms of the Special Warrants and the Warrants, the New Certificate of Incorporation and the FCC Trust Agreement. On the Effective Date, Reorganized ION will enter into the Registration Rights Agreement.

G.      *Cancellation of Securities and Agreements*

On the Effective Date, except as otherwise specifically provided for in the Plan: (1) the obligations of the Debtors under the Prepetition Credit Facility, First Priority Indenture, Second Priority Indenture, Prepetition Hedges, 11% Series A Notes Indenture, 11% Series B Notes Indenture, and any other Certificate, share, note, bond, indenture, purchase right, option, warrant, or other instrument or document directly or indirectly evidencing or creating any indebtedness or obligation of or ownership interest in the Debtors giving rise to any Claim or Interest (except such Certificates, notes, or other instruments or documents evidencing indebtedness or obligations of the Debtors that are specifically reinstated pursuant to the Plan), shall be cancelled solely as to the Debtors, and the Reorganized Debtors shall not have any continuing obligations thereunder; and (2) the obligations of the Debtors pursuant, relating, or pertaining to any agreements, indentures, certificates of designation, bylaws, or certificate or articles of incorporation or similar documents governing the shares, Certificates, notes, bonds, purchase rights, options, warrants, or other instruments or documents evidencing or creating any indebtedness or obligation of the Debtors (except such agreements, Certificates, notes, or other instruments evidencing indebtedness or obligations of the Debtors that are specifically reinstated pursuant to the Plan) shall be released and discharged; *provided, however,* notwithstanding Confirmation or the occurrence of the Effective Date, any such indenture or agreement that governs the rights of the Holder of a Claim shall continue in effect solely for purposes of (a) allowing Holders of First Lien Debt Claims and the Prepetition Agents to receive distributions under the Plan as provided herein, (b) allowing the

Prepetition Agents to make distributions under the Plan as provided herein, and deduct therefrom such compensation, fees, and expenses due thereunder or incurred in making such distributions, (c) allowing the Prepetition Agents to exercise their charging liens against any such distributions, and (d) allowing the Prepetition Agents to seek compensation and/or reimbursement of fees and expenses in accordance with the terms of this Plan and the DIP Order, and directly from each of the Holders of First Lien Debt, other than Holders of First Priority Secured Swap Claims, in accordance with the terms of the Prepetition Credit Facility, the First Priority Indenture and the Prepetition Security Agreement, as applicable; *provided, further, however*, that the preceding proviso shall not affect the discharge of Claims or Interests pursuant to the Bankruptcy Code, the Confirmation Order, or the Plan, or result in any expense or liability to the Reorganized Debtors, except to the extent set forth in or provided for under this Plan. Any reasonable fees and expenses of the Prepetition Agents remaining unpaid on the Effective Date shall be paid in full in cash on the Effective Date, or within ten (10) days after receipt by Reorganized ION of invoices therefor; *provided, however*, any disputes over the reasonableness of such fees and expenses shall be determined by the Bankruptcy Court. On and after the Effective Date, all duties and responsibilities of the Prepetition Agents under the Prepetition Credit Facility, the First Priority Indenture and the Prepetition Security Agreement, as applicable, shall be discharged unless otherwise specifically set forth in or provided for under this Plan.

In addition, and notwithstanding the entry of the Confirmation Order or the occurrence of the Plan Effective Date, the Second Priority Notes Trustee and the Senior Subordinated Notes Trustee shall continue in effect solely to (a) allow the Holders of Second Priority Notes Claims and Senior Subordinated Notes Claims to receive distributions provided for hereunder, (b) allow the Second Priority Notes Trustee and the Senior Subordinated Notes Trustee to make distributions under the Plan as provided herein, and deduct therefrom such compensation, fees, and expenses due thereunder or incurred in making such distributions, to the extent not paid by the Debtors, (c) allow the Second Priority Notes Trustee and the Senior Subordinated Notes Trustee to exercise their charging liens against any such distributions, (d) preserve the right of the Second Priority Notes Trustee and the Senior Subordinated Notes Trustee under the Indentures against the Holders of Second Priority Notes Claims and Senior Subordinated Notes Claims, including, without limitation, their charging liens and rights to seek indemnification. The charging liens held by the Second Priority Notes Trustee and the Senior Subordinated Notes Trustee against distributions to Holders shall be deemed released only upon the payment of the Second Priority Notes Trustee and the Senior Subordinated Notes Trustee fees and expenses in full; provided further however that nothing in this section shall affect the discharge of Claims pursuant to the Bankruptcy Code, the Confirmation Order, or the Plan or result in any liability or expense to the Reorganized Debtors.

## H. Section 1145 Exemption

Pursuant to section 1145 of the Bankruptcy Code, the offering, issuance, and distribution of any Plan Securities contemplated by the Plan and all agreements incorporated herein, including the New Common Stock, the Special Warrants, the Warrants, the beneficial interests in the FCC Trust and the distribution of the New Common Stock from the FCC Trust to holders of beneficial interests in the FCC Trust as contemplated herein shall be exempt from, among other things, the registration requirements of section 5 of the Securities Act and any other applicable law requiring registration before the offering, issuance, distribution, or sale of securities. In addition, under section 1145 of the Bankruptcy Code, any Plan Securities contemplated by the Plan and any and all agreements incorporated therein, including the New Common Stock, will be freely tradable by the recipients thereof, subject to (1) the provisions of section 1145(b)(1) of the Bankruptcy Code relating to the definition of an underwriter in section 2(a)(11) of the Securities Act; (2) compliance with any rules and regulations of the Securities and Exchange Commission, if any, applicable at the time of any future transfer of such securities or instruments; (3) the restrictions, if any, on the transferability of such securities and instruments, including those set forth in Article V.F hereof, the New Shareholders Agreement, the New Certificate of Incorporation, the FCC Trust Agreement and the relevant agreements governing the Special Warrants and the Warrants; and (4) applicable regulatory approval, including the required FCC Approval.

## I. Corporate Existence

Except as otherwise provided herein, each Debtor shall continue to exist after the Effective Date as a separate corporate entity, limited liability company, partnership, or other form, as the case may be, with all the powers of a corporation, limited liability company, partnership, or other form, as the case may be, pursuant to the

applicable law in the jurisdiction in which each applicable Debtor is incorporated or formed and pursuant to the respective certificate of incorporation and bylaws (or other formation documents) in effect before the Effective Date, except to the extent such certificate of incorporation and bylaws (or other formation documents) are amended by the Plan or otherwise, and to the extent such documents are amended, such documents are deemed to be amended pursuant to the Plan and require no further action or approval (other than any requisite filings required under applicable state law).

J.      New Certificate of Incorporation and New By-Laws

On or immediately before the Effective Date, the Reorganized Debtors will file their respective New Certificates of Incorporation with the applicable Secretaries of State and/or other applicable authorities in their respective states of incorporation in accordance with the corporate laws of the respective states of incorporation. After the Effective Date, the Reorganized Debtors may amend and restate their respective New Certificates of Incorporation and New By-Laws and other constituent documents as permitted by the laws of their respective states of incorporation and their respective New Certificates of Incorporation and New By-Laws.

K.      Reorganized ION Board of Directors

If the New Common Stock is transferred to the FCC Trust, the boards of directors of Reorganized ION and the Reorganized Debtor Subsidiaries during the period that the New Common Stock is held by the FCC Trust shall consist of the same individuals as the FCC Trustees. To the extent known, the identity of the members of the New Board, which New Board shall only come into effect after the Transfer of Control, and the nature and compensation for any member of the board who is an "insider" under section 101(31) of the Bankruptcy Code will be identified in the Plan Supplement. The members of the New Board shall be determined by the agreement of each of the Initial Consenting First Lien Lenders, but shall always include the then current Chief Executive Officer of ION.

L.      Reorganized Debtor Subsidiaries Board of Directors

If the New Common Stock is transferred to the FCC Trust, the boards of directors of the Reorganized Debtor Subsidiaries during the period that the New Common Stock is held by the FCC Trust shall consist of the same individuals as the FCC Trustees. To the extent known, the identity of the members of the board of directors of the Reorganized Debtor Subsidiaries after the Transfer of Control, and the nature and compensation for any member of the board who is an "insider" under section 101(31) of the Bankruptcy Code will be identified in the Plan Supplement. The members of the board of directors of the Reorganized Debtor Subsidiaries after the Transfer of Control shall be determined by agreement of each of the Initial Consenting First Lien Lenders, but shall always include the then current Chief Executive Officer of ION.

M.      Officers of Reorganized Debtors

R. Brandon Burgess, President, Chairman and CEO of Reorganized ION, shall serve in accordance with applicable non-Bankruptcy law and the New Employment Agreement with ION, which agreement shall be negotiated with the Initial Consenting First Lien Lenders, and the form of which will be acceptable to the Requisite Initial Lenders and included in the Plan Supplement.

To the extent known, additional officers of Reorganized ION and the Reorganized Debtor Subsidiaries shall be identified in the Plan Supplement, which officers shall be determined in consultation with the Initial Consenting First Lien Lenders, who shall serve in accordance with applicable non-Bankruptcy law and, to the extent applicable, the New Employment Agreements with ION.

N.      Employee Benefits

Except as otherwise provided herein, on and after the Effective Date, the Reorganized Debtors may: (1) honor, in the ordinary course of business, any contracts, agreements, policies, programs, and plans for, among other things, compensation (other than equity based compensation related to Equity Interests), health care benefits, disability benefits, deferred compensation benefits, travel benefits, savings, severance benefits, retirement benefits,

welfare benefits, workers' compensation insurance, and accidental death and dismemberment insurance for the directors, officers, and employees of any of the Debtors who served in such capacity at any time; and (2) honor, in the ordinary course of business, Claims of employees employed as of the Effective Date for accrued vacation time arising before the Petition Date; *provided, however,* that the Debtors' or Reorganized Debtors' performance under any employment agreement will not entitle any person to any benefit or alleged entitlement under any policy, program, or plan that has expired or been terminated before the Effective Date, or restore, reinstate, or revive any such benefit or alleged entitlement under any such policy, program, or plan. Nothing herein shall limit, diminish, or otherwise alter the Reorganized Debtors' defenses, claims, Causes of Action, or other rights with respect to any such contracts, agreements, policies, programs, and plans.

O.      *Equity Incentive Program*

The Equity Incentive Program will provide for a certain percentage of New Common Stock, not to exceed 10% of the issued and outstanding New Common Stock and New Common Stock issuable upon exercise of the Special Warrants, in each instance on the Effective Date, to be reserved for issuance as options, equity or equity-based grants in connection with the Reorganized Debtors' management equity incentive program and/or director equity incentive program. The amount of New Common Stock if any, to be issued pursuant to the Equity Incentive Program, and the terms thereof shall be determined by the Requisite Initial Lenders with the Initial Consenting First Lien Lenders working in good faith to set forth the terms of the Equity Incentive Program in the Plan Supplement; but in no event shall the terms of the Equity Incentive Program be determined by the Requisite Initial Lenders and subsequently implemented by the FCC Trustees or the New Board (as applicable) later than 60 days after the Confirmation Order becomes a Final Order; *provided*, *however*, that the grant of such New Common Stock issued pursuant to the Equity Incentive Program shall not vest until the Transfer of Control occurs.

P.      *Vesting of Assets in the Reorganized Debtors*

Except as otherwise provided in the Plan or any agreement, instrument, or other document incorporated therein, on the Effective Date, all property in each Estate, all Causes of Action (except those released pursuant to the Releases by the Debtors), and any property acquired by any of the Debtors pursuant to the Plan shall vest in each respective Reorganized Debtor, free and clear of all Liens, Claims, charges, or other encumbrances (except for Liens, if any, granted to secure the Exit Facility). On and after the Effective Date, except as otherwise provided in the Plan, and subject to compliance with the applicable provisions of the Communications Act, each Reorganized Debtor may operate its business and may use, acquire, or dispose of property and compromise or settle any Claims, Interests, or Causes of Action without supervision or approval by the Bankruptcy Court and free of any restrictions of the Bankruptcy Code or Bankruptcy Rules; *provided, however,* the Bankruptcy Court shall retain jurisdiction with respect to the FCC Trust, if established, as set forth in Article XII hereof.

