**UNITED STATES BANKRUPTCY COURT**　　　　FOR PUBLICATION
**SOUTHERN DISTRICT OF NEW YORK**

| | | |
|---|---|---|
| ------------------------------------------------: | | Chapter 11 |
| In re | : | |
| | : | Case No. 09-13125 (JMP) |
| ION MEDIA NETWORKS, INC., *et. al.*, | : | |
| | : | (Jointly Administered) |
| Debtors. | : | |
| | : | |
| ------------------------------------------------: | | |
| | : | |
| ION MEDIA NETWORKS, INC., | : | Adversary Proceeding |
| | : | |
| Plaintiff, | : | |
| -against- | : | Case No. 09-01440 (JMP) |
| | : | |
| CYRUS SELECT OPPORTUNITIES | : | |
| MASTER FUND, LTD., | : | |
| | : | |
| Defendant. | : | |
| ------------------------------------------------: | | |
| CYRUS SELECT OPPORTUNITIES | : | |
| MASTER FUND, LTD., | : | Adversary Proceeding |
| | : | |
| Plaintiff, | : | |
| -against- | : | Case No. 09-01479 (JMP) |
| | : | |
| ION MEDIA NETWORKS, INC., *et al.*, | : | |
| | : | |
| Defendant. | : | |
| ------------------------------------------------: | | |

## MEMORANDUM DECISION

KIRKLAND & ELLIS, LLP
*Attorneys for Debtors*
601 Lexington Avenue
New York, New York 10022

　　　　Jonathan S. Henes, Esq.
　　　　Joshua A. Sussberg, Esq.
　　　　Matthew F. Dexter, Esq.

AKIN GUMP STRAUSS HAUER & FELD LLP
*Attorneys for First Lien Holders*
One Bryant Park
New York, NY 10036

　　　　Ira S. Dizengoff, Esq.

Alexis Freeman, Esq.
Deborah Newman, Esq.

AKIN GUMP STRAUSS HAUER & FELD LLP
*Attorneys for First Lienholders*
Robert S. Strauss Building
1333 New Hampshire Avenue
Washington, DC 20036

Kimberly Debeers, Esq. (Telephonically)

DOW LOHNES, PLLC
*Attorneys for Debtor, FCC counsel*
1200 New Hampshire Avenue, NW,
Suite 800
Washington, DC 20036

John R. Feore, Esq.

DRINKER BIDDLE & REATH LLP
*Attorneys for Manufacturers & Traders Bank*
140 Broadway
39th Floor
New York, NY 10005

Stephanie Wickouski, Esq.

LATHAM & WATKINS LLP
*Attorneys for Moelis & Company LLC*
885 Third Avenue
New York, NY 10022

Michael Riela, Esq.

LOEB & LOEB LLP
*Attorneys for Wells Fargo Bank as Administrative Agent*
345 Park Avenue
New York, NY 10154

Walter H. Curchack, Esq.
Vadim J. Rubenstein,Esq.

LOWENSTEIN SANDLER PC
*Attorneys for Official Committee of Unsecured Creditors*
65 Livingston Avenue
Roseland, NJ 07068

Sharon Levine, Esq.

LOWENSTEIN SANDLER PC
*Attorneys for Official Committee of Unsecured Creditors*

1251 Avenue of the Americas
New York, NY 10020

      Wojciech F. Jung, Esq.

NIXON PEABODY LLP
*Attorneys for Wilmington Trust FSB as Agent*
437 Madison Avenue
New York, NY 10022

      Robert N.H. Christmas, Esq.

SKADDEN, ARPS, SLATE, MEAGHER & FLOM LLP
*Attorneys for Black Diamond Commercial Finance*
Four Times Square
New York, NY 10036

      Mark A. McDermott, Esq.

TROUTMAN SANDERS LLP
*Attorneys for Bank of New York, Mellon Trust N.A.*
The Chrysler Building
405 Lexington Avenue
New York, NY 10174

      Hollace T. Cohen, Esq.
      Brett D. Goodman, Esq.
      Lee W. Stremba, Esq.

WHITE & CASE LLP
*Attorneys for Cyrus Select Opportunities Master Fund Ltd.*
1155 Avenue of the Americas
New York, NY 10036

      J. Christopher Shore, Esq.
      Julia M. Winters, Esq.

WHITE & CASE LLP
*Attorneys for Cyrus Select Opportunities Master Fund Ltd.*
200 South Biscayne Boulevard
Suite 4900
Miami, FL 33131

      Frank L. Eaton, Esq.

UNITED STATES DEPARTMENT OF JUSTICE
Office of the U.S. Trustee
33 Whitehall Street, 21st Floor
New York, NY 10004

      Marylou Martin, Esq.

**JAMES M. PECK**
**UNITED STATES BANKRUPTCY JUDGE**

### *Introduction*

Cyrus Select Opportunities Master Fund Ltd. ("Cyrus") is an activist distressed investor that purchased certain deeply discounted second lien debt of ION Media Networks, Inc. ("ION," together with its affiliated debtors, the "Debtors") for pennies on the dollar. Throughout these cases and despite purported restrictions on its activities set forth in an intercreditor agreement (the "Intercreditor Agreement") between the first lien lenders (the "First Lien Lenders") and the subordinated second lien lenders (the "Second Lien Lenders," and, together with the First Lien Lenders, the "Secured Parties"), Cyrus has been vigorously challenging the rights of the First Lien Lenders to recover as secured creditors any of the enterprise value attributable to ION's FCC broadcast licenses (the "FCC Licenses"). Cyrus' motivations are easy enough to recognize. It has been using aggressive bankruptcy litigation tactics as a means to gain negotiating leverage or obtain judicial rulings that will enable it to earn outsize returns on its bargain basement debt purchases at the expense of the First Lien Lenders[1].

There certainly is nothing wrong with raising and pursuing opportunistic legal theories as a means to reap profits in connection with acquired, deeply discounted bankruptcy claims. Such activist strategies are an increasingly familiar part of the landscape in large chapter 11 cases. Cyrus, in advancing its private economic agenda, has been both consistent and insistent throughout this case in contending that the FCC

---

[1] In addition to using leverage to possibly obtain a handsome return on its investment in ION second lien debt, Cyrus has made an offer to acquire control of ION. The Court assumes that to be a sincere offer reflecting confidence in the value of a reorganized and deleveraged ION. Under either scenario, Cyrus is using the bankruptcy process to its own economic advantage.