Q.      *Restructuring Transactions*

On the Effective Date or as soon as reasonably practicable thereafter, the Reorganized Debtors may take all actions as may be necessary or appropriate to effect any transaction described in, approved by, contemplated by, or necessary to effectuate the Plan, including: (1) the execution and delivery of appropriate agreements or other documents of merger, consolidation, restructuring, conversion, disposition, transfer, dissolution or liquidation containing terms that are consistent with the terms of the Plan and that satisfy the applicable requirements of applicable law and any other terms to which the applicable Entities may agree; (2) the execution and delivery of appropriate instruments of transfer, assignment, assumption or delegation of any asset, property, right, liability, debt or obligation on terms consistent with the terms of the Plan and having other terms for which the applicable parties agree; (3) the filing of appropriate certificates or articles of incorporation, reincorporation, merger, consolidation, conversion or dissolution pursuant to applicable state law; and (4) all other actions that the applicable Entities determine to be necessary or appropriate, including making filings or recordings that may be required by applicable law.

R.      *Corporate Action*

Upon the Effective Date, all actions contemplated by the Plan shall be deemed authorized and approved in all respects, including (1) entry into the New Employment Agreements; (2) selection of the directors and officers of

K&E 14662808.

the Reorganized Debtors; (3) the execution of and entry into the Exit Facility; (4) the distribution of the Plan Securities as provided herein; and (5) all other actions contemplated by the Plan (whether to occur before, on, or after the Effective Date). All matters provided for in the Plan involving the corporate structure of the Debtors or the Reorganized Debtors, and any corporate action required by the Debtors or the Reorganized Debtors in connection with the Plan shall be deemed to have occurred and shall be in effect, without any requirement of further action by the security holders, directors or officers of the Debtors or the Reorganized Debtors.

On or (as applicable) before the Effective Date, the appropriate officers of the Debtors or the Reorganized Debtors, as applicable, shall be authorized and directed to issue, execute and deliver the agreements, documents, securities, certificates of incorporation, operating agreements, and instruments contemplated by the Plan (or necessary or desirable to effect the transactions contemplated by the Plan) in the name of and on behalf of the Reorganized Debtors, including the Exit Facility and any and all other agreements, documents, securities and instruments relating to the foregoing. The authorizations and approvals contemplated by this Article V.R shall be effective notwithstanding any requirements under nonbankruptcy law.

S.        *Effectuating Documents; Further Transactions*

On and after the Effective Date, the Reorganized Debtors and the managers, officers and members of the boards of directors thereof, are authorized to and may issue, execute, deliver, file, or record such contracts, securities, instruments, releases, and other agreements or documents and take such actions as may be necessary or appropriate to effectuate, implement, and further evidence the terms and conditions of the Plan and the securities issued pursuant to the Plan in the name of and on behalf of the Reorganized Debtors, without the need for any approvals, authorization, or consents except for those expressly required pursuant to the Plan.

T.        *Exemption from Certain Taxes and Fees*

Pursuant to section 1146(a) of the Bankruptcy Code, any transfers of property pursuant hereto shall not be subject to any stamp tax or other similar tax or governmental assessment in the United States, and the Confirmation Order shall direct and be deemed to direct the appropriate state or local governmental officials or agents to forgo the collection of any such tax or governmental assessment and to accept for filing and recordation instruments or other documents pursuant to such transfers of property without the payment of any such tax or governmental assessment. Such exemption specifically applies, without limitation, to (1) the creation of any mortgage, deed of trust, lien or other security interest; (2) the making or assignment of any lease or sublease; (3) any restructuring transaction authorized by Article V.Q hereof; or (4) the making or delivery of any deed or other instrument of transfer under, in furtherance of or in connection with the Plan, including: (a) any merger agreements; (b) agreements of consolidation, restructuring, disposition, liquidation, or dissolution; (c) deeds; (d) bills of sale; or (e) assignments executed in connection with any Restructuring Transaction occurring under the Plan.

U.        *D&O Liability Insurance Policies*

Notwithstanding anything herein to the contrary, as of the Effective Date, the Debtors shall assume (and assign to the Reorganized Debtors if necessary to continue the D&O Liability Insurance Policies in full force) all of the D&O Liability Insurance Policies pursuant to section 365(a) of the Bankruptcy Code. Entry of the Confirmation Order shall constitute the Bankruptcy Court's approval of the Debtors' foregoing assumption of each of the D&O Liability Insurance Policies. Notwithstanding anything to the contrary contained herein, Confirmation of the Plan shall not discharge, impair, or otherwise modify any obligations assumed by the foregoing assumption of the D&O Liability Insurance Policies, and each such obligation shall be deemed and treated as an Executory Contract that has been assumed by the Debtors under the Plan as to which no Proof of Claim need be Filed. On or before the Effective Date, the Reorganized Debtors may obtain reasonably sufficient tail coverage (*i.e.*, D&O insurance coverage that extends beyond the end of the policy period) under a directors and officers' liability insurance policy for the current and former directors, officers, and managers for such terms or periods of time, and placed with such insurers, with the consent of the Requisite Initial Lenders, to be reasonable under the circumstances or as otherwise specified and ordered by the Bankruptcy Court in the Confirmation Order.

V.      *Preservation of Rights of Action*

In accordance with section 1123(b) of the Bankruptcy Code, and except where such Causes of Action have been expressly released (including, for the avoidance of doubt, pursuant to the Releases by the Debtors provided by Article IX.B hereof), the Reorganized Debtors shall retain and may enforce all rights to commence and pursue, as appropriate, any and all Causes of Action, whether arising before or after the Petition Date, including any actions specifically enumerated in the Plan Supplement, and the Reorganized Debtors' rights to commence, prosecute, or settle such Causes of Action shall be preserved notwithstanding the occurrence of the Effective Date. The Reorganized Debtors may pursue such Causes of Action, as appropriate, in accordance with the best interests of the Reorganized Debtors. No Entity may rely on the absence of a specific reference in the Plan, the Plan Supplement, or the Disclosure Statement to any Cause of Action against them as any indication that the Debtors or Reorganized Debtors, as applicable, will not pursue any and all available Causes of Action against them. Except with respect to Causes of Action as to which the Debtors or Reorganized Debtors have released any Person or Entity on or before the Effective Date (including pursuant to the Releases by the Debtors or otherwise), the Debtors or Reorganized Debtors, as applicable, expressly reserve all rights to prosecute any and all Causes of Action against any Entity, except as otherwise expressly provided in the Plan. Unless any Causes of Action against an Entity are expressly waived, relinquished, exculpated, released, compromised, or settled in the Plan or a Bankruptcy Court order, the Reorganized Debtors expressly reserve all Causes of Action, for later adjudication, and, therefore, no preclusion doctrine, including the doctrines of res judicata, collateral estoppel, issue preclusion, claim preclusion, estoppel (judicial, equitable or otherwise), or laches, shall apply to such Causes of Action upon, after, or as a consequence of the Confirmation or Consummation. For the avoidance of doubt, and except to the extent listed in the retained Causes of Action filed as part of the Plan Supplement, all Avoidance Actions are released pursuant to this Plan.

W.      *FCC Trust*

1.      Generally

On the Effective Date, the FCC Trust will be established and become effective for the benefit of the Holders of Allowed Claims entitled to distributions from the FCC Trust under the Plan. The powers, authority, responsibilities, and duties of the FCC Trust and the FCC Trustees are set forth in and shall be governed by the FCC Trust Agreement. The FCC Trust Agreement shall contain provisions customary to trust agreements utilized in comparable circumstances, including, without limitation, any and all provisions necessary to ensure the continued treatment of the FCC Trust as a grantor trust and the beneficiaries of the FCC Trust as the grantors and owners thereof for federal income tax purposes. The FCC Trust and the FCC Trustees, including any successors, shall be bound by the Plan and shall not challenge any provision of the Plan.

2.      Purpose and Establishment of the FCC Trust

On the Effective Date, the FCC Trust shall be established for the purposes set forth in the FCC Trust Agreement.

For all federal income tax purposes, the beneficiaries of the FCC Trust will be treated as grantors and deemed owners of the FCC Trust and it is intended that the FCC Trust be classified as a liquidating trust under Section 301.7701-4(d) of the Regulations and qualify as a "grantor trust" for federal income tax purposes. Accordingly, for all federal income tax purposes, it is intended that the beneficiaries of the FCC Trust be treated as if they had received a distribution of an undivided interest in the assets of the FCC Trust (*i.e.*, the New Common Stock) and then contributed such undivided interest to the FCC Trust. The FCC Trustees shall, in an expeditious but orderly manner, make timely distributions to beneficiaries of the FCC Trust pursuant to the Plan and the FCC Trust Agreement and not unduly prolong its duration. The FCC Trust shall not be deemed a successor in interest of the Debtors for any purpose other than as specifically set forth herein or in the FCC Trust Agreement.

On or before the Effective Date, the FCC Trust Agreement shall be executed and the Debtors shall take all other steps necessary to establish the FCC Trust pursuant to the FCC Trust Agreement and consistent with the Plan.

3.  Transferability of Beneficial Interests

Ownership of a beneficial interest shall be uncertificated and shall be in book entry form.  The beneficial interests in the FCC Trust will not be registered pursuant to the Securities Act, as amended, or any state securities law.  If the beneficial interests constitute "securities," the parties hereto intend that the exemption provisions of section 1145 of the Bankruptcy Code will apply to the beneficial interests.  The beneficial interests will be transferable, subject to the terms of the FCC Trust Agreement.

4.  Appointment of the FCC Trustees

On the Effective Date, and in compliance with the provisions of the Plan and the FCC Trust Agreement, the Debtors will appoint the FCC Trustees in accordance with the FCC Trust Agreement and, thereafter, any successor FCC Trustees shall be appointed and serve in accordance with the FCC Trust Agreement.  The FCC Trustees or any successor thereto will administer the FCC Trust in accordance with the Plan and the FCC Trust Agreement.

5.  Funding of the FCC Trust

 On the Effective Date, the Reorganized Debtors will deposit with the FCC Trust the minimum amount necessary for federal income tax purposes, with such amount to be determined with the consent of the Requisite Initial Lenders.

6.  Implementation of the FCC Trust

On the Effective Date, the FCC Trust will be established and become effective for the benefit of the Holders of Allowed Claims entitled to distributions from the FCC Trust under the Plan.

7.  Distributions; Withholding

The FCC Trustees shall make distributions to the beneficiaries of the FCC Trust when and as authorized pursuant to the FCC Trust Agreement in compliance with the Plan, provided that distributions in respect of First Priority Note Claims and the Prepetition Credit Facility Claims will be made to the Prepetition Collateral Agent who will make distributions to the Prepetition Administrative Agent and the First Priority Notes Trustee, as Disbursing Agents, subject to implementing a mechanism with respect to the beneficial interests in the FCC Trust to be held by Holders of Prepetition Credit Facility Claims. The FCC Trustees may withhold from amounts otherwise distributable to any Entity any and all amounts required by the FCC Trust Agreement, any law, regulation, rule, ruling, directive, treaty, or other governmental requirement.

8.  Termination of the FCC Trust

The FCC Trust shall terminate as soon as practicable, but in no event later than the third anniversary of the Effective Date; *provided that*, on or after the date that is less than thirty (30) days before such termination date, the Bankruptcy Court, upon motion by a party in interest, may extend the term of the FCC Trust for a finite period if such an extension is necessary to complete any pending matters required under the FCC Trust Agreement provided that the aggregate of all extensions shall not exceed two years unless the FCC Trustees receive an opinion of counsel or a favorable ruling from the Internal Revenue Service to the effect that any such extension would not adversely affect the status of the FCC Trust as a liquidating trust within the meaning of Section 301.7701-4(d) of the Treasury Regulations for federal income tax purposes.  There will be no tax consequences upon the liquidating distribution of assets, *i.e.*, the New Common Stock, by the FCC Trust to Holders of the beneficial interests therein.  A Holder of the beneficial interests will carryover its basis and holding period to the distributed assets, *i.e.*, the New Common Stock. Notwithstanding the foregoing, multiple extensions may be obtained so long as the conditions in the preceding sentence are met no more than six months prior to the expiration of the then-current termination date of the FCC Trust.

K&E 14662808.