Licenses owned by special purpose vehicles within the Debtors' capital structure (the "FCC License Subsidiaries") represent a valuable unencumbered source of recovery for holders of second lien indebtedness.  Cyrus submits that the licenses are properly immune from being legitimately encumbered due to their special character as a federally sanctioned and regulated right to use the airwaves in the public interest.   Cyrus persistently has made the point[2] that the licenses do not fit the definition of collateral for purposes of the Intercreditor Agreement applicable to the first and second lien indebtedness and should be deemed available for *pari passu* sharing by the First Lien Lenders and Second Lien Lenders.

A confirmation hearing took place on November 3, 2009, and at that time Cyrus was the only party with continuing objections to confirmation of ION's plan of reorganization.  The objections focused on alleged structural infirmities of the Plan, but unmistakably the objections are part of the ongoing effort to obtain incremental recoveries associated with the value of the allegedly unliened FCC Licenses.   The Official Committee of Unsecured Creditors (the "Committee"), which includes the indenture trustee for holders of the second lien debt as one of its members, supported

---

[2] Cyrus has been very active.  It objected to DIP financing proposed by the First Lien Lenders, requested reconsideration of the DIP financing order so that it could offer alternative financing on better terms, objected to ION's disclosure statement, commenced its own adversary proceeding for a declaratory judgment, prosecuted a motion to withdraw the reference with respect to two adversary proceedings concerning the FCC Licenses, objected to confirmation, proposed amendments to the Plan to enable it more effectively to appeal adverse rulings of the Court and even filed supplemental papers in opposition to confirmation on the morning of the confirmation hearing.  The Court issued a memorandum decision denying reconsideration of the DIP Order, 2009 WL 2902568 (Bankr. S.D.N.Y. 2009).  The Court assumes familiarity of the parties with this slip opinion.  The latest initiative by Cyrus is its letter to ION's Board of Directors dated November 9 proposing a plan amendment.  A copy of that letter was delivered to chambers on November 11 together with a letter from its counsel White & Case complaining that a group of First Lien Lenders (the "Ad Hoc Group of First Lien Lenders") has not been playing by the rules.  The unsolicited proposal to the ION's board has been rejected but allegedly has been extended and remains outstanding pending the Court's ruling on confirmation.

confirmation of the Plan that now offers consideration[3] to unsecured creditors that otherwise would not be available in a liquidation under chapter 7 of the Bankruptcy Code.

Since the commencement of these cases, parties have referred frequently to the Intercreditor Agreement between the First and Second Lien Lenders and have argued that Cyrus lacks standing to object to actions taken by Ion and the First Lien Lenders due to the explicit and strict restrictions imposed under the Intercreditor Agreement that were drafted to suppress or eliminate the very kind of obstructive behavior that has been exhibited by Cyrus.  The question presented is whether Cyrus, which admits to being subject to the Intercreditor Agreement, may blithely disregard the restrictions of that agreement and openly oppose an otherwise consensual plan of reorganization simply by saying that the FCC Licenses are not covered by the agreement.

Here, a sophisticated, economically motivated and woefully out of the money creditor has deliberately chosen to ignore the terms of an unambiguous agreement that, read literally, precludes it from opposing confirmation.  This is a high risk strategy that is being implemented without first obtaining a declaration of rights under the Intercreditor Agreement.  Cyrus has chosen instead to object to confirmation and thereby assume the consequence of being found liable for a breach of the Intercreditor Agreement.  Cyrus'

---

[3] The consideration consists of a ratable percentage of a $5 million fund and the right to receive certain warrants.  Specifically, the Second Lien Lenders' warrants feature a strike price of $800.0 million total equity value, a 7-year term, and grant Second Lien Lenders the ability to acquire 5.0% of the fully-diluted primary common equity as of the Effective Date in the Reorganized Debtors, subject to dilution protections.  See Disclosure Statement at Ex. F.  ION submits that the settlement with the Committee precludes objections by an individual creditor such as Cyrus.  The Court disagrees.  Unsecured creditors have the right to object to any settlement including one that is incorporated in a plan of reorganization. See Section B below.

reasoning is based on the asserted correctness of its own legal position regarding the definition of collateral and the proper interpretation of the Intercreditor Agreement.

To avoid potential liability for breach of the agreement, Cyrus must prevail in showing that objections to confirmation are not prohibited because those objections are grounded in the proposition that the FCC Licenses are not collateral and so are not covered by the agreement. But that argument is hopelessly circular. Cyrus is free to object only if it can convince this Court or an appellate court that it has correctly analyzed a disputed legal issue. It is objecting as if it has the right to do so without regard to the incremental administrative expenses that are being incurred in the process.[4]

In order to resolve the issue of standing to object to the Plan, the Court in this decision finds that the FCC Licenses constitute "purported" Collateral as that term is used in the Intercreditor Agreement and rules that Cyrus lacks standing to object to the Plan and is in breach of such agreement by virtue of its objections to confirmation. The objections of Cyrus to confirmation are overruled. The Plan respects the rights of the First Lien Lenders as recognized in the Intercreditor Agreement and is confirmable. The Court will enter a separate confirmation order consistent with this decision.

### *Relevant Facts and Procedural History*

*(i)      The Chapter 11 Filing*

In 2005, the Debtors entered into a series of agreements ("Transaction Documents") with the Secured Parties. Among the Transaction Documents is a security agreement setting forth the rights of the Secured Parties to the Debtors' assets (the

---

[4] The Court believes that Cyrus' tactics have caused a material increase in administrative expenses in these cases. To the extent that these expenses are traceable to violations of the Intercreditor Agreement, such expenses may be a measure of damages to be claimed against Cyrus.

"Security Agreement"), and the Intercreditor Agreement governing the relationship between the Secured Parties.

In 2009, the Debtors began negotiating with certain of their pre-petition First Lien Lenders to engage in a restructuring. The Debtors and these First Lien Lenders entered into a Restructuring Support Agreement ("RSA") that detailed arrangements for financing the chapter 11 cases and an exit strategy. Under the RSA, the First Lien Lenders as a class would ultimately receive close to 100% of the common stock of the Reorganized Debtors.

On May 19, 2009, the Debtors commenced jointly administered cases under chapter 11 of the Bankruptcy Code. As one of their first day motions, the Debtors filed a motion for interim and final DIP financing consistent with the RSA. Among other things, the DIP financing proposal provided for $150 million of DIP loans to convert, as part of the Debtors' plan of reorganization, into 62.5% of the equity of the reorganized Debtors (the "Reorganized Debtors"). Cyrus, a holder of second lien debt, objected to the DIP financing proposal on the grounds that (a) the Debtors' FCC License Subsidiaries were not receiving any value from the DIP financing; and (b) the DIP financing contained an improper roll up of certain First Lien Obligations, particularly as to purported liens on the FCC Licenses.