# ARTICLE VI.

## TREATMENT OF EXECUTORY CONTRACTS AND UNEXPIRED LEASES

A.     *Assumption and Rejection of Executory Contracts and Unexpired Leases*

Except as otherwise provided herein, or in any contract, instrument, release, indenture, or other agreement or document entered into in connection with the Plan, each of the Debtors' Executory Contracts and Unexpired Leases shall be deemed rejected as of the Effective Date, unless such Executory Contract or Unexpired Lease: (1) was assumed or rejected previously by the Debtors; (2) previously expired or terminated pursuant to its own terms; (3) is the subject of a motion to assume filed on or before the Effective Date; or (4) is identified as an Executory Contract or Unexpired Lease to be assumed pursuant to the Plan Supplement, which shall be subject to the approval of the Requisite Initial Lenders, which approval shall not be unreasonably withheld, including any amendments before the Effective Date.

Entry of the Confirmation Order shall constitute a Bankruptcy Court order approving the assumptions or rejections of such Executory Contracts or Unexpired Leases as set forth in the Plan, all pursuant to sections 365(a) and 1123 of the Bankruptcy Code. Unless otherwise indicated, all assumptions or rejections of such Executory Contracts and Unexpired Leases in the Plan are effective as of the Effective Date. Each such Executory Contract or Unexpired Lease assumed pursuant to the Plan or by Bankruptcy Court order but not assigned to a third party before the Effective Date shall revest in and be fully enforceable by the applicable contracting Reorganized Debtor in accordance with its terms, except as such terms may have been modified by such order. Notwithstanding anything to the contrary in the Plan, the Debtors or Reorganized Debtors, as applicable, reserve the right, with the consent of the Requisite Initial Lenders, which consent shall not be unreasonably withheld, to alter, amend, modify or supplement the list of Executory Contracts and Unexpired Leases identified in the Plan Supplement. Notwithstanding the foregoing paragraph, after the Effective Date, the Reorganized Debtors shall have the right to terminate, amend, or modify any intercompany contracts, leases, or other agreements without approval of the Bankruptcy Court.

B.     *Payments Related to Assumption of Executory Contracts and Unexpired Leases*

With respect to any Executory Contracts and Unexpired Leases to be assumed by the Debtors pursuant hereto (including pursuant to Article VI.A hereof) or otherwise, Cure Claims shall be satisfied, pursuant to section 365(b) of the Bankruptcy Code, by payment of the Cure Claims in Cash on the Effective Date or as soon as reasonably practicable thereafter or on such other terms as the parties to each such Executory Contract or Unexpired Lease may otherwise agree. In the event of a dispute regarding: (1) the amount of any Cure Claim; (2) the ability of the Reorganized Debtors to provide "adequate assurance of future performance" (within the meaning of section 365(b) of the Bankruptcy Code), if applicable, under the Executory Contract or the Unexpired Lease to be assumed; or (3) any other matter pertaining to assumption, the Cure Claims shall be paid following the entry of a Final Order resolving the dispute and approving the assumption of such Executory Contracts or Unexpired Leases; *provided, however,* that the Debtors or the Reorganized Debtors may settle any dispute regarding the amount of any Cure Claim without any further notice to or action, order, or approval of the Bankruptcy Court.

Assumption of any Executory Contract or Unexpired Lease pursuant to the Plan or otherwise shall result in the full release and satisfaction of any Claims or defaults, whether monetary or nonmonetary, including defaults of provisions restricting the change in control or ownership interest composition or other bankruptcy-related defaults, arising under any assumed Executory Contract or Unexpired Lease at any time before the effective date of assumption. Any Proofs of Claim Filed with respect to an Executory Contract or Unexpired Lease that has been assumed shall be deemed disallowed and expunged, without further notice to or action, order, or approval of the Bankruptcy Court.

C.     *Preexisting Obligations to the Debtors Under Executory Contracts and Unexpired Leases*

Rejection or repudiation of any Executory Contract or Unexpired Lease pursuant to the Plan or otherwise shall not constitute a termination of preexisting obligations owed to the Debtors under such contracts or leases. In particular, notwithstanding any nonbankruptcy law to the contrary, the Reorganized Debtors expressly reserve and

K&E 14662808.

do not waive any right to receive, or any continuing obligation of a counterparty to provide, warranties or continued maintenance obligations on goods previously purchased by the contracting Debtors or Reorganized Debtors, as applicable, from counterparties to rejected or repudiated Executory Contracts or Unexpired Leases.

D.      *Contracts and Leases Entered Into After the Petition Date*

On and after the Effective Date, the Debtors may continue to perform under contracts and leases entered into after the Petition Date by any Debtor in the ordinary course of business, including any Executory Contracts and Unexpired Leases assumed by such Debtor.

E.      *Rejection of Indemnification Provisions*

Notwithstanding anything herein, the Debtors, and upon the Effective Date, the Reorganized Debtors, shall reject all of the Indemnification Provisions in place on and before the Effective Date for Indemnified Parties for Claims related to or in connection with any actions, omissions or transactions occurring before the Effective Date.

F.      *Modifications, Amendments, Supplements, Restatements, or Other Agreements*

Unless otherwise provided in the Plan, each assumed Executory Contract or Unexpired Lease shall include all modifications, amendments, supplements, restatements, or other agreements that in any manner affect such Executory Contract or Unexpired Lease, and all Executory Contracts and Unexpired Leases related thereto, if any, including all easements, licenses, permits, rights, privileges, immunities, options, rights of first refusal, and any other interests, unless any of the foregoing agreements has been previously rejected or repudiated or is rejected or repudiated under the Plan.

Modifications, amendments, supplements, and restatements to prepetition Executory Contracts and Unexpired Leases that have been executed by the Debtors during the Chapter 11 Cases shall not be deemed to alter the prepetition nature of the Executory Contract or Unexpired Lease, or the validity, priority, or amount of any Claims that may arise in connection therewith.

G.      *Reservation of Rights*

Neither the exclusion nor inclusion of any contract or lease in the Plan Supplement, nor anything contained in the Plan, shall constitute an admission by the Debtors that any such contract or lease is in fact an Executory Contract or Unexpired Lease or that any Reorganized Debtor has any liability thereunder. In the event of a dispute regarding whether a contract or lease is or was executory or unexpired at the time of assumption or rejection, the Debtors or the Reorganized Debtors, as applicable, shall have 45 days following entry of a Final Order resolving such dispute to alter the treatment of such contract or lease as otherwise provided herein.

H.      *Nonoccurrence of Effective Date*

In the event that the Effective Date does not occur, the Bankruptcy Court shall retain jurisdiction with respect to any consensual request to extend the deadline for assuming or rejecting Unexpired Leases pursuant to section 365(d)(4) of the Bankruptcy Code.

I.      **Rejection Claims Bar Date**

**Notwithstanding anything herein to the contrary, any Creditor holding a Rejection Claim must File a Proof of Claim on account of such Claim with the Bankruptcy Court on or before the Rejection Claims Bar Date. All Rejection Claims for which a Proof of Claim is not timely Filed will be forever barred from assertion against the Debtors or the Reorganized Debtors, their Estates, and their property unless otherwise ordered by the Bankruptcy Court or as otherwise provided herein. All such Rejection Claims shall, as of the Effective Date, be subject to the discharge and permanent injunction set forth in Article IX.E and Article IX.F hereof.**

K&E 14662808.

# ARTICLE VII.

## PROVISIONS GOVERNING DISTRIBUTIONS

A.      *Record Date for Distributions*

As of the entry of the Confirmation Order, the various transfer registers for each of the Classes of Claims or Interests as maintained by the Debtors or their respective agents shall be deemed closed, and there shall be no further changes made to reflect any new record holders of any Claims or Interests. The Debtors shall have no obligation to recognize any transfer of Claims or Interests occurring on or after the Voting Deadline.

B.      *Timing and Calculation of Amounts to Be Distributed*

Except as otherwise provided in the Plan, on the Effective Date or as soon as reasonably practicable thereafter (or if a Claim is not an Allowed Claim on the Effective Date, on the date that such a Claim becomes an Allowed Claim, or as soon as reasonably practicable thereafter), each Holder of an Allowed Claim against the Debtors shall receive the full amount of the distributions that the Plan provides for Allowed Claims in the applicable Class and in the manner provided herein. In the event that any payment or act under the Plan is required to be made or performed on a date that is not a Business Day, then the making of such payment or the performance of such act may be completed on the next succeeding Business Day, but shall be deemed to have been completed as of the required date. If and to the extent that there are Disputed Claims, distributions on account of any such Disputed Claims shall be made pursuant to the provisions set forth in Article VIII hereof. Except as otherwise provided herein, Holders of Claims shall not be entitled to interest, dividends, or accruals on the distributions provided for herein, regardless of whether such distributions are delivered on or at any time after the Effective Date.

C.      *Disbursing Agent*

Except as otherwise provided herein, all distributions under the Plan shall be made by the Reorganized Debtors as Disbursing Agent or such other Entity designated by the Reorganized Debtors as a Disbursing Agent on the Effective Date. A Disbursing Agent shall not be required to give any bond or surety or other security for the performance of its duties unless otherwise ordered by the Bankruptcy Court. In the event that a Disbursing Agent is so ordered, all costs and expenses of procuring any such bond or surety shall be borne by the Reorganized Debtors.

D.      *Rights and Powers of Disbursing Agent*

1.      Powers of the Disbursing Agent

The Disbursing Agent shall be empowered to: (a) effect all actions and execute all agreements, instruments, and other documents necessary to perform its duties under the Plan; (b) make all distributions contemplated hereby; (c) employ professionals to represent it with respect to its responsibilities; and (d) exercise such other powers as may be vested in the Disbursing Agent by order of the Bankruptcy Court, pursuant to the Plan, or as deemed by the Disbursing Agent to be necessary and proper to implement the provisions hereof.

2.      Expenses Incurred On or After the Effective Date

Except as otherwise ordered by the Bankruptcy Court, the amount of any reasonable fees and expenses incurred by the Disbursing Agent on or after the Effective Date (including taxes) and any reasonable compensation and expense reimbursement claims (including reasonable attorney fees and expenses) made by the Disbursing Agent shall be paid in Cash by the Reorganized Debtors.

33

*E.*     *Distributions on Account of Claims Allowed After the Effective Date*

　　　1.　Payments and Distributions on Disputed Claims

Notwithstanding any other provision of the Plan, no distributions shall be made under the Plan on account of any Disputed Claim, unless and until such Claim becomes an Allowed Claim.  Distributions made after the Effective Date to Holders of Disputed Claims that are not Allowed Claims as of the Effective Date but which later become Allowed Claims shall be deemed to have been made on the Effective Date.

　　　2.　Special Rules for Distributions to Holders of Disputed Claims

Notwithstanding any provision otherwise in the Plan and except as may be agreed to by the Debtors or the Reorganized Debtors, on the one hand, and the Holder of a Disputed Claim, on the other hand, no partial payments and no partial distributions shall be made with respect to any Disputed Claim until all Disputed Claims held by the Holder of such Disputed Claim have become Allowed Claims or have otherwise been resolved by settlement or Final Order.

*F.*     *Delivery of Distributions and Undeliverable or Unclaimed Distributions*

　　　1.　Delivery of Distributions in General

Except as otherwise provided in the Plan, distributions to Holders of Allowed Claims shall be made to Holders of record as of the Distribution Record Date by the Reorganized Debtors or the applicable Disbursing Agent, as appropriate: (a) to the signatory set forth on any of the Proofs of Claim Filed by such Holder or other representative identified therein (or at the last known addresses of such Holder if no Proof of Claim is Filed or if the Debtors have been notified in writing of a change of address); (b) at the addresses set forth in any written notices of address changes delivered to the Reorganized Debtors or the applicable Disbursing Agent, as appropriate, after the date of any related Proof of Claim; (c) at the addresses reflected in the Schedules if no Proof of Claim has been Filed and the Reorganized Debtors or the applicable Disbursing Agent, as appropriate, has not received a written notice of a change of address; or (d) on any counsel that has appeared in the Chapter 11 Cases on the Holder's behalf. Distributions under the Plan on account of Allowed Claims shall not be subject to levy, garnishment, attachment, or like legal process, so that each Holder of an Allowed Claim shall have and receive the benefit of the distributions in the manner set forth in the Plan.  The Debtors, the Reorganized Debtors, and the applicable Disbursing Agent, as applicable, shall not incur any liability whatsoever on account of any distributions under the Plan except for gross negligence or willful misconduct.

Except as otherwise provided in the Plan, all distributions to Holders of First Lien Debt Claims shall be governed by the Prepetition Credit Facility, the First Priority Indenture and the Prepetition Hedges, as applicable, and shall be deemed completed when made to the Prepetition Collateral Agent, who shall in turn make distributions in accordance with the Prepetition Security Agreement to the Prepetition Administrative Agent and the First Priority Notes Trustee, as Disbursing Agents hereunder, for further distribution to the Holders of First Lien Debt Claims, but subject to the charging liens of the Prepetition Agents.