On June 30, 2009, Cyrus presented an alternative DIP financing proposal offering more favorable terms than the financing offered by the First Lien Lenders, but that included a due diligence contingency which conditioned Cyrus' financing commitment on satisfactory completion of certain diligence. After a hearing on July 1, 2009, the Court

approved the First Lien Lender proposal.[5]  The next day, Cyrus filed a motion seeking reconsideration of the Court's ruling in favor of the First Lien Lender DIP proposal (the "Motion for Reconsideration").  Cyrus argued in its Motion for Reconsideration that the Court should reconsider its holding in light of Cyrus' decision to remove the due-diligence requirement from its DIP proposal.  The Court denied Cyrus' Motion for Reconsideration because Cyrus failed to "demonstrate[d] any errors or injustice, nor … any newly discovered evidence," and made clear that the diligence condition in the initial proposal by Cyrus was one of several reasons for the Court's denial of its DIP proposal. 2009 WL 2902568, *4 (Bankr. S.D.N.Y. 2009).

### (ii)    The Adversary Proceedings

On August 19, 2009, ION commenced an adversary proceeding against Cyrus seeking to enjoin Cyrus from:  (a) contesting the validity or enforceability of any lien, mortgage, assignment, or security interest granted on all of the Debtors' property to the First Lien Lenders; (b) contesting the priority rights granted to the First Lien Lenders under the Security Agreement; and (c) opposing or objecting to the Debtors' Plan of Reorganization and Disclosure Statement.  See Complaint (ECF Doc. # 1), Adv. Pro. No. 09-01440.

On September 19, 2009, Cyrus moved to dismiss the ION adversary proceeding on the grounds that it (a) failed to name all the necessary parties to the dispute and (b) failed to state a claim for relief.   See Motion to Dismiss (ECF Doc. # 5), Adv. Pro. No. 09-01440.  At the same time, Cyrus commenced an adversary proceeding against all

---

[5] In entering the DIP Order, the Court made clear that it was not resolving the issue with respect to the FCC Licenses.  See 7/1 Hearing Tr. at p. 135:15-20 ("[T]his is not the confirmation hearing, this is not a hearing with respect to substantive consolidation, this is not a hearing with respect to intercreditor claims.  This is a hearing that relates to whether or not this debtor needs a debtor-in-possession financing facility with these terms").

Debtors and other parties to the Security Agreement.  See Complaint (ECF Doc. # 1), Adv. Pro. No. 09-01479.  Cyrus' adversary proceeding sought a declaratory judgment as to whether the FCC Licenses are encumbered by any valid and enforceable security interests.[6]  On September 29, 2009, the Ad Hoc Group of First Lien Lenders filed a motion to enforce the terms of the DIP Order, arguing that Cyrus' adversary proceeding was not a timely and properly filed objection to the binding stipulations in the Final DIP Order.  This motion was opposed by Cyrus.

Following a pre-trial conference, the Court entered an Agreed Consolidation and Scheduling Order,[7] which consolidated the two adversary proceedings (together, the "Adversary Proceeding") and limited each party's summary judgment motions to addressing the following issues:

- Do the First Lien Lenders have liens on the FCC Licenses and/or the rights to proceeds of the FCC Licenses, and, if so, does the Security Agreement prohibit Cyrus from contesting the validity or enforceability of those liens?

- Are the First Lien Lenders' claims against the Debtors with respect to the FCC Licenses and/or the proceeds derived therefrom senior to those of the Second Lien Lenders and, if so, does the Security Agreement prohibit Cyrus from objecting to the priority of the claims?

- Is the Plan consistent with the rights of the First Lien Lenders and, if so, does the Security Agreement prohibit Cyrus from objecting to the Disclosure Statement and/or Plan? and

- Is Cyrus' adversary proceeding barred by, or otherwise violative of, the Final DIP Order?

---

[6] Moreover, on that same day, Cyrus filed with the United States District Court for the Southern District of New York a motion to withdraw the reference from the bankruptcy court.  See Ion Media Networks, Inc. v. Cyrus Special Opportunities Master Fund Ltd. et al., Case No. 09-Civ-8076.  The District Court denied Cyrus' request on November 2, 2009.

[7] ECF Doc. # 9 (Oct. 9, 2009).

Thereafter, both Cyrus and the Debtors moved for summary judgment on their respective claims in the consolidated Adversary Proceeding. After extensive briefing, the Court heard oral argument on the summary judgment motions on October 28, 2009 and took the matters under advisement. This decision on standing and plan confirmation answers the above questions and makes it unnecessary to separately rule with respect to the Adversary Proceeding.

*(iii)*    ***Plan Of Reorganization***

On August 19, 2009, the Debtors filed a disclosure statement and plan of reorganization. On September 30, 2009, ION filed a First Modified Plan (as modified, the "Plan") and Disclosure Statement. The Plan is based on the valuation analysis provided by Moelis & Company LLC, the Debtors' financial advisors, which determined that the Reorganized Debtors will have a total enterprise value of between $310 million and $445 million, which amount is insufficient to satisfy the approximately $850 million in first lien debt. Consistent with this valuation, the Plan provides for the First Lien Lenders to receive nearly all of the common stock of the Reorganized Debtors. As a result of an agreement reached with the Committee, Second Lien Lenders (including Cyrus) and general unsecured creditors are to receive their pro rata share of an aggregate five million dollar cash distribution and warrants to purchase 5% of common stock in the Reorganized Debtors. The Plan also provides that all Holders of Claims or Interests will release the Debtors, the Reorganized Debtors, and the Released Parties (as defined in the Plan) from all current and future claims and causes of actions (excluding willful misconduct, gross negligence, and governmental claims) relating to the Debtors' bankruptcy and bankruptcy related proceedings. The Plan presumes that the First Lien

Lenders are entitled under the Transaction Documents to receive the value all of the assets of the FCC License Subsidiaries, including the FCC Licenses.

Cyrus objected to the Disclosure Statement on the grounds that the Plan is unconfirmable because the FCC Licenses are unencumbered, and that the Disclosure Statement did not contain information adequate to allow creditors to make an informed decision on the Plan. Following a hearing on September 30, 2009, the Court approved the Disclosure Statement, including minor modifications, on October 2, 2009.