　　　2.　Minimum Distributions

The Reorganized Debtors and Disbursing Agents shall not be required to make partial distributions or payments of fractions of Plan Securities and such fractions shall be deemed to be zero.

　　　3.　Undeliverable Distributions and Unclaimed Property

In the event that any distribution to any Holder is returned as undeliverable, no distribution to such Holder shall be made unless and until the Disbursing Agent has determined the then current address of such Holder, at which time such distribution shall be made as soon as practicable after such distribution has become deliverable or has been claimed to such Holder without interest; *provided, however,* such distributions shall be deemed unclaimed property under section 347(b) of the Bankruptcy Code and forfeited at the expiration of six months from the

Effective Date. After such date, all "unclaimed property" or interests in property shall revert to the Reorganized Debtors (notwithstanding any applicable federal or state escheat, abandoned, or unclaimed property laws to the contrary), and the Claim of any Holder to such property or Interest in property shall be discharged and forever barred.

## G. Withholding and Reporting Requirements

In connection with the Plan and all instruments issued in connection therewith, the Disbursing Agent shall comply with all applicable withholding and reporting requirements imposed by any federal, state or local taxing authority, and all distributions under the Plan shall be subject to any such withholding or reporting requirements.

## H. Setoffs

The Debtors and the Reorganized Debtors may withhold (but not set off except as set forth below) from the distributions called for under the Plan on account of any Allowed Claim an amount equal to any claims, equity interests, rights, and Causes of Action of any nature that the Debtors or the Reorganized Debtors may hold against the Holder of any such Allowed Claim. In the event that any such claims, equity interests, rights, and Causes of Action of any nature that the Debtors or the Reorganized Debtors may hold against the Holder of any such Allowed Claim are adjudicated by Final Order or otherwise resolved, the Debtors may, pursuant to section 553 of the Bankruptcy Code or applicable non-bankruptcy law, set off against any Allowed Claim and the distributions to be made pursuant hereto on account of such Allowed Claim (before any distribution is made on account of such Allowed Claim) the amount of any adjudicated or resolved claims, equity interests, rights, and Causes of Action of any nature that the Debtors or the Reorganized Debtors may hold against the Holder of any such Allowed Claim, but only to the extent of such adjudicated or resolved amount. Neither the failure to effect such a setoff nor the allowance of any Claim under the Plan shall constitute a waiver or release by the Debtors or the Reorganized Debtors of any such claims, equity interests, rights, and Causes of Action that the Debtors or the Reorganized Debtors may possess against any such Holder, except as specifically provided herein.

## I. Claims Paid or Payable by Third Parties

### 1. Claims Paid by Third Parties

The Debtors or the Reorganized Debtors, as applicable, shall reduce in full a Claim, and such Claim shall be disallowed without a Claim objection having to be Filed and without any further notice to or action, order, or approval of the Bankruptcy Court, to the extent that the Holder of such Claim receives payment in full on account of such Claim from a party that is not a Debtor or Reorganized Debtor. To the extent a Holder of a Claim receives a distribution on account of such Claim and receives payment from a party that is not a Debtor or a Reorganized Debtor on account of such Claim, such Holder shall, within two weeks of receipt thereof, repay or return the distribution to the applicable Reorganized Debtor, to the extent the Holder's total recovery on account of such Claim from the third party and under the Plan exceeds the amount of such Claim as of the date of any such distribution under the Plan.

### 2. Claims Payable by Third Parties

No distributions under the Plan shall be made on account of an Allowed Claim that is payable pursuant to one of the Debtors' insurance policies until the Holder of such Allowed Claim has exhausted all remedies with respect to such insurance policy. To the extent that one or more of the Debtors' insurers agrees to satisfy in full a Claim (if and to the extent adjudicated by a court of competent jurisdiction), then immediately upon such insurers' agreement, such Claim may be expunged without a Claims objection having to be Filed and without any further notice to or action, order, or approval of the Bankruptcy Court.

### 3. Applicability of Insurance Policies

Except as otherwise provided in the Plan, distributions to Holders of Allowed Claims shall be in accordance with the provisions of any applicable insurance policy. Nothing contained in the Plan shall constitute or

35

be deemed a waiver of any Cause of Action that the Debtors or any Entity may hold against any other Entity, including insurers under any policies of insurance, nor shall anything contained herein constitute or be deemed a waiver by such insurers of any defenses, including coverage defenses, held by such insurers.

# ARTICLE VIII.

## PROCEDURES FOR RESOLVING CONTINGENT, UNLIQUIDATED AND DISPUTED CLAIMS

A.     *Prosecution of Objections to Claims*

The Debtors (before the Effective Date, in consultation with the Requisite Initial Lenders) or the Reorganized Debtors (on or after the Effective Date), as applicable, shall have the exclusive authority to File, settle, compromise, withdraw, or litigate to judgment any objections to Claims as permitted under the Plan. From and after the Effective Date, the Debtors and the Reorganized Debtors may settle or compromise any Disputed Claim without approval of the Bankruptcy Court. The Debtors reserve all rights to resolve any Disputed Claim outside the Bankruptcy Court under applicable governing law.

B.     *Allowance of Claims and Interests*

Except as expressly provided herein, no Claim shall be deemed Allowed unless and until such Claim is deemed Allowed under the Bankruptcy Code, under the Plan, or the Bankruptcy Court enters a Final Order in the Chapter 11 Cases allowing such Claim under section 502 of the Bankruptcy Code. Except as expressly provided herein or in any order entered in the Chapter 11 Cases before the Effective Date (including the Confirmation Order), the Reorganized Debtors after the Effective Date will have and retain any and all rights and defenses held by the Debtors with respect to any Claim as of the Petition Date. All claims of any Entity that owes money to the Debtors shall be disallowed unless and until such Entity pays, in full, the amount it owes the Debtors.

C.     *No Distributions Pending Allowance*

Notwithstanding any other provision hereof, if any portion of a Claim is a Disputed Claim, no payment or distribution provided under the Plan shall be made on account of such Disputed Claim unless and until such Disputed Claim becomes an Allowed Claim.

D.     *Distributions After Allowance*

To the extent that a Disputed Claim ultimately becomes an Allowed Claim, distributions (if any) shall be made to the Holder of such Allowed Claim in accordance with the provisions of the Plan. As soon as reasonably practicable after the date that the order or judgment of the Bankruptcy Court allowing any Disputed Claim becomes a Final Order, the Disbursing Agent shall provide to the Holder of such Claim the distribution (if any) to which such Holder is entitled under the Plan as of the Effective Date, without any interest to be paid on account of such Claim.

Notwithstanding anything to the contrary contained herein, the Debtors shall pay within five (5) Business Days of the Effective Date the reasonable Indenture Trustees fees, including the reasonable fees and documented out-of-pocket expenses of Drinker Biddle & Reath LLP and Kelley Drye & Warren LLP, as counsel to the Indenture Trustees, without the need of these parties to File fee applications with the Bankruptcy Court; *provided* that the Indenture Trustees and their counsel shall provide the Debtors and the Initial Consenting First Lien Lenders with the invoices (or other documentation as the Debtors may reasonably request) for which they seek payment on or before the Effective Date; *provided further* that the Debtors and the Initial Consenting First Lien Lenders have no objection to such fees. To the extent that the Debtors object to any of the fees of the Indenture Trustees or their counsel, the Debtor shall not be required to pay any disputed portion of such fees until a resolution of such objection agreed to by the Debtors and the Indenture Trustees and/or their counsel or a further order of the Bankruptcy Court upon a motion by the applicable Indenture Trustee.

E.    *Estimation of Claims*

The Debtors (before the Effective Date, in consultation with the Requisite Initial Lenders) or Reorganized Debtors (on or after the Effective Date) may, at any time, and from time to time, request that the Bankruptcy Court estimate any Disputed Claim pursuant to section 502(c) of the Bankruptcy Code regardless of whether an objection was previously Filed with the Bankruptcy Court with respect to such Claim, or whether the Bankruptcy Court has ruled on any such objection, and the Bankruptcy Court will retain jurisdiction to estimate any Claim at any time during litigation concerning any objection to any Claim, including during the pendency of any appeal relating to any such objection. In the event that the Bankruptcy Court estimates any Disputed Claim, that estimated amount will constitute either the Allowed amount of such Claim or a maximum limitation on such Claim against any party or Entity, as determined by the Bankruptcy Court. If the estimated amount constitutes a maximum limitation on such Claim, the Debtors (before the Effective Date) or the Reorganized Debtors (after the Effective Date), may elect to pursue any supplemental proceedings to object to any ultimate distribution on such Claim. All of the objection, estimation, settlement, and resolution procedures set forth in the Plan are cumulative and not necessarily exclusive of one another. Claims may be estimated and subsequently compromised, objected to, settled, withdrawn, or resolved by any mechanism approved by the Bankruptcy Court.

F.    *Expungement or Adjustment to Claims Without Objection*

Any Claim that has been paid, satisfied or superseded may be expunged on the Claims Register by the Reorganized Debtors, and any Claim that has been amended may be adjusted thereon by the Reorganized Debtors, in both cases without a claims objection having to be Filed and without any further notice to or action, order or approval of the Bankruptcy Court. Beginning on the last day of the first full calendar quarter that is at least 90 days after the Effective Date, the Reorganized Debtors shall File every calendar quarter a list of all Claims or Interests that have been paid, satisfied, superseded or amended during such prior calendar quarter.

G.    *Deadline to File Objections to Claims*

Any objections to Claims shall be Filed no later than the Claims Objection Bar Date.

## ARTICLE IX.

## SETTLEMENT, RELEASE, INJUNCTION AND RELATED PROVISIONS

A.    *Compromise and Settlement of Claims, Interests, and Controversies*

Pursuant to section 363 of the Bankruptcy Code and Bankruptcy Rule 9019 and in consideration for the distributions and other benefits provided pursuant to the Plan, the provisions of the Plan shall constitute a good faith compromise of all Claims, Interests, and controversies relating to the contractual, legal, and subordination rights that a Holder of a Claim may have with respect to any Allowed Claim or Interest, or any distribution to be made on account of such Allowed Claim or Interest. The entry of the Confirmation Order shall constitute the Bankruptcy Court's approval of the compromise or settlement of all such Claims, Interests, and controversies, as well as a finding by the Bankruptcy Court that such compromise or settlement is in the best interests of the Debtors, their Estates, and Holders of Claims and Interests and is fair, equitable, and reasonable. In accordance with the provisions of the Plan, pursuant to section 363 of the Bankruptcy Code and Bankruptcy Rule 9019(a), without any further notice to or action, order, or approval of the Bankruptcy Court, after the Effective Date, the Reorganized Debtors may compromise and settle Claims against them and Causes of Action against other Entities.

B.    **Releases by the Debtors**

**Pursuant to section 1123(b) of the Bankruptcy Code, and except as otherwise specifically provided in the Plan or the Plan Supplement, for good and valuable consideration, including the service of the Released Parties to facilitate the expeditious reorganization of the Debtors and the implementation of the restructuring contemplated by the Plan, on and after the Effective Date, the Released Parties and the Debtors' former officers and directors are deemed released and discharged by the Debtors, the Reorganized**

K&E 14662808.

Debtors, and the Estates from any and all claims, obligations, rights, suits, damages, Causes of Action, remedies, and liabilities whatsoever, including any derivative claims, asserted or assertable on behalf of the Debtors, whether known or unknown, foreseen or unforeseen, existing or hereinafter arising, in law, equity, or otherwise, that the Debtors, the Reorganized Debtors, the Estates, or their Affiliates would have been legally entitled to assert in their own right (whether individually or collectively) or on behalf of the Holder of any Claim or Interest or other Entity, based on or relating to, or in any manner arising from, in whole or in part, the Debtors, the Chapter 11 Cases, the purchase, sale, or rescission of the purchase or sale of any Security of the Debtors or the Reorganized Debtors, the subject matter of, or the transactions or events giving rise to, any Claim or Interest that is treated in the Plan, the business or contractual arrangements between any Debtor and any Released Party, the restructuring of Claims and Interests before or during the Chapter 11 Cases, the negotiation, formulation, or preparation of the Plan and Disclosure Statement, or related agreements, instruments, or other documents, upon any other act or omission, transaction, agreement, event, or other occurrence taking place on or before the Confirmation Date, other than Claims or liabilities arising out of or relating to any act or omission of a Released Party or a former officer or director of the Debtors that constitutes willful misconduct (including fraud) or gross negligence.