On October 22, 2009, Cyrus conveyed a "settlement proposal" to both the Debtors' professionals and Ion's board of directors pursuant to which Cyrus would agree to settle its entire objection to the Plan (the "Cyrus Plan"). Specifically, the Cyrus Plan contemplates three main components: (a) the creation of a reserve of 20% of the New Common Stock (which equity, according to Cyrus, would be free for distribution after full and final disposition of the pending Adversary Proceedings), (b) an investment by Cyrus or an affiliated fund to retire Debtors' $150 million DIP facility in exchange for 42.5% of the equity of the Reorganized Debtors, and (c) maintaining the distribution of 37.5% of the equity of Reorganized Debtors for the First Lien Lenders. Following a board meeting on October 27, 2009, the Debtors rejected the Cyrus Plan.

On October 28, 2009, Cyrus filed its objections to the Plan.[8] Thereafter, on November 2, 2009, the Debtors filed several minor modifications to the Plan.[9] This Court held a hearing on confirmation of the Plan on November 3, 2009.

---

[8] ECF Doc. # 368.

[9] ECF Doc. # 387.

*Discussion*

**A.      Cyrus Lacks Standing To Challenge Liens Of The First Lien Lenders And The Priority Of First Lien Lenders' Claims**

The Intercreditor Agreement expressly prohibits Cyrus from arguing that the FCC Licenses are unencumbered[10] and that the First Lien Lenders' claims against the FCC License Subsidiaries are therefore unsecured.  Indeed, section 9(a) of the Intercreditor Agreement expressly prohibits Second Lien Lenders such as Cyrus from challenging the priority of the First Lien Lenders' claims.  <u>See</u> Intercreditor Agreement at § 9(a)(iii) ("Each of the Secured Parties acknowledges and agrees (x) to the relative priorities as to the Collateral (and the application of the proceeds therefrom) as provided in the Security Agreement … and acknowledges and agrees that such priorities (and the application of proceeds from the Collateral) shall not be affected or impaired in any manner whatsoever including, without limitation, on account of … (iii) any nonperfection of any lien ***purportedly securing*** any of the Secured Obligations (including, without limitation, whether any such Lien is now perfected, hereafter ceases to be perfected, is avoidable by any bankruptcy trustee or otherwise is set aside, invalidated, or lapses)") (emphasis added).

---

[10]Specifically, Cyrus argues that the FCC Licenses constitute unencumbered "Special Property" excluded from the Security Agreement's definition of "Collateral."  <u>See</u> Security Agreement at § 2.2 (extending security interests to all of the Debtors' "Collateral" including "FCC Licenses" but excluding "Excluded Property"); at § 1.1 (defining "Excluded Property" as "Special Property" including "any … license agreement or other personal property held by any Grantor to the extent that any Requirement of Law applicable thereto prohibits the creation of a security interest therein").  As unencumbered property, Cyrus argues, the Second Lien Lenders' claims against the Debtors' FCC License Subsidiaries are unsecured claims entitled to share *pro rata* in any recovery with those belonging to the First Lien Lenders.  <u>See</u> Cyrus Reply Brief In Support Of Summary Judgment at p. 19 ("Once the court determines that neither the FCC Licenses, nor the hypothetical proceeds or economic value thereof, are 'Collateral', then … Cyrus is entitled to share in recoveries on a *pari passu* basis with all other creditors of the License Subsidiaries").

The use in section 9(a) of the term "purportedly securing" to describe the universe of liens granted by the Debtors in favor of the Secured Parties evidences the intent of the Secured Parties to establish their relative legal rights *vis a vis* each other, regardless of the ultimate validity of each individual right granted by the Debtors.[11]  At bottom, the language of the Intercreditor Agreement demonstrates that the Second Lien Lenders agreed to be "silent" as to any dispute regarding the validity of liens granted by the Debtors in favor of the First Lien Lenders and conclusively accepted their relative priorities regardless of whether a lien ever was properly granted in the FCC Licenses.

Even if Cyrus had standing to contest the priority of the First Lien Lenders' claims, however, the First Lien Lenders' claims against the FCC License Subsidiaries are of higher priority than the Second Lien Lenders' claims against the FCC License Subsidiaries.   See Intercreditor Agreement at § 9(a)(z) ("Each of the Secured Parties acknowledges and agrees … that the Second Priority Secured Parties' claims against the [Debtors] ***in respect of the Collateral*** constitute second priority claims separate and apart from … the First Priority Secured Parties' claims against the [Debtors] ***in respect of the Collateral***") (emphasis added); at § 14(i) ("Second Priority Secured Parties' claims against the grantors ***in respect of the Collateral*** constitute junior claims separate and apart … from the senior claims of the First Priority Secured Parties against the Grantors ***in respect of the Collateral***") (emphasis added).

---

[11] Although not dispositive to the Court's ruling, it bears noting that, in a hearing on Cyrus' motion to withdraw the reference, the District Court also recognized that the Intercreditor Agreement prevents Cyrus from challenging the First Lien Lenders.  See 11/2 District Court Hearing Tr. at p.41:11-14 ("[T]he intercreditor agreement at issue here specifically provides that even if the liens are invalid, first lienholders are still entitled to priority").

Cyrus argues unconvincingly that subordination of the claims of Second Lien Lenders does not extend to claims relating to the FCC Licenses because those licenses are not "Collateral".   <u>See</u> Cyrus Motion For Summary Judgment at pp. 33-37.   The Transaction Documents indicate otherwise.   The parties agreed to grant an indisputable first lien interest to the First Lien Lenders in all Collateral regardless of actual perfection of a security interest.   This makes "purported" Collateral a proper subject of the agreement to the same extent as any asset that fits the definition of Collateral.   The objective was to prevent or render moot the very sort of technical argument that is being made here by Cyrus regarding the validity of liens on the FCC Licenses.   By virtue of the Intercreditor Agreement, the parties have allocated among themselves the economic value of the FCC Licenses as "Collateral" (regardless of the actual validity of liens in these licenses).   The claims of the First Lien Lenders are, therefore, entitled to higher priority.

Giving effect to the plain language of the Intercreditor Agreement in this manner also reinforces general principles of public policy.   Affirming the legal efficacy of unambiguous intercreditor agreements leads to more predictable and efficient commercial outcomes and minimizes the potential for wasteful and vexatious litigation.   The sophisticated parties who entered into the Intercreditor Agreement were certainly aware of the nature of ION's business and the well-known restrictions and limitations applicable to security interests in FCC Licenses.   This reality adds credence to the notion that the parties fully intended to place the Second Lien Lenders in an indisputably subordinate position and to prevent interference with the stipulated senior rights of the First Lien Lenders.