C.      *Releases by Holders of Claims and Interests*

As of the Effective Date, each Holder of a Claim or an Interest shall be deemed to have conclusively, absolutely, unconditionally, irrevocably, and forever, released and discharged the Debtors, the Reorganized Debtors, and the Released Parties from any and all Claims, Interests, obligations, rights, suits, damages, Causes of Action, remedies, and liabilities whatsoever, including any derivative Claims, asserted on behalf of a Debtor, whether known or unknown, foreseen or unforeseen, existing or hereafter arising, in law, equity or otherwise, that such Entity would have been legally entitled to assert (whether individually or collectively), based on or relating to, or in any manner arising from, in whole or in part, the Debtors, the Debtors' restructuring, the Debtors' Chapter 11 Cases, the purchase, sale, or rescission of the purchase or sale of any Security of the Debtors or the Reorganized Debtors, the subject matter of, or the transactions or events giving rise to, any Claim or Interest that is treated in the Plan, the business or contractual arrangements between any Debtor and any Released Party, the restructuring of Claims and Interests before or during the Chapter 11 Cases, the negotiation, formulation, or preparation of the Plan, the Disclosure Statement, the Plan Supplement, or related agreements, instruments, or other documents, upon any other act or omission, transaction, agreement, event, or other occurrence taking place on or before the Confirmation Date, other than Claims or liabilities arising out of or relating to any act or omission of a Released Party that constitutes willful misconduct (including fraud) or gross negligence. Notwithstanding anything to the contrary in the foregoing, the release set forth above does not release any post-Effective Date obligations of any party under the Plan or any document, instrument, or agreement (including those set forth in the Plan Supplement) executed to implement the Plan.

Nothing in the Confirmation Order or the Plan shall affect a release of any claim by the United States Government or any of its agencies or any state and local authority whatsoever, including any claim arising under the Internal Revenue Code, federal securities laws, the environmental laws or any criminal laws of the United States or any state and local authority against the Debtors, the Reorganized Debtors, or Released Parties, nor shall anything in the Confirmation Order or the Plan enjoin the United States Government or any of its agencies or any state or local authority from bringing any claim, suit, action or other proceedings against the Debtors, the Reorganized Debtors or Released Parties for any liability whatever, including without limitation any claim, suit or action arising under the Internal Revenue Code, federal securities laws, the environmental laws or any criminal laws of the United States Government or any of its agencies or any state or local authority, nor shall anything in the Confirmation Order or the Plan exculpate any party from any liability to the United States Government or any of its agencies or any state and local authority whatsoever, including any liabilities arising under the Internal Revenue Code, federal securities laws, the environmental laws or any criminal laws of the United States Government or any of its agencies or any state and local authority against the Debtors, the Reorganized Debtors and Released Parties. This paragraph, however, shall in no way affect or limit the discharge granted to the Debtors under sections 524 and 1141 of the Bankruptcy Code.

K&E 14662808.

### D.    Exculpation

**Except as otherwise specifically provided in the Plan or Plan Supplement, no Exculpated Party shall have or incur, and each Exculpated Party is hereby released and exculpated from any Exculpated Claim, obligation, cause of action, or liability for any Exculpated Claim, except for gross negligence or willful misconduct, but in all respects such Entities shall be entitled to reasonably rely upon the advice of counsel with respect to their duties and responsibilities pursuant to the Plan.   The Debtors and the Reorganized Debtors (and each of their respective Affiliates, agents, directors, officers, employees, advisors, and attorneys) have participated in compliance with the applicable provisions of the Bankruptcy Code with regard to the solicitation and distribution of the Plan Securities pursuant to the Plan, and, therefore, are not, and on account of such distributions shall not be, liable at any time for the violation of any applicable law, rule, or regulation governing the solicitation of acceptances or rejections of the Plan or such distributions made pursuant to the Plan.**

### E.    Discharge of Claims and Termination of Interests

Pursuant to section 1141(d) of the Bankruptcy Code, and except as otherwise specifically provided in the Plan, the distributions, rights, and treatment that are provided in the Plan shall be in full and final satisfaction, settlement, release, and discharge, effective as of the Effective Date, of all Claims, Interests, and Causes of Action of any nature whatsoever, including any interest accrued on Claims or Interests from and after the Petition Date, whether known or unknown, against, liabilities of, Liens on, obligations of, rights against, and Interests in, the Debtors or any of their assets or properties, regardless of whether any property shall have been distributed or retained pursuant to the Plan on account of such Claims and Interests, including demands, liabilities, and Causes of Action that arose before the Effective Date, any contingent or non-contingent liability on account of representations or warranties issued on or before the Effective Date, and all debts of the kind specified in sections 502(g), 502(h), or 502(i) of the Bankruptcy Code, in each case whether or not:  (1) a Proof of Claim or Interest based upon such Claim, debt, right, or Interest is Filed or deemed Filed pursuant to section 501 of the Bankruptcy Code; (2) a Claim or Interest based upon such Claim, debt, right, or Interest is Allowed pursuant to section 502 of the Bankruptcy Code; or (3) the Holder of such a Claim or Interest has accepted the Plan.  Except as otherwise provided herein, any default by the Debtors or their Affiliates with respect to any Claim or Interest that existed immediately before or on account of the filing of the Chapter 11 Cases shall be deemed cured on the Effective Date.  The Confirmation Order shall be a judicial determination of the discharge of all Claims and Interests subject to the Effective Date occurring, except as otherwise expressly provided in the Plan.

### F.    Injunction

FROM AND AFTER THE EFFECTIVE DATE, ALL ENTITIES ARE PERMANENTLY ENJOINED FROM COMMENCING OR CONTINUING IN ANY MANNER, ANY CAUSE OF ACTION RELEASED OR TO BE RELEASED PURSUANT TO THE PLAN OR THE CONFIRMATION ORDER.

FROM AND AFTER THE EFFECTIVE DATE, TO THE EXTENT OF THE RELEASES AND EXCULPATION GRANTED IN ARTICLE IX HEREOF, THE RELEASING PARTIES SHALL BE PERMANENTLY ENJOINED FROM COMMENCING OR CONTINUING IN ANY MANNER AGAINST THE RELEASED PARTIES AND THE EXCULPATED PARTIES AND THEIR ASSETS AND PROPERTIES, AS THE CASE MAY BE, ANY SUIT, ACTION OR OTHER PROCEEDING, ON ACCOUNT OF OR RESPECTING ANY CLAIM, DEMAND, LIABILITY, OBLIGATION, DEBT, RIGHT, CAUSE OF ACTION, INTEREST OR REMEDY RELEASED OR TO BE RELEASED PURSUANT TO ARTICLE IX HEREOF.

EXCEPT AS OTHERWISE EXPRESSLY PROVIDED IN THE PLAN, THE PLAN SUPPLEMENT OR RELATED DOCUMENTS, OR FOR OBLIGATIONS ISSUED PURSUANT TO THE PLAN, ALL ENTITIES WHO HAVE HELD, HOLD, OR MAY HOLD CLAIMS OR INTERESTS THAT HAVE BEEN RELEASED PURSUANT TO ARTICLE IX.B OR ARTICLE IX.C, DISCHARGED PURSUANT TO ARTICLE IX.E, OR ARE SUBJECT TO EXCULPATION PURSUANT TO ARTICLE IX.E ARE PERMANENTLY ENJOINED, FROM AND AFTER THE EFFECTIVE DATE, FROM TAKING ANY OF THE FOLLOWING ACTIONS: (1) COMMENCING OR CONTINUING IN ANY MANNER ANY ACTION OR OTHER PROCEEDING OF ANY KIND ON ACCOUNT OF OR IN CONNECTION WITH OR WITH RESPECT TO ANY SUCH CLAIMS

K&E 14662808.

OR INTERESTS; (2) ENFORCING, ATTACHING, COLLECTING, OR RECOVERING BY ANY MANNER OR MEANS ANY JUDGMENT, AWARD, DECREE OR ORDER AGAINST SUCH ENTITIES ON ACCOUNT OF OR IN CONNECTION WITH OR WITH RESPECT TO ANY SUCH CLAIMS OR INTERESTS; (3) CREATING, PERFECTING, OR ENFORCING ANY ENCUMBRANCE OF ANY KIND AGAINST SUCH ENTITIES OR THE PROPERTY OR ESTATE OF SUCH ENTITIES ON ACCOUNT OF OR IN CONNECTION WITH OR WITH RESPECT TO ANY SUCH CLAIMS OR INTERESTS; (4) ASSERTING ANY RIGHT OF SETOFF, SUBROGATION, OR RECOUPMENT OF ANY KIND AGAINST ANY OBLIGATION DUE FROM SUCH ENTITIES OR AGAINST THE PROPERTY OR ESTATE OF SUCH ENTITIES ON ACCOUNT OF OR IN CONNECTION WITH OR WITH RESPECT TO ANY SUCH CLAIMS OR INTERESTS UNLESS SUCH HOLDER HAS FILED A MOTION REQUESTING THE RIGHT TO PERFORM SUCH SETOFF ON OR BEFORE THE CONFIRMATION DATE, AND NOTWITHSTANDING AN INDICATION IN A PROOF OF CLAIM OR INTEREST OR OTHERWISE THAT SUCH HOLDER ASSERTS, HAS, OR INTENDS TO PRESERVE ANY RIGHT OF SETOFF PURSUANT TO SECTION 553 OF THE BANKRUPTCY CODE OR OTHERWISE; AND (5) COMMENCING OR CONTINUING IN ANY MANNER ANY ACTION OR OTHER PROCEEDING OF ANY KIND ON ACCOUNT OF OR IN CONNECTION WITH OR WITH RESPECT TO ANY SUCH CLAIMS OR INTERESTS RELEASED OR SETTLED PURSUANT TO THE PLAN.

THE RIGHTS AFFORDED IN THE PLAN AND THE TREATMENT OF ALL CLAIMS AND EQUITY INTERESTS HEREIN SHALL BE IN EXCHANGE FOR AND IN COMPLETE SATISFACTION OF CLAIMS AND EQUITY INTERESTS OF ANY NATURE WHATSOEVER, INCLUDING, WITHOUT LIMITATION, ANY INTEREST ACCRUED ON CLAIMS FROM AND AFTER THE PETITION DATE, AGAINST THE DEBTORS OR ANY OF THEIR ASSETS, PROPERTY OR ESTATES.  ON THE EFFECTIVE DATE, ALL SUCH CLAIMS AGAINST THE DEBTORS SHALL BE FULLY RELEASED AND DISCHARGED, AND THE EQUITY INTERESTS SHALL BE CANCELLED.

EXCEPT AS OTHERWISE EXPRESSLY PROVIDED FOR HEREIN OR IN OBLIGATIONS ISSUED PURSUANT HERETO FROM AND AFTER THE EFFECTIVE DATE, ALL CLAIMS AGAINST THE DEBTORS SHALL BE FULLY RELEASED AND DISCHARGED, AND THE EQUITY INTERESTS SHALL BE CANCELLED, AND THE DEBTORS' LIABILITY WITH RESPECT THERETO SHALL BE EXTINGUISHED COMPLETELY, INCLUDING, WITHOUT LIMITATION, ANY LIABILITY OF THE KIND SPECIFIED UNDER SECTION 502(G) OF THE BANKRUPTCY CODE.

ALL ENTITIES SHALL BE PRECLUDED FROM ASSERTING AGAINST THE DEBTORS, THE DEBTORS' ESTATES, THE REORGANIZED DEBTORS, EACH OF THEIR RESPECTIVE SUCCESSORS AND ASSIGNS, AND EACH OF THEIR ASSETS AND PROPERTIES, ANY OTHER CLAIMS OR EQUITY INTERESTS BASED UPON ANY DOCUMENTS, INSTRUMENTS OR ANY ACT OR OMISSION, TRANSACTION OR OTHER ACTIVITY OF ANY KIND OR NATURE THAT OCCURRED BEFORE THE EFFECTIVE DATE.

G.      *Term of Injunctions or Stays*

Unless otherwise provided in the Plan or in the Confirmation Order, all injunctions or stays in effect in the Chapter 11 Cases pursuant to sections 105 or 362 of the Bankruptcy Code or any order of the Bankruptcy Court, and extant on the Confirmation Date (excluding any injunctions or stays contained in the Plan or the Confirmation Order) shall remain in full force and effect until the Effective Date.  All injunctions or stays contained in the Plan or the Confirmation Order shall remain in full force and effect in accordance with their terms.