Nor does this holding conflict with the recognized public policy of liberally permitting parties to appear and be heard in Bankruptcy Court. Although no party raised the issue in the matter before the Court, some courts have refrained from enforcing a creditor's waiver of bankruptcy rights in a pre-bankruptcy intercreditor agreement on public policy grounds.[12]  These cases often relate to waivers of the right to vote on a reorganization plan.  Nothing in the Intercreditor Agreement infringes on Cyrus' right to vote.  Nor does it limit the right of Cyrus to appear as an unsecured creditor.  The Court concludes that the Intercreditor Agreement is strictly enforceable in accordance with its terms.    Moreover, plainly worded contracts establishing priorities and limiting obstructionist, destabilizing and wasteful behavior should be enforced and creditor expectations should be appropriately fulfilled.    The Intercreditor Agreement is an enforceable contract under section 510(a), and the Court will not disturb the bargained-for rights and restrictions governing the second lien debt currently held by Cyrus.  See 11 U.S.C. § 510(a).

It follows, then, that the dispute before the Court is distinct from cases where a senior creditor fails to perfect its security interest in certain collateral that it mistakenly presumed to be part of its collateral package.  Here, the parties contemporaneously recognized and disclosed the uncertainty surrounding the ability to grant a direct security

---

12 See, e.g., Beatrice Foods Co. v. Hart Ski Mfg. Co. (In re Hart Ski Mfg. Co.), 5 B.R. 734 (Bankr. D. Minn. 1980) (finding a subordination agreement to be effective, but not extinguishing the junior creditor's ability to assert claims or vote its claims); Bank of Am. v. North LaSalle St. L.P. (In re 203 North Lasalle St. Pshp.), 246 BR 325 (Bankr. N.D. Ill. 2000), (finding an intercreditor agreement unenforceable when it granted a senior lien holder the right to vote a junior lien holder's claim).  But see Blue Ridge Investors, II, Ltd. Partnership v. Wachovia Bank, National Ass'n. (In re Aerosol Packaging, LLC), 362 B.R. 43 (Bankr. N.D. Ga. 2006) (enforcing the contractual provisions of an intercreditor agreement that granted the senior lien holder the right to vote the claims of a junior lien holder).

interest in an FCC license.[13]   Notwithstanding such uncertainty, however, the parties expressly manifested their intent to insulate the First Lien Lenders' collateral package from attack by the Second Lien Lenders and to thereby ensure that any economic value associated with the FCC Licenses was included in the First Lien Lenders' collateral package.

This intent is reflected in the Second Lien Indenture that prohibits Cyrus from challenging the validity of the First Lien Lenders' liens.   Specifically, the Indenture provides that "a Holder may not institute any proceeding with respect to this Indenture or any Security Document or the Notes unless the Holder first takes certain steps, including having given the Trustee written notice of a continuing event of default.  See Ex. 6 to Decl. of Julia M. Winters In Support of Cyrus Motion for Summary Judgment (Indenture Governing Second Lien Notes with Manufacturers and Traders Trust Company, dated Dec. 30, 2005) at § 6.06.  Cyrus has not taken any of these steps and accordingly lacks standing under the Indenture to challenge the validity of the First Lien Lenders' liens.[14]

---

[13] See Ex. 3 to Decl. of Julia M. Winters In Support of Cyrus Motion For Summary Judgment (Offering Memorandum) at 5-6 ("[T]hese security interests with respect to certain assets of the guarantors, including FCC licenses, may be limited to security interests in the ownership interests of the entity holding such assets and the proceeds of such assets, as a result of restrictions applicable to such assets that prohibit the granting of security interests directly therein").

[14] Cyrus has responded by arguing that it did not "institute" a proceeding in violation of the Indenture because it has merely defended its legal rights in response to the initial adversary proceeding commenced by the Debtors.  See Cyrus Reply In Support Of Summary Judgment at p. 20 ("In addition, the Cyrus Adversary Proceeding does not amount to "instituting" a proceeding because it was a defensive filing seeking declaratory relief in conjunction with the Ion Complaint.  Indeed, Cyrus has answered and counterclaimed.").  Taken to its logical extension, however, Cyrus' argument is unpersuasive and leads to absurd results.  Cyrus' activities during the bankruptcy case that were in breach of the Intercreditor Agreement caused the Debtors to commence the initial adversary proceeding against Cyrus as a means to prevent such prohibited activities.  In aggressively prosecuting its counterclaims, however, Cyrus has continued to engage in the very sort of litigious conduct that its contract, and the Debtors' initial complaint, seeks to prevent.  The counterclaim is a means to the same end as a complaint brought initially against the Debtors.

Lastly, the DIP Order similarly prohibits Cyrus from challenging the validity of the First Lien Lenders' liens.  Paragraph 4 of the DIP Order unambiguously provides that the first lien debt is secured by "first priority liens on and security interest in substantially all of the Debtors' assets."  DIP Order (ECF Doc. # 142) at ¶ 4.  Paragraph 23 of the DIP Order, in turn, states that "[e]ach stipulation and admission contained in this Final Order, including, without limitation, in paragraph 4 of this Final Order, shall be binding upon all other parties in interest" unless such party in interest "timely and properly filed an adversary proceeding or contested matter asserting a Lender Claim … by no later than September 21, 2009."  DIP Order (ECF Doc. # 142) at ¶ 23.

Cyrus' adversary proceeding, although commenced on September 19, two days prior to the expiration of the September 21 deadline set forth in the DIP Order, does not constitute a "lender claim" of the type described in paragraph 23 of the DIP Order.  This is so because Cyrus lacks any particularized interest in this action separate and apart from what all unsecured creditors could claim.  To properly assert a lender claim under the DIP Order, Cyrus would have had to first seek derivative standing, which it has not done.  See Motion For Enforcement of DIP Order (ECF Doc. # 347) at p. 4 ("In the case *sub judice*, the Court need not apply the factors utilized in determining whether a party has standing as Cyrus has failed to even seek standing prior to filing the Cyrus Adversary Proceeding"); 10/28 Hearing Tr. at 83:10-84:7 (The Court noted that Cyrus was fully aware that it needed to seek the right to pursue estate claims if it wanted to make a challenge in respect of the grant of rights to under the DIP Order).

**B.**     *Cyrus Lacks Standing To File Objections To The Plan*

The Transaction Documents make clear that Cyrus, by purchasing second lien debt that was expressly subject to the Intercreditor Agreement, agreed to remain silent in the event of a chapter 11 case.  <u>See</u> Intercreditor Agreement at § 11(b) ("[U]pon the commencement of a case under the Bankruptcy Code by or against any Grantor, … (b) each secured party agrees not to take any action or vote in any way inconsistent with this Agreement so as to contest (1) the validity or enforcement of any of the Security Documents … (2) the validity, priority, or enforceability of the Liens, mortgages, assignments, and security interests granted pursuant to the Security Documents … or (3) the relative rights and duties of the holders of the First Priority Secured Obligations…").