H.      *Protection Against Discriminatory Treatment*

Consistent with section 525 of the Bankruptcy Code and the Supremacy Clause of the U.S. Constitution, all Entities, including Governmental Units, shall not discriminate against the Reorganized Debtors or deny, revoke, suspend or refuse to renew a license, permit, charter, franchise or other similar grant to, condition such a grant to, discriminate with respect to such a grant against, the Reorganized Debtors or another Entity with whom such Reorganized Debtors have been associated, solely because one of the Debtors has been a debtor under chapter 11, has been insolvent before the commencement of the Chapter 11 Cases (or during the Chapter 11 Cases but before the Debtor is granted or denied a discharge) or has not paid a debt that is dischargeable in the Chapter 11 Cases.

K&E 14662808.

*I.*     *Setoff and Recoupment*

**Except with respect to Claims or payments allowed in or provided for under the Plan, the Debtors may setoff against or recoup from any Claims of any nature whatsoever that the Debtors may have against the claimant, but the failure to do so shall not constitute a waiver or release by the Debtors or the Reorganized Debtors of any such claim it may have against such claimant.**

**In no event shall any Holder of Claims or Interests be entitled to setoff any Claim or Interest against any Claim, right, or Cause of Action of the Debtors or Reorganized Debtors unless such Holder has Filed a motion with the Bankruptcy Court requesting the authority to perform such setoff on or before the Confirmation Date, and notwithstanding any indication in any Proof of Claim or Interest or otherwise that such Holder asserts, has, or intends to preserve any right of setoff pursuant to section 553 or otherwise.**

**In no event shall any Holder of Claims or Interests be entitled to recoup any Claim or Interest against any Claim, right, or Cause of Action of the Debtors or the Reorganized Debtors unless such Holder actually has performed such recoupment and provided notice thereof in writing to the Debtors on or before the Confirmation Date, notwithstanding any indication in any Proof of Claim or Interest or otherwise that such Holder asserts, has, or intends to preserve any right of recoupment.**

*J.*     *Release of Liens*

Except as otherwise provided herein or in any contract, instrument, release, or other agreement or document created pursuant to the Plan, on the Effective Date and concurrently with the applicable distributions made pursuant to the Plan and, in the case of a Secured Claim, satisfaction in full of the portion of the Secured Claim that is Allowed as of the Effective Date, all mortgages, deeds of trust, Liens, pledges, or other security interests against any property of the Estates shall be fully released and discharged, and all of the right, title, and interest of any Holder of such mortgages, deeds of trust, Liens, pledges, or other security interests shall revert to the Reorganized Debtor and its successors and assigns.

*K.*     *Releases of Governmental Claims*

Nothing in the Confirmation Order or the Plan shall effect a release of any claim by the United States Government or any of its agencies or any state and local authority whatsoever, including without limitation any claim arising under the Internal Revenue Code, the environmental laws or any criminal laws of the United States or any state and local authority against the Released Parties, nor shall anything in the Confirmation Order or the Plan enjoin the United States or any state or local authority from bringing any claim, suit, action or other proceedings against the Released Parties for any liability whatever, including without limitation any claim, suit or action arising under the Internal Revenue Code, the environmental laws or any criminal laws of the United States or any state or local authority, nor shall anything in the Confirmation Order or the Plan exculpate any party from any liability to the United States Government or any of its agencies or any state and local authority whatsoever, including any liabilities arising under the Internal Revenue Code, the environmental laws or any criminal laws of the United States or any state and local authority against the Released Parties.

## ARTICLE X.

## CONDITIONS PRECEDENT TO CONFIRMATION OF THE PLAN AND THE EFFECTIVE DATE

A.     *Conditions Precedent to Confirmation*

It shall be a condition to Confirmation hereof that all provisions, terms and conditions hereof are approved in the Confirmation Order.

K&E 14662808.

*B.* *Conditions Precedent to the Effective Date*

It shall be a condition to the Effective Date that the following provisions, terms and conditions shall have been satisfied or waived pursuant to the provisions of Article X.C. hereof.

1. The Confirmation Order (a) shall be a Final Order in form and substance acceptable to the Debtors and the Requisite Initial Lenders; *provided, however*, that if the Confirmation Order effects a material change to the terms of the Plan that are adverse to any of the Initial Consenting First Lien Lenders individually or to the Initial Consenting First Lien Lenders as a group, then those terms in the Confirmation Order must be reasonably acceptable to each of the Initial Consenting First Lien Lenders and (b) shall include a finding by the Bankruptcy Court that the Plan Securities to be issued on the Effective Date will be authorized and exempt from registration under applicable securities law pursuant to section 1145 of the Bankruptcy Code.

2. The Plan, including any amendments, modifications, or supplements thereto shall be reasonably acceptable to: (a) the Debtors, (b) each of the Initial Consenting First Lien Lenders and (c) the Committee.

3. The Plan Supplement, including any amendments, modifications, or supplements thereto shall be reasonably acceptable to: (a) the Debtors, (b) the Requisite Initial Lenders and (c) the Committee.

4. The Exit Facility shall have been executed and delivered by all of the Entities that are parties thereto, and all conditions precedent to the consummation thereof shall have been waived or satisfied in accordance with the terms thereof.

5. All actions, documents, certificates, and agreements necessary to implement this Plan shall have been effected or executed and delivered to the required parties and, to the extent required, Filed with the applicable governmental units in accordance with applicable laws.

6. The FCC Approval shall have been obtained and the FCC Trust, if applicable, shall have been established in accordance with the provisions hereof and the FCC Trust Agreement.

*C.* *Waiver of Conditions*

Except as otherwise provided herein that the consent of each of the Initial Consenting First Lien Lenders is required, the conditions to Confirmation of the Plan and to Consummation of the Plan set forth in this Article X may be waived at any time by the Debtors, with the consent of the Requisite Initial Lenders and the Committee; *provided, however,* that the Debtors may not waive entry of the Order approving the Disclosure Statement, the Confirmation Order or any condition the waiver of which is proscribed by law; *provided, further, however,* that the consent of each of the Initial Consenting First Lien Lenders is required for the waiver of (i) conditions precedent requiring the consent of each of the Initial Consenting First Lien Lenders and (ii) the conditions precedent set forth in Articles X.B.4 and X.B.6. Any such waivers shall be evidenced by a writing, signed by the waiving parties, served upon the U.S. Trustee and Filed with the Bankruptcy Court. The waiver may be a conditional one, such as to extend the time under which a condition may be satisfied.

*D.* *Effective Date*

The Effective Date shall be the later to occur of (i) the date on which the Confirmation Order becomes a Final Order and (ii) three (3) Business Days after the date that FCC Approval is obtained; *provided, however,* in each case, the conditions specified in Article X.B. have been satisfied or waived.

*E.* *Effect of Failure of Conditions*

If the Consummation of the Plan does not occur, the Plan shall be null and void in all respects and nothing contained in the Plan or the Disclosure Statement shall: (1) constitute a waiver or release of any claims by or Claims against or Equity Interests in the Debtors; (2) prejudice in any manner the rights of the Debtors, any Holders or any

other Entity; or (3) constitute an admission, acknowledgment, offer, or undertaking by the Debtors, any Holders, or any other Entity in any respect.

# ARTICLE XI.

## MODIFICATION, REVOCATION OR WITHDRAWAL OF THE PLAN

A.   *Modification and Amendments*

Except as otherwise specifically provided herein, the Debtors reserve the right to modify the Plan as to material terms and seek Confirmation consistent with the Bankruptcy Code and, as appropriate, not re-solicit votes on such modified Plan; *provided, however,* that such modifications shall be subject to the consent of the Requisite Initial Lenders and the Committee; *provided, further, however*, that material modifications that are adverse to any of the Initial Consenting First Lien Lenders individually or to the Initial Consenting First Lien Lenders as a group shall be subject to the consent of each of the Initial Consenting First Lien Lenders.  Subject to certain restrictions and requirements set forth in section 1127 of the Bankruptcy Code and Bankruptcy Rule 3019 and those restrictions on modifications set forth in the Plan, the Debtors expressly reserve their rights to alter, amend, or modify materially the Plan with respect to such Debtor, one or more times, after Confirmation, and, to the extent necessary, may initiate proceedings in the Bankruptcy Court to so alter, amend, or modify the Plan, or remedy any defect or omission, or reconcile any inconsistencies in the Plan, the Disclosure Statement, or the Confirmation Order, in such matters as may be necessary to carry out the purposes and intent of the Plan; *provided, however,* that such alterations, amendments, modifications, remedies or reconciliations shall be subject to the consent of the Requisite Initial Lenders and the Committee; *provided, further, however*, that material alterations, amendments, modifications, remedies or reconciliations that are adverse to any of the Initial Consenting First Lien Lenders individually or to the Initial Consenting First Lien Lenders as a group or shall be subject to the consent of each of the Initial Consenting First Lien Lenders.  Any such modification or supplement shall be considered a modification of the Plan and shall be made in accordance with this Article XI.

B.   *Effect of Confirmation on Modifications*

Entry of a Confirmation Order shall mean that all modifications or amendments to the Plan occurring after the solicitation thereof are approved pursuant to section 1127(a) of the Bankruptcy Code and do not require additional disclosure or resolicitation under Bankruptcy Rule 3019.

C.   *Revocation or Withdrawal of the Plan*

The Debtors reserve the right to revoke or withdraw the Plan before the Confirmation Date, with the consent of each of the Initial Consenting First Lien Lenders.  If the Debtors revoke or withdraw the Plan, or if Confirmation or Consummation does not occur, then:  (1) the Plan shall be null and void in all respects; (2) any settlement or compromise embodied in the Plan (including the fixing or limiting to an amount certain of any Claim or Interest or Class of Claims or Interests), assumption or rejection of Executory Contracts or Unexpired Leases effected by the Plan, and any document or agreement executed pursuant to the Plan, shall be deemed null and void; and (3) nothing contained in the Plan shall:  (a) constitute a waiver or release of any Claims or Interests; (b) prejudice in any manner the rights of such Debtor or any other Entity; or (c) constitute an admission, acknowledgement, offer, or undertaking of any sort by such Debtor or any other Entity.

# ARTICLE XII.

## RETENTION OF JURISDICTION

Notwithstanding the entry of the Confirmation Order and the occurrence of the Effective Date, on and after the Effective Date, the Bankruptcy Court shall retain such jurisdiction over the Chapter 11 Cases and all matters, arising out of, or related to, the Chapter 11 Cases and the Plan including jurisdiction to:

1.   allow, disallow, determine, liquidate, classify, estimate, or establish the priority, secured or unsecured status, or amount of any Claim or Interest, including the resolution of any request for payment of any Administrative

Claim and the resolution of any and all objections to the secured or unsecured status, priority, amount, or allowance of Claims;

2.    decide and resolve all matters related to the granting and denying, in whole or in part, any applications for allowance of compensation or reimbursement of expenses to Professionals authorized pursuant to the Bankruptcy Code or the Plan;

3.    resolve any matters related to:  (a) the assumption, assumption and assignment, or rejection of any Executory Contract or Unexpired Lease to which a Debtor is party or with respect to which a Debtor may be liable in any manner and to hear, determine, and, if necessary, liquidate, any Claims arising therefrom, including Rejection Claims, Cure Claims pursuant to section 365 of the Bankruptcy Code or any other matter related to such Executory Contract or Unexpired Lease; (b) any potential contractual obligation under any Executory Contract or Unexpired Lease that is assumed; (c) the Reorganized Debtors amending, modifying, or supplementing, after the Effective Date, pursuant to Article VI, any Executory Contracts or Unexpired Leases to the list of Executory Contracts and Unexpired Leases to be assumed or rejected or otherwise; and (d) any dispute regarding whether a contract or lease is or was executory or expired.