The language is plain and purposeful.  The Intercreditor Agreement explicitly prohibits Cyrus from objecting to the Plan.  Intercreditor Agreement at § 11(c)(vi) (providing that unless the First Lien Lenders are paid in full, the Second Lien Lenders may not "oppose, object to or vote against any plan of reorganization or disclosure statement the terms of which are consistent with the rights of the First Priority Secured Parties under the Security Agreement").  Those rights are to be paid in full first.

The First Lien Lenders are owed more than $850 million but are not being paid in full under the Plan because the uncontroverted enterprise value of the Reorganized Debtors is a fraction of that entitlement, estimated to fall in a range between $310 million and $455 million.  The Plan converts the Debtors' $150 million debtor-in-possession financing to 62.5% of the equity of the Reorganized Debtors.  Then, all outstanding first priority indebtedness is converted into the remaining 37.5% of the equity of the Reorganized Debtors.  The Plan's allocation of substantially all economic value to the

First Lien Lenders (other than amounts dedicated to junior classes by agreement) is consistent with their rights under the Transaction Documents.

Despite language in the Intercreditor Agreement expressly forbidding objections by Second Lien Lenders to a Plan with provisions such as the one now before the Court, Cyrus argues that it should be allowed to object to the Plan under section 16 of the Intercreditor Agreement in its capacity as a general unsecured creditor. See Cyrus Reply In Support Of Summary Judgment at p.19 ("To the extent that Cyrus is contesting the Plan's treatment of the FCC Licenses (which are not collateral) it is not instituting a proceeding with respect to the Pre-petition Loan Documents, but rather is pursuing its rights as an unsecured creditor"). Cyrus has raised this argument to justify its behavior as an objecting creditor at multiple stages during these chapter 11 cases.[15] This attempt to use Section 16 as a means to avoid the express prohibitions of the Intercreditor Agreement misreads the provision.

Section 16, which governs the relationship among the Secured Parties as unsecured creditors, explicitly incorporates section 11's prohibitions on Second Lien Lender action in the chapter 11 cases. See Intercreditor Agreement at § 16 ("***Except as otherwise specifically set forth in section 11 of this Agreement***, the Second Priority Secured Parties may exercise rights and remedies as unsecured creditors against any Grantor in accordance with the terms of the Second Priority Documents and applicable law") (emphasis added). This language allows a Second Priority Secured Party to take

---

[15] See, e.g., 7/1 Hearing Tr. at 21:7-10 (justifying Cyrus' objection to First Lien Lenders' DIP proposal on grounds that "we don't believe that the intercreditor restriction applies to our protection of our rights as unsecured creditors, which is what we think we are largely doing here"); 10/28 Hearing Tr. at 61:22-63:1 (justifying Cyrus' objection to validity of First Lien Lenders' liens on FCC Licenses on grounds that "let's start with the premise that we're an unsecured creditor … nobody could possibly reasonably rely upon this document to establish that no unsecured creditor was going to be heard").

action within ION's bankruptcy case only to the extent that such action is not otherwise proscribed by the explicit limitations imposed under Section 11.[16]

Section 11 of the Intercreditor Agreement in plain words directly prohibits Cyrus from objecting to the Plan, as well as the First Lien Lenders' DIP proposal and the Disclosure Statement. <u>See</u> Intercreditor Agreement at § 11(c)(iv) (prohibiting Second Lien Lenders from "oppos[ing] or object[ing] to any post-petition financing (including any debtor-in-possession financing) provided by any of the First Priority Secured Parties …); at § 11(c)(vi) (prohibiting Second Lien Lenders from "oppos[ing], object[ing], or vot[ing] against any … disclosure statement the terms of which are consistent with the rights of the First Priority Secured Parties under the Security Agreement").

Throughout these cases, the right of Cyrus to participate has been an issue that has been raised as an issue on a number of occasions but has not been pressed to the point of silencing Cyrus. Even as these cases are poised for confirmation of the Plan, Cyrus despite the contractual restrictions on creditor action and its lack of standing, has presumed to act as if it has the right to be heard. It does not. Cyrus has been willful in its treatment of the Intercreditor Agreement as inapplicable to it simply on the basis of its own untested theory as to what does and does not fall within the definition of Collateral. Apparently without regard for the consequences of its actions, Cyrus has chosen to treat the Intercreditor Agreement as inapplicable to its conduct in these cases resulting in a material increase in the overall cost of administration in these cases. This added expense is unjustified.

---

[16] Nonetheless, the Court believes that section 16 does permit objections by Cyrus to the so-called Global Settlement negotiated by the Committee. Cyrus' objections to the Plan go well beyond (and barely mention) the Global Settlement, and, as a result, violate the prohibitions of the Intercreditor Agreement.

**C.**      ***The Plan Satisfies Applicable Confirmation Standards***

Despite the determination that Cyrus lacks standing to object to the Plan, the Court recognizes that it has an independent obligation to review the Plan to make sure that it satisfies the standards for plan confirmation set forth in section 1129.  See 11 U.S.C. § 1129(a) ("The court shall confirm a plan only if all of the following requirements are met:  (1) … (16)").  It is undisputed[17] that the Plan satisfies a majority of the applicable[18] confirmation requirements.  In confirming the Plan, the Court is persuaded that the Plan satisfies each of the remaining contested confirmation requirements.  For administrative ease, the Court briefly addresses each of the standards for confirmation challenged by Cyrus[19] in sequence below.

**(i)**      ***The Plan Was Proposed In Good Faith In Satisfaction Of Section 1129(a)(3)***

The Plan satisfies section 1129(a)(3) in that it "has been proposed in good faith and not by any means forbidden by law."  11 U.S.C. § 1129(a)(3).  The Second Circuit defines the good faith standard as requiring a showing that "the plan [was] proposed with honesty and good intentions and with a basis for expecting that a reorganization can be effected."  Kane v. Johns-Manville Corp. (In re Johns-Manville Corp.), 843 F.2d 636, 649 (2d Cir. 1998).  This requirement is satisfied here, given that the Plan deleverages the Debtors' capital structure thereby enabling the Debtors to function as a going concern

---

17 No parties dispute that the Plan satisfies the following applicable confirmation requirements:  §§ 1129(a)(2), 1129(a)(4)-(5), and 1129(a)(8)-(13).