4.    ensure that distributions to Holders of Allowed Claims are accomplished pursuant to the provisions of the Plan;

5.    adjudicate, decide, or resolve any motions, adversary proceedings, contested or litigated matters, and any other matters, and grant or deny any applications involving a Debtor that may be pending on the Effective Date;

6.    adjudicate, decide, or resolve any and all matters related to Causes of Action;

7.    adjudicate, decide, or resolve any and all matters related to section 1141 of the Bankruptcy Code;

8.    during the period of time that the FCC Trust is in place, enter and implement such orders as may be necessary or appropriate to execute, implement, or consummate the provisions of the Plan and all contracts, instruments, releases, indentures, and other agreements or documents created in connection with the Plan or the Disclosure Statement;

9.    enter and enforce any order for the sale of property pursuant to sections 363, 1123, or 1146(a) of the Bankruptcy Code;

10.  resolve any cases, controversies, suits, disputes, or Causes of Action that may arise in connection with the Consummation, interpretation, or enforcement of the Plan or any Entity's obligations incurred in connection with the Plan;

11.  resolve any cases, controversies, suits, disputes, or Causes of Action that may arise in connection with or under the Prepetition Security Agreement and related Intercreditor Agreement;

12.  issue injunctions, enter and implement other orders, or take such other actions as may be necessary or appropriate to restrain interference by any Entity with Consummation or enforcement of the Plan;

13.  resolve any cases, controversies, suits, disputes, or Causes of Action with respect to the discharge, releases, injunctions, exculpations, indemnifications and other provisions contained in Article IX and enter such orders as may be necessary or appropriate to implement such releases, injunctions, and other provisions;

14.  resolve any cases, controversies, suits, disputes, or Causes of Action with respect to the repayment or return of distributions and the recovery of additional amounts owed by the Holder of a Claim for amounts not timely repaid pursuant to Article VII.I.1;

15.  enter and implement such orders as are necessary or appropriate if the Confirmation Order is for any reason modified, stayed, reversed, revoked, or vacated;

K&E 14662808.

16. determine any other matters that may arise in connection with or relate to the Plan, the Disclosure Statement, the Confirmation Order, or any contract, instrument, release, indenture, or other agreement or document created in connection with the Plan or the Disclosure Statement;

17. adjudicate any and all disputes arising from or relating to distributions under the Plan;

18. consider any modifications of the Plan, to cure any defect or omission, or to reconcile any inconsistency in any Bankruptcy Court order, including the Confirmation Order;

19. determine requests for the payment of Claims and Interests entitled to priority pursuant to section 507 of the Bankruptcy Code;

20. hear and determine disputes arising in connection with the interpretation, implementation, or enforcement of the Plan, or the Confirmation Order, including disputes arising under agreements, documents, or instruments executed in connection with the Plan;

21. hear and determine matters concerning state, local, and federal taxes in accordance with sections 346, 505, and 1146 of the Bankruptcy Code;

22. during the period of time that the FCC Trust is in place, enter and implement such orders as are necessary or appropriate to sell, dispose of, liquidate or abandon any assets or properties of the Debtors, the Reorganized Debtors or the FCC Trust, including, without limitation, the New Common Stock. For the avoidance of doubt, the FCC Trustees shall be required to obtain, and the Bankruptcy Court hereby retains jurisdiction to adjudicate and implement, orders, pursuant to section 363 and 365 of the Bankruptcy Code or otherwise, for the sale or other disposition of the New Common Stock or all or a portion of the FCC-related assets including, without limitation, the Debtors' FCC licenses and the Debtors' broadcast television stations;

23. enter and implement such orders as may be necessary regarding the actions of the FCC Trust pursuant to the terms of the Plan and the FCC Trust Agreement including, but not limited to, orders regarding the FCC Trustees' operating decisions and exercise of control over the New Common Stock and the FCC-related assets, including the Debtors' FCC licenses and broadcast television stations;

24. hear and determine all disputes involving the existence, nature, or scope of the Debtors' discharge, including any dispute relating to any liability arising out of the termination of employment or the termination of any employee or retiree benefit program, regardless of whether such termination occurred before or after the Effective Date;

25. enforce all orders previously entered by the Bankruptcy Court;

26. hear any other matter not inconsistent with the Bankruptcy Code; and

27. enter an order concluding or closing the Chapter 11 Cases.

# ARTICLE XIII.

## MISCELLANEOUS PROVISIONS

A. *Immediate Binding Effect*

Subject to Article X.B, and notwithstanding Bankruptcy Rules 3020(e), 6004(h), or 7062 or otherwise, upon the occurrence of the Effective Date, the terms of the Plan and the Plan Supplement shall be immediately effective and enforceable and deemed binding upon the Debtors, the Reorganized Debtors, and any and all Holders of Claims or Interests (irrespective of whether such Claims or Interests are deemed to have accepted the Plan), all Entities that are parties to or are subject to the settlements, compromises, releases, discharges, and injunctions

described in the Plan, each Entity acquiring property under the Plan, and any and all non-Debtor parties to Executory Contracts and Unexpired Leases with the Debtors.

## B.     Additional Documents

On or before the Effective Date, the Debtors may File with the Bankruptcy Court, in form and substance acceptable to the Requisite Initial Lenders, such agreements and other documents as may be necessary or appropriate to effectuate and further evidence the terms and conditions of the Plan.  The Debtors or Reorganized Debtors, as applicable, and all Holders of Claims or Interests receiving distributions pursuant to the Plan and all other parties in interest shall, from time to time, prepare, execute, and deliver any agreements or documents and take any other actions as may be necessary or advisable to effectuate the provisions and intent of the Plan.

## C.     Dissolution of Committee

On the Effective Date, the Committee shall dissolve and members thereof shall be released and discharged from all rights and duties from or related to the Chapter 11 Cases.

## D.     Payment of Fees and Expenses of Initial Consenting First Lien Lenders, the Prepetition Agents and the Indenture Trustees

Notwithstanding any provision in the Plan to the contrary, Debtors or Reorganized Debtors shall promptly pay in Cash in full reasonable and documented fees and expenses incurred by (i) Akin Gump Strauss Hauer & Feld LLP and UBS Securities LLC, as counsel and financial advisor, respectively, to the informal committee comprised of the Initial Consenting First Lien Lenders, in accordance with their respective engagement letters and (ii) (a) one (1) counsel for each of Avenue and Trilogy, which shall not exceed $200,000 for each counsel and (b) one (1) counsel for Black Diamond which shall not exceed $[550,000] for such counsel, and $950,000 in the aggregate incurred under and in connection this Plan, the DIP Credit Agreement (including, without limitation, obligations under section 11.05 thereof) and the restructuring, including, without limitation, in connection with the negotiation, documentation and consummation this Plan, the Plan Supplement and all other documents related to the Plan and the restructuring; and (iii) the Prepetition Agents (x) that are payable in accordance with the DIP Order and (y) that are incurred in connection with distributions under the Plan and in accordance with the terms hereof.  All amounts distributed and paid to the foregoing parties pursuant to the Plan and DIP Order shall not be subject to setoff, recoupment, reduction or allocation of any kind.

Notwithstanding anything to the contrary contained herein, the Debtors shall pay within five Business Days of the Effective Date the reasonable Indenture Trustees Fees, including the reasonable fees and documented out-of-pocket expenses of Drinker Biddle & Reath LLP and Kelley Drye & Warren LLP, as counsel to the Second Priority Notes Trustee and the Senior Subordinated Notes Trustee, respectively, without the need of these parties to File fee applications with the Bankruptcy Court; provided that the Indenture Trustees and their counsel shall provide the Debtors and the Initial Consenting First Lien Lenders with the invoices (or other documentation as the Debtors may reasonably request) for which they seek payment on or before the Effective Date and provided that the Debtors and the Initial Consenting First Lien Lenders have no objection to such fees, such fees shall be paid within five Business Days of the Effective Date.  To the extent that the Debtors object to any of the fees of the Indenture Trustees or its counsel, the Debtor shall not be required to pay any disputed portion of such fees until a resolution of such objection agreed to by the Debtors and the Indenture Trustees and/or their counsel or a further order of the Bankruptcy Court upon a motion by the applicable Indenture Trustee

## E.     Reservation of Rights

Except as expressly set forth in the Plan, the Plan shall have no force or effect unless the Bankruptcy Court shall enter the Confirmation Order.  Neither the Plan, any statement or provision contained in the Plan, nor any action taken or not taken by any Debtor with respect to the Plan, the Disclosure Statement, or the Plan Supplement shall be or shall be deemed to be an admission or waiver of any rights of any Debtor with respect to the Holders of Claims or Interests before the Effective Date.

*F.    Successors and Assigns*

The rights, benefits, and obligations of any Entity named or referred to in the Plan shall be binding on, and shall inure to the benefit of any heir, executor, administrator, successor or assign, affiliate, officer, director, manager, agent, representative, attorney, beneficiaries, or guardian, if any, of each Entity.

*G.    Service of Documents*

After the Effective Date, any pleading, notice, or other document required by the Plan to be served on or delivered to the Reorganized Debtors shall be served on:

ION Media Networks, Inc.
1330 Avenue of the Americas
New York, New York  10019
Attn:  R. Brandon Burgess

with copies to:

Kirkland & Ellis LLP
601 Lexington Avenue
New York, New York 10022
Attn: Jonathan S. Henes and Joshua A. Sussberg

-and-

Akin Gump Strauss Hauer & Feld LLP
One Bryant Park
New York, New York 10036
Attn: Ira S. Dizengoff and Alexis Freeman


After the Effective Date, the Debtors may, in their sole discretion, notify Entities that, in order to continue receiving documents pursuant to Bankruptcy Rule 2002, such Entities must File a renewed request to receive documents pursuant to Bankruptcy Rule 2002.  After the Effective Date, the Debtors are authorized to limit the list of Entities receiving documents pursuant to Bankruptcy Rule 2002 to those Entities who have Filed such renewed requests.

*H.    Entire Agreement*

Except as otherwise indicated, the Plan and the Plan Supplement supersede all previous and contemporaneous negotiations, promises, covenants, agreements, understandings, and representations on such subjects, all of which have become merged and integrated into the Plan.

*I.    Severability of Plan Provisions*

If, before Confirmation of the Plan, any term or provision of the Plan is held by the Bankruptcy Court to be invalid, void, or unenforceable, the Bankruptcy Court shall have the power to alter and interpret such term or provision to make it valid or enforceable to the maximum extent practicable, consistent with the original purpose of the term or provision held to be invalid, void, or unenforceable, and such term or provision shall then be applicable as altered or interpreted.  Notwithstanding any such holding, alteration, or interpretation, the remainder of the terms and provisions of the Plan will remain in full force and effect and will in no way be affected, impaired, or invalidated by such holding, alteration, or interpretation.  The Confirmation Order shall constitute a judicial determination and shall provide that each term and provision of the Plan, as it may have been altered or interpreted in accordance with the foregoing, is: (1) valid and enforceable pursuant to its terms; (2) integral to the Plan and may not be deleted or modified without (a) the Debtors' consent and (b) the consent of the Requisite Initial Lenders;

*provided, further, however*, that material deletions or modifications that are adverse to any of the Initial Consenting First Lien Lenders individually or to the Initial Consenting First Lien Lenders as a group shall be subject to the consent of each of the Initial Consenting First Lien Lenders; and (3) nonseverable and mutually dependent.

J.      *Exhibits*

All exhibits and documents included in the Plan Supplement are incorporated into and are a part of the Plan as if set forth in full in the Plan.  After the exhibits and documents are Filed, copies of such exhibits and documents shall be available upon written request to the Debtors' counsel or the Bankruptcy Court's web site at *www.nysb.uscourts.gov*.  To the extent any exhibit or document is inconsistent with the terms of the Plan, unless otherwise ordered by the Bankruptcy Court, the non-exhibit or non-document portion of the Plan shall control.

K.      *Votes Solicited in Good Faith*

Upon entry of the Confirmation Order, the Debtors will be deemed to have solicited votes on the Plan in good faith and in compliance with the Bankruptcy Code and any applicable non-bankruptcy law, and pursuant to section 1125(e) of the Bankruptcy Code, the Debtors and their respective Affiliates, agents, representatives, members, principals, shareholders, officers, directors, employees, advisors, and attorneys will be deemed to have participated in good faith and in compliance with the Bankruptcy Code in the offer, issuance, sale, and purchase of Plan Securities offered and sold under the Plan, and, therefore, will have no liability for the violation of any applicable law, rule, or regulation governing the solicitation of votes on the Plan or the offer, issuance, sale, or purchase of the Plan Securities offered and sold under the Plan.

L.      *Closing of Chapter 11 Cases*

The Reorganized Debtors shall, promptly after the full administration of the Chapter 11 Case, File with the Bankruptcy Court all documents required by Bankruptcy Rule 3022 and any applicable order of the Bankruptcy Court to close the Chapter 11 Cases.