18 The confirmation requirements set forth in subsections (a)(6), (14), (15), and (16) of section 1129 are not applicable to the Plan.  11 U.S.C. § 1129(a)(6) concerns the need for government approval of rate changes subject to government regulatory jurisdiction; § 1129(a)(14) concerns debtors required by order or statute to pay domestic support obligations; § 1129(a)(15) applies to individual debtors; and § 1129(a)(16) is only relevant to the mechanism by which certain property is transferred.

[19] Notwithstanding its lack of standing, Cyrus has raised a number of objections to confirmation that should be addressed.

without the burden of excessive debt.   The Plan also enjoys widespread support, including the DIP Lenders, over 70% of the First Lien Lenders and the Committee.

The Debtors' rejection of the competing plan of reorganization recently proposed by Cyrus, particularly in light of the findings made by the Court regarding Cyrus' lack of standing, appears to have been an exercise of the Debtors' reasonable business judgment. The Court understands that Debtors' board of directors extensively considered the Cyrus Plan at a board meeting convened on October 27, 2009.   See Burgess Dep. Tr. at pp.160:14-22 (discussing deliberations of board of directors).   In the end, however, the Debtors appear to have acted reasonably in concluding that the Cyrus Plan was not superior to the Plan because the Cyrus Plan introduced delay, uncertainty and incremental risk to the Plan process.   See Debtors' Omnibus Response In Support Of Plan Confirmation at pp. 33-34; Burgess Dep. Tr. at 168:14-18 (noting that delay associated with the possibility of having to submit the Cyrus Plan to a second creditor vote[20] was "one consideration" taken into account by the board of directors).

Additionally, the Plan was proposed in good faith despite its lack of a reserve to cover the contingencies raised by Cyrus in its objections to confirmation.   The Court has sole and absolute discretion to determine whether, as Cyrus demands, a reserve should be established for claims under a chapter 11 plan.   The facts and circumstances here do not warrant establishing a reserve because Cyrus never had standing to challenge the Plan which is consistent with the rights of the First Lien Lenders, and approval of the Global Settlement effectively forecloses the possibility of asserting such claims.   Notably, the

---

[20] Because of the decision of the board to reject the Cyrus Plan, the Court was not asked by the Debtors to address the question of whether the Cyrus Plan would, in fact, require resolication.   During argument, however, counsel for Debtors stated that the board was advised that resolicitiation was highly likely due to the change in the proposed treatment of the claims held by the First Lien Lenders under the Cyrus Plan.

requested reserve is not being requested for purposes of securing rights in connection with legitimate disputes regarding claim allowance, but as a means to carry on litigation that should never have been brought in the first place.

> ### (ii)    *The Plan Satisfies Best Interests Of Creditors Test In Satisfaction Of Section 1129(a)(7)*

Cyrus argues that the Plan fails the "best interests" test under section 1129(a)(7) because (a) it is based on a consolidated liquidation analysis that does not value the FCC Licenses on an entity-by-entity basis, (b) it contemplates a deemed substantive consolidation of the Debtors' estates for distribution purposes, and (c) it provides Holders of Class 4 Second Priority Notes Claims with less than they would recover in a chapter 7 liquidation.

Each of these arguments is without merit. First, the Second Lien Lenders would undeniably receive less under chapter 7 liquidation than under the Plan because it is not disputed, even by Cyrus, that the First Lien Lenders would be entitled to recover all proceeds arising from the chapter 7 liquidation sale of the FCC Licenses. See 10/28 Hearing Tr. at 52:22-53:1 ("Court: even you would agree that as to proceeds, there is law that says secured creditors are entitled to proceeds where they have a properly documented security interest[21]. [Cyrus Counsel]: I agree with that"). Second,

---

[21] One of the anomalies of these cases is that a chapter 7 liquidation resulting in a sale of the Debtors' FCC Licenses would yield proceeds that are subject to an enforceable lien in favor of the First Lien Lenders, and even Cyrus acknowledges that the First Lien Lenders would have a right to these proceeds. Cyrus objects that the Plan will not yield proceeds because the licenses are not being sold. The Court agrees that the Plan, predicated on a debt for equity exchange, is not generating sales proceeds in the sense that term is used, but is satisfied that in the context of asserting rights to the value of the FCC Licenses this is not a relevant distinction. It would be illogical and counterproductive for the treatment of a senior secured claim to vary simply based on whether assets are sold at the FCC License Subsidiary level or an ownership change occurs at the parent level. The economic substance is the same, although it is clearly desirable, as shown by the structure of the Plan, to be able to preserve an existing corporate structure instead of having to reinvent one following a sale of assets. Under either alternative, the First Lien Lenders should be entitled to the same benefit of their bargain and receive the economic value of the FCC Licenses. Any

performing a consolidated liquidation analysis in these chapter 11 cases is appropriate in light of the integrated nature of the Debtors' broadcasting business.  See 7/1 Hearing Tr. at 65:25 – 66:4 (Mr. Burgess: "and so the question should be, is the license company paying the operating company?  The answer to that is no, because we manage the business as an integrated business.  That's the way we inherited the business, and that's how our business model functions").  Third, the Plan's preservation of intercompany interests does not effect a deemed substantive consolidation because the Plan was not proposed on a substantively consolidated basis, and because the First Lien Lenders have senior undersecured claims at all levels of the capital structure.  They are, as a result, entitled to share ratably in the value of the Debtors.

### (iii)     *The Plan Does Not Violate Absolute Priority Rule Of Section 1129(b)(2)(B)*

Section 1129(b)(1) provides that, in the event an impaired class does not vote in favor of a plan, but all other requirements of section 1129(a) are satisfied, then the Court may only confirm the plan if it "does not discriminate unfairly, and is fair and equitable, with respect to each class of claims or interests that is impaired under, and has not accepted, the Plan."  11 U.S.C. § 1129(b)(1).  Contrary to arguments made by Cyrus, the Plan satisfies the requirements for "cram down" under section 1129(b) of the Bankruptcy Code.  Cyrus complains that the Plan violates the absolute priority rule because it preserves intercompany interests without paying in full the guarantee claims held by the Secured Parties against the FCC License Subsidiaries.

---

other alternative would compel sales of assets and unnecessarily increase the transaction costs for restructuring a financially troubled broadcasting business.

This technical preservation of equity is a means to preserve the corporate structure that does not have any economic substance and that does not enable any junior creditor or interest holder to retain or recover any value under the Plan. The Plan's retention of intercompany equity interests for holding company purposes constitutes a device utilized to allow the Debtors to maintain their organizational structure and avoid the unnecessary cost of having to reconstitute that structure. These intercompany equity interests are being retained with the consent and support of the First Lien Lenders in recognition of the value to the enterprise that the company's structure represents to the Debtors' estate and creditors.[22]

### (iv)   The Releases Contained In The Plan Are Appropriate

Cyrus asserts the Plan contains improper Non-Debtor Releases (releases by the Holders of Claims and Interests in Article IX.C of the Plan; the "Non-Debtor Releases").[23]  In the Second Circuit, non-debtor releases are appropriate only when "truly unusual circumstances render the release terms important to success of the plan." In re Metromedia Fiber Network, Inc., 416 F.3d 136, 141-43 (2d Cir. 2005).

Here, the Non-Debtor Releases arise in the unusual setting of a transaction that is conditioned upon FCC approval. The procedures associated with managing the business of the Debtors during the interim period between confirmation and ultimate approval by

---

[22] To the extent the preservation of the intercompany equity interests may be deemed an allocation of value to interest holders whose priority should be junior to the guarantee claims of the Secured Parties, then such a carve-out of property belonging to the First Lien Lenders is permissible under the "gifting" doctrine. See Debtors' Omnibus Response In Support Of Plan Confirmation at pp.22-23 ("'Gifting' does not implicate the absolute priority rule at all because the property being 'gifted' does not belong to the estate; it belongs to the secured creditors by virtue of their perfected security interest in the at-issue property"); In re DBSD, N.A., 09-13061 (REG), bench decision at 47 (Oct. 26, 2009) (finding that gifting doctrine defeated absolute priority rule objection to reinstatement of intercompany interests by subsidiary-specific creditor not paid in full).

[23] Cyrus Objection To Plan Confirmation at ¶ 48.

the FCC are unusual circumstances.    The Debtors have asserted that the non-debtor releases are critical to governance of the Debtors pending FCC approval, and the Court agrees.

The Debtors' Plan is unusual because the Debtors need FCC authorization to transfer control of their most valuable assets, their FCC Licenses, and while awaiting this authorization they need the continued cooperation of the parties being released in order to achieve the objectives of the Plan.

The Debtors have proposed a two-step process for compliance with the FCC requirements.  The Debtors have sought FCC short form approval to be followed by FCC long form approval.  See Disclosure Stmt. at § IV.A.  Short form approval permits the Debtors to assign the FCC Licenses to a trust and exit bankruptcy, but requires a continuity of control over the FCC Licenses.  Id.  The long form approval will allow the Reorganized Debtors to transfer control of the FCC Licenses to Ion's new equity owners. Id.

To expedite and facilitate emergence from chapter 11 and satisfy the FCC's short form requirements, the Debtors' current board of directors will be staying in control of the trust and the FCC Licenses. In return for retaining control over the FCC Licenses during this interim period between the effectiveness of the Plan and long form approval by the FCC, the directors of the Debtors' boards of directors are receiving the releases described under the Plan.  Likewise, the DIP Lenders, Initial Consenting First Lien Lenders, Avenue Capital, Black Diamond and Trilogy have made substantial contributions to the success of the Plan including DIP financing, exit financing, and funding of the Global Settlement with the Committee.  Without these releases, these

27

critical aspects of the Plan would not have been achieved.  Additionally, in the context of these consensual cases (with Cyrus as the only objecting party), the Non-Debtor Releases have been consented to by a vast majority of the affected creditors.  They also are subject to a carve-out for governmental claims.

Cyrus is the only party seeking to block a fully consensual chapter 11 plan for the Debtors.  It has an undisguised economic objective – to use its role as a potential spoiler to gain leverage that may lead to enhanced recoveries or perhaps even an outright acquisition of ION.  That self-interested motivation does not detract from the strength of an otherwise good argument, but it does provide context that cannot be ignored.  Cyrus, regardless of its motive in attempting to defeat the releases, has failed to show that the releases are not truly important to the success of ION's Plan, particularly in view of the unique circumstances of a change in ownership that is dependent on subsequent approvals by the FCC.  Under the circumstances presented, the releases are approved.

**D.     *Plan Confirmation Renders The Adversary Proceeding Moot***

In the Adversary Proceeding, Cyrus argues that the Debtors' FCC Licenses constitute unencumbered property because "under existing law, an FCC Licensee may not grant a lien on its FCC license."  See Cyrus Motion For Summary Judgment at p. 17. Cyrus' argument amounts to a "red herring."  It does not matter whether the FCC Licenses are or are not subject to a valid lien, because they are subject to an enforceable dedication of their economic value to the First Lien Lenders.

The plain language of the Transaction Documents specifies that the First Lien Lenders and the Second Lien Lenders expressly contracted in the Transaction Documents for separate security interests in all economic value of the FCC Licenses and in all non-

monetary aspects of the FCC Licenses themselves to the extent allowed by law.  See Security Agreement at § 2.1(f) (including FCC Licenses in definition of "Collateral"); § 5.7 (clarifying that the grant of security interest in the FCC Licenses is "to the extent that a security interest in such licenses is permitted under applicable law").[24]  This grant of a security interest in the economic value of the FCC Licenses is further confirmed by the utilization of special purpose subsidiaries to hold the FCC Licenses, the concomitant pledges of the equity interests in each FCC License Subsidiary by the Debtors to the Secured Parties, and the Intercreditor Agreement's restrictions on Second Lien Lender actions.

The Debtors and the Secured Parties did all that they could do under the circumstances to make clear that the First Lien Lenders were secured by the value of this Collateral.  The Second Lien Lenders also surrendered any and all challenges to lien validity in the Intercreditor Agreement.  Taken together, the Transaction Documents grant incontestable rights to the First Lien Lenders and insulate the First Lien Lenders from any attack by Cyrus.

The Plan respects the senior rights of the First Lien Lenders and is otherwise confirmable.  As a result of confirmation of the Plan, the questions raised in the Adversary Proceeding are either answered in this decision or are rendered moot.

---

[24] Other courts that have confronted this issue have validated the grant of qualified rights in FCC Licenses. See Urban Communicators PCS Ltd. P'ship v. Gabriel Capital, LP, 394 BR 325, 334 (S.D.N.Y. 2008) ("a creditor may perfect a security interest in a borrower's FCC broadcasting license to the extent that the creditor seeks to protect its interest in the proceeds of the borrower's license").

### *Conclusion*

For the reasons stated, Cyrus lacks standing to object to the Plan and its objections to confirmation are overruled.   The Plan satisfies the requirements of the Bankruptcy Code and is confirmed.   ION shall submit a confirmation order consistent with this decision.

SO ORDERED.

Dated: New York, New York
     November 24, 2009

                 *s/ James M. Peck*
                 Honorable James M. Peck
                 United States Bankruptcy Judge