M.      *Conflicts*

Except as set forth in the Plan, to the extent that any provision of the Disclosure Statement or any other order (other than the Confirmation Order) referenced in the Plan (or any exhibits, schedules, appendices, supplements, or amendments to any of the foregoing), conflict with or are in any way inconsistent with any provision of the Plan, the Plan shall govern and control; *provided, however,* that if there is a conflict between this Plan and a Plan Supplement document, the Plan Supplement document shall govern and control.

N.      *Filing of Additional Documents*

On or before the Effective Date, the Debtors may File with the Bankruptcy Court all agreements and other documents as may be necessary or appropriate to effectuate and further evidence the terms and conditions hereof.

Dated:  September 30, 2009

                                          Respectfully submitted,

                                          ION Media Networks, Inc.

                                          By:   /s/ R. Brandon Burgess
                                                Chairman, President and CEO

America 51, L.P.                          ION Media Akron License, Inc.
By:   /s/ R. Brandon Burgess              By:   /s/ R. Brandon Burgess
      President and CEO                          President and CEO

48

ION Media Albany License, Inc.
By: /s/ R. Brandon Burgess
President and CEO

ION Media Atlanta License, Inc.
By: /s/ R. Brandon Burgess
President and CEO

ION Media Battle Creek License, Inc.
By: /s/ R. Brandon Burgess
President and CEO

ION Media Boston License, Inc.
By: /s/ R. Brandon Burgess
President and CEO

ION Media Brunswick License, Inc.
By: /s/ R. Brandon Burgess
President and CEO

ION Media Buffalo License, Inc.
By: /s/ R. Brandon Burgess
President and CEO

ION Media Charleston License, Inc.
By: /s/ R. Brandon Burgess
President and CEO

ION Media Chicago License, Inc.
By: /s/ R. Brandon Burgess
President and CEO

ION Media Dallas License, Inc.
By: /s/ R. Brandon Burgess
President and CEO

ION Media Denver License, Inc.
By: /s/ R. Brandon Burgess
President and CEO

ION Media Des Moines License, Inc.
By: /s/ R. Brandon Burgess
President and CEO

ION Media Entertainment, Inc.
By: /s/ R. Brandon Burgess
President and CEO

ION Media Greensboro License, Inc.
By: /s/ R. Brandon Burgess
President and CEO

ION Media Greenville License, Inc.
By: /s/ R. Brandon Burgess
President and CEO

ION Media Hartford License, Inc.
By: /s/ R. Brandon Burgess
President and CEO

ION Media Hawaii License, Inc.
By: /s/ R. Brandon Burgess
President and CEO

ION Media Hits, Inc.
By: /s/ R. Brandon Burgess
President and CEO

ION Media Holdings, Inc.
By: /s/ R. Brandon Burgess
President and CEO

ION Media Houston License, Inc.
By: /s/ R. Brandon Burgess
President and CEO

ION Media Indianapolis License, Inc.
By: /s/ R. Brandon Burgess
President and CEO

ION Media Jacksonville License, Inc.
By: /s/ R. Brandon Burgess
President and CEO

ION Media Kansas City License, Inc.
By: /s/ R. Brandon Burgess
President and CEO

ION Media Knoxville License, Inc.
By: /s/ R. Brandon Burgess
President and CEO

ION Media Lexington License, Inc.
By: /s/ R. Brandon Burgess
President and CEO

ION Media License Company, LLC

ION Media Los Angeles License, Inc.

By:  /s/ R. Brandon Burgess
     President and CEO

By:  /s/ R. Brandon Burgess
     President and CEO

ION Media LPTV, Inc.
By:  /s/ R. Brandon Burgess
     President and CEO

ION Media Management Company
By:  /s/ R. Brandon Burgess
     President and CEO

ION Media Martinsburg License, Inc.
By:  /s/ R. Brandon Burgess
     President and CEO

ION Media Memphis License, Inc.
By:  /s/ R. Brandon Burgess
     President and CEO

ION Media Milwaukee License, Inc.
By:  /s/ R. Brandon Burgess
     President and CEO

ION Media Minneapolis License, Inc.
By:  /s/ R. Brandon Burgess
     President and CEO

ION Media New Orleans License, Inc.
By:  /s/ R. Brandon Burgess
     President and CEO

ION Media of Akron, Inc.
By:  /s/ R. Brandon Burgess
     President and CEO

ION Media of Albany, Inc.
By:  /s/ R. Brandon Burgess
     President and CEO

ION Media of Atlanta, Inc.
By:  /s/ R. Brandon Burgess
     President and CEO

ION Media of Battle Creek, Inc.
By:  /s/ R. Brandon Burgess
     President and CEO

ION Media of Birmingham, Inc.
By:  /s/ R. Brandon Burgess
     President and CEO

ION Media of Boston, Inc.
By:  /s/ R. Brandon Burgess
     President and CEO

ION Media of Brunswick, Inc.
By:  /s/ R. Brandon Burgess
     President and CEO

ION Media of Buffalo, Inc.
By:  /s/ R. Brandon Burgess
     President and CEO

ION Media of Cedar Rapids, Inc.
By:  /s/ R. Brandon Burgess
     President and CEO

ION Media of Charleston, Inc.
By:  /s/ R. Brandon Burgess
     President and CEO

ION Media of Chicago, Inc.
By:  /s/ R. Brandon Burgess
     President and CEO

ION Media of Dallas, Inc.
By:  /s/ R. Brandon Burgess
     President and CEO

ION Media of Denver, Inc.
By:  /s/ R. Brandon Burgess
     President and CEO

ION Media of Des Moines, Inc.
By:  /s/ R. Brandon Burgess
     President and CEO

ION Media of Detroit, Inc.
By:  /s/ R. Brandon Burgess
     President and CEO

ION Media of Fayetteville, Inc.
By:  /s/ R. Brandon Burgess
     President and CEO

ION Media of Greensboro, Inc.
By:  /s/ R. Brandon Burgess
     President and CEO

K&E 14662808.

ION Media of Greenville, Inc.
By: /s/ R. Brandon Burgess
President and CEO

ION Media of Honolulu, Inc.
By: /s/ R. Brandon Burgess
President and CEO

ION Media of Indianapolis, Inc.
By: /s/ R. Brandon Burgess
President and CEO

ION Media of Kansas City, Inc.
By: /s/ R. Brandon Burgess
President and CEO

ION Media of Lexington, Inc.
By: /s/ R. Brandon Burgess
President and CEO

ION Media of Louisville, Inc.
By: /s/ R. Brandon Burgess
President and CEO

ION Media of Memphis, Inc.
By: /s/ R. Brandon Burgess
President and CEO

ION Media of Milwaukee, Inc.
By: /s/ R. Brandon Burgess
President and CEO

ION Media of Nashville, Inc.
By: /s/ R. Brandon Burgess
President and CEO

ION Media of New York, Inc.
By: /s/ R. Brandon Burgess
President and CEO

ION Media of Oklahoma City, Inc.
By: /s/ R. Brandon Burgess
President and CEO

ION Media of Philadelphia, Inc.
By: /s/ R. Brandon Burgess
President and CEO

ION Media of Portland, Inc.

ION Media of Hartford, Inc.
By: /s/ R. Brandon Burgess
President and CEO

ION Media of Houston, Inc.
By: /s/ R. Brandon Burgess
President and CEO

ION Media of Jacksonville, Inc.
By: /s/ R. Brandon Burgess
President and CEO

ION Media of Knoxville, Inc.
By: /s/ R. Brandon Burgess
President and CEO

ION Media of Los Angeles, Inc.
By: /s/ R. Brandon Burgess
President and CEO

ION Media of Martinsburg, Inc.
By: /s/ R. Brandon Burgess
President and CEO

ION Media of Miami, Inc.
By: /s/ R. Brandon Burgess
President and CEO

ION Media of Minneapolis, Inc.
By: /s/ R. Brandon Burgess
President and CEO

ION Media of New Orleans, Inc.
By: /s/ R. Brandon Burgess
President and CEO

ION Media of Norfolk, Inc.
By: /s/ R. Brandon Burgess
President and CEO

ION Media of Orlando, Inc.
By: /s/ R. Brandon Burgess
President and CEO

ION Media of Phoenix, Inc.
By: /s/ R. Brandon Burgess
President and CEO

ION Media of Providence, Inc.

K&E 14662808.

By: ___/s/ R. Brandon Burgess___
      President and CEO

By: ___/s/ R. Brandon Burgess___
      President and CEO

ION Media of Raleigh, Inc.
By: ___/s/ R. Brandon Burgess___
      President and CEO

ION Media of Roanoke, Inc.
By: ___/s/ R. Brandon Burgess___
      President and CEO

ION Media of Sacramento, Inc.
By: ___/s/ R. Brandon Burgess___
      President and CEO

ION Media of Salt Lake City, Inc.
By: ___/s/ R. Brandon Burgess___
      President and CEO

ION Media of San Antonio, Inc.
By: ___/s/ R. Brandon Burgess___
      President and CEO

ION Media of San Jose, Inc.
By: ___/s/ R. Brandon Burgess___
      President and CEO

ION Media of Scranton, Inc.
By: ___/s/ R. Brandon Burgess___
      President and CEO

ION Media of Seattle, Inc.
By: ___/s/ R. Brandon Burgess___
      President and CEO

ION Media of Spokane, Inc.
By: ___/s/ R. Brandon Burgess___
      President and CEO

ION Media of Syracuse, Inc.
By: ___/s/ R. Brandon Burgess___
      President and CEO

ION Media of Tampa, Inc.
By: ___/s/ R. Brandon Burgess___
      President and CEO

ION Media of Tulsa, Inc.
By: ___/s/ R. Brandon Burgess___
      President and CEO

ION Media of Washington, Inc.
By: ___/s/ R. Brandon Burgess___
      President and CEO

ION Media of Wausau, Inc.
By: ___/s/ R. Brandon Burgess___
      President and CEO

ION Media of West Palm Beach, Inc.
By: ___/s/ R. Brandon Burgess___
      President and CEO

ION Media Oklahoma City License, Inc.
By: ___/s/ R. Brandon Burgess___
      President and CEO

ION Media Orlando License, Inc.
By: ___/s/ R. Brandon Burgess___
      President and CEO

ION Media Philadelphia License, Inc.
By: ___/s/ R. Brandon Burgess___
      President and CEO

ION Media Portland License, Inc.
By: ___/s/ R. Brandon Burgess___
      President and CEO

ION Media Publishing, Inc.
By: ___/s/ R. Brandon Burgess___
      President and CEO

ION Media Raleigh License, Inc.
By: ___/s/ R. Brandon Burgess___
      President and CEO

ION Media Sacramento License, Inc.
By: ___/s/ R. Brandon Burgess___
      President and CEO

ION Media Salt Lake City License, Inc.
By: ___/s/ R. Brandon Burgess___
      President and CEO

ION Media San Antonio License, Inc.
By: ___/s/ R. Brandon Burgess___
      President and CEO

K&E 14662808.

ION Media San Jose License, Inc.
By:  /s/ R. Brandon Burgess
        President and CEO

ION Media Songs, Inc.
By:  /s/ R. Brandon Burgess
        President and CEO

ION Media Syracuse License, Inc.
By:  /s/ R. Brandon Burgess
        President and CEO

ION Media Tulsa License, Inc.
By:  /s/ R. Brandon Burgess
        President and CEO

ION Media Wausau License, Inc.
By:  /s/ R. Brandon Burgess
        President and CEO

ION Media West Palm Beach License, Inc.
By:  /s/ R. Brandon Burgess
        President and CEO

Ocean State Television, L.L.C.
By:  /s/ R. Brandon Burgess
        President and CEO

ION Media Scranton License, Inc.
By:  /s/ R. Brandon Burgess
        President and CEO

ION Media Spokane License, Inc.
By:  /s/ R. Brandon Burgess
        President and CEO

ION Media Television, Inc.
By:  /s/ R. Brandon Burgess
        President and CEO

ION Media Washington License, Inc.
By:  /s/ R. Brandon Burgess
        President and CEO

ION Media West Palm Beach Holdings, Inc.
By:  /s/ R. Brandon Burgess
        President and CEO

ION Television Net, Inc.
By:  /s/ R. Brandon Burgess
        President and CEO

Open Mobile Ventures Corporation
By:  /s/ R. Brandon Burgess
        President and CEO

K&E 14662808